# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

AISHA HUSSAIN                )
                                      )
          Plaintiff,          )
                                        )
         v.               )       Civil Action No. 07cv1364 (HHK)
                                        )
CARLOS M, GUITIERREZ, SECRETARY   )
U.S. DEPARTMENT OF COMMERCE,    )
                                        )
         Defendant.        )
                                        )

---

## MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Defendant, Carlos Gutierrez, Secretary of the United States Department of Commerce, by and through undersigned counsel, hereby moves to dismiss Plaintiff's "pregnancy discrimination" claim, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), because Plaintiff failed to exhaust her administrative remedies with respect to that claim; and for summary judgment on all claims pursuant to Fed. R. Civ. P. 56, as the material facts are not in genuine dispute, and Plaintiff cannot establish a claim as a matter of law.

In support of this Motion, the Court is referred to the accompanying Memorandum of Points and Authorities, the Statement of Material Facts Not in Genuine Dispute, and the proposed Order attached hereto.

Plaintiff should take notice that any factual assertions contained in the attached Statement of Material Facts, Memorandum in Support of this Motion and supporting exhibits may be accepted by the Court as true unless the Plaintiff submits her own affidavit or other documentary evidence contradicting the assertions therein.  See Neal v. Kelly, 963 F.2d 453 (D.C. Cir. 1992). Furthermore, the Federal Rules of Civil Procedure provide:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e); see Fox v. Strickland, 837 F.2d 507 (D.C. Cir. 1988) ( *pro se* party may lose if he fails to respond to a dispositive motion).

Respectfully submitted,


  /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


  /s/ Rudolph Contreras
RUDOLPH  CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


  /s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. BAR # 420232
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530
(202) 307-2843

Agency Counsel:

ADAM CHANDLER
Office of the General Counsel
U.S. Department of Commerce

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
AISHA HUSSAIN                                 )
                                              )
                 Plaintiff,                   )
                                              )
        v.                                    )        Civil Action No. 07cv1364 (HHK)
                                              )
CARLOS M, GUITIERREZ, SECRETARY               )
U.S. DEPARTMENT OF COMMERCE,                  )
                                              )
                 Defendant.                   )
———————————————————————)

## STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

1.      The U.S. Department of Commerce is part of the Executive Branch of the Federal

Government and is made up of a number of bureaus and activities, one of which is the

International Trade Administration ("ITA"), which includes U.S. Foreign Commercial Service

("USFCS").  See www.doc.gov.

2.      On or around May 28, 2001, Complainant signed a Personal Services Contract

("PSC") to fill the position of Administrative Assistant with USFCS in the American Embassy in

Riyadh, Saudia Arabia.  Def. Exh. 1 at 1.  The original contract had a completion date of

September 30, 2001, and was subject to termination at any time.  Id. at 7.  Effective October 1,

2001, Plaintiff's contract with the Agency was extended, not-to-exceed (NTE) September 30,

2002.  Id. at 10.  The extension plainly states that Plaintiff's contract could "be terminated at any

time."  Id.

3.      As an Administrative Assistant, Plaintiff was responsible, among other things, for

providing "clerical support" to Commercial Service Officers, handling phone calls, receiving

visitors, arranging schedules and official travel, preparing work orders and coordinating their

execution, monitoring and procuring office supplies, and preparing schedules for office drivers. Def. Exh. at 1.

4.      In or around late August 2002, David Rundell, Counselor for Commercial Affairs, became Plaintiff's supervisor.  Def. Exh. 3 at 1.

5.      At approximately the time Mr. Rundell arrived in Riyadh, Plaintiff asked him whether she could be relieved of her secretarial/administrative duties.  Def. Exh. 3 at 1. Plaintiff was interested in working on an outreach conference with which she had already had some involvement.  Id.  According to Mr. Rundell, he was receptive to the idea of Plaintiff continuing to work with the outreach conference but stressed to Plaintiff that she would have to return to her normal duties when the conference was over.  Id at 2.

6.      Effective September 28, 2002, Plaintiff's contract with the Agency was extended, NTE September 30, 2003.  Def. Exh. 1 at 12.  Once again, the extension plainly stated that Complainant could "be terminated at any time."  Id.

7.      On October 7, 2002, Plaintiff met with Mr. Rundell and Ms. Smoker-Ali, the human resources manager, to discuss her position description and her performance.  Def. Exh. 4 at 5.  Mr. Rundell showed Plaintiff the job announcement to which she had responded and clarified that her position was administrative in nature and that she was expected to answer "phone calls, keep track of paperwork and set up a filing system for the office."  Id.  According to Ms. Smoker-Ali's contemporaneous memorandum to the file, Mr. Rundell identified the clerical work as "especially important."  Id.  It was Mr. Rundell's position that Plaintiff was refusing to perform clerical duties, despite having been counseled.  Def. Exh. 5 at 7.

8.      On October 8, 2002, Mr. Rundell received a memorandum from Commercial

Service Officer Edward Burton regarding the state of clerical and administrative support in the office.  Def. Exh. 6 at 8-10.  Mr. Burton concluded in relevant part:

> Clearly, someone should be performing the duties as delineated in [Plaintiff's] existing [position description].  The record shows that [Plaintiff] has demonstrated her resistence, refusal, and in some cases failure to adequately perform some of the clerical and administrative duties and responsibilities in her existing [position description.]

Id. at 10.

9.    At Mr. Rundell's request, Plaintiff presented him with a draft revision of her job description on or around October 23, 2002.  Def. Exh. 7 at 14.  Among the additions Plaintiff sought in her responsibilities was to be allowed to continue working on the office website.  Id. at 13.  That request was granted by Mr. Rundell.  Id.

10.    On or around March 29, 2003, Mr. Rundell received an electronic mail message from Michael McGee, Commercial Attache, Jeddah, Saudi Arabia, regarding Plaintiff's work on the website.  Def. Exh. 8 at 27.  Mr. McGee, who oversaw the website, saw no continued role for Plaintiff and suggested that she return to concentrating on her "office manager activities."  Id. at 28.

11.    On April 6, 2003, Mr. Rundell met with Plaintiff and two other members of staff to clarify responsibilities with regard to motor pool supervision.  Def. Exh. 9 at 30.  Mr. Rundell asked Plaintiff to coordinate with the employee who kept Mr. Rundell's schedule to avoid conflicts.  Id.  According to Mr. Rundell's contemporaneous memorandum to the record, Plaintiff resisted this and attempted to shift the responsibilities for checking the schedule to the drivers.  Id.  Plaintiff claimed that she did not schedule the drivers, but only stepped in when there was a problem.  Id.  Mr. Rundell reminded her that it was in her position description to schedule and

3

monitor the drivers.  Id.  Plaintiff stated she had too much else to do and was too busy to get

involved in this on a daily basis.  Id.

        12.    On April 7, 2003, Mr. Rundell forwarded to Debra Smoker-Ali, Human

Resources Officer for the Riyadh Embassy, a new Position Description for Plaintiff "in light of

[requests from Plaintiff] for further clarification" of her duties.  Def. Exh. 10 at 18-22.  The new

position description did not change the basic functions and responsibilities described above.  Id.

at 21-22.  However, in response to Mr. McGee's concerns, Plaintiff was given "backup"

webmaster responsibilities.  Id. at 21.  Plaintiff continued to be responsible for the drivers'

schedules.  Id.

        13.    On April 16, 2003, Mr. Rundell received an electronic mail message from

Michael McGee, Commercial Attache, Jeddah, Saudi Arabia, regarding the Commercial

Service's web site in Saudi Arabia.  Def. Exh. 8 at 24-25.  Mr. MeGee's message read, in

relevant part:

> When I agreed to get involved in ebusiness activities here in Saudi Arabia, I had no idea
> that it would involve so much wasted effort to 'justify' to [Plaintiff] that the [Foreign
> Service Officers] are the supervisors and she is a subordinate.  Sadly, you and I have been
> drawn into endless emails, and phone calls that have taken many hours of our time
> because one person refuses to cooperate with us.  Had her work been exemplary, perhaps
> it would have been worthwhile....

Id.

        14.    Plaintiff continued to challenge the contents of her position description despite the

fact that it closely tracked the job announcement she had responded to and the fact that she had

suffered no change in compensation or any other benefit.  See Def. Exh. 9 at 31-32.

        15.    On or around April 19, 2003, Plaintiff met with Human Resources Officer Debra

Smoker-Ali and Deputy Chief of Mission Margaret Scobey to discuss Plaintiff's grievances regarding her position description and Mr. Rundell. See Def. Exh. 11 at 57. Plaintiff alleged that she was being discriminated against by Mr. Rundell on the basis of her sex, religion, and national origin. Id. Specifically, she alleged that on two occasions, when she was praying with her door closed, she heard Mr. Rundell coming down the hall saying her name. Id. During the course of the conversation, Ms. Scobey and Ms. Smoker-Ali confirmed for Plaintiff that Mr. Rundell, as supervisor, had the authority to assign her tasks. Id. They also confirmed that the Agency took allegations of discrimination seriously. Id.

16.    Over the period from March to April 2003, Mr. Rundell had to make seven requests to Plaintiff before she would cull and organize office files, as directed. Def. Exh. 12 at 35-42.

17.    On March 31, 2003, Mr. Rundell tasked Plaintiff with preparing a leave schedule for the office. Def. Exh. 12 at 44. On May 10, 2003, he sent Plaintiff an example to work from to complete the project. Id. at 45. On May 28, 2003, Mr. Rundell again had to ask Plaintiff to complete the project, which had been pending for more than two months. Id. at 46.

18.    On or about May 26, 2003, Mr. Rundell asked Plaintiff to complete a travel voucher for his recently completed official travel. Def. Exh. 9 at 33. According to his contemporaneous memorandum to the record, she refused and said it was not her job. Id.

19.    On September 29, 2003, Plaintiff contacted an equal employment opportunity (EEO) counselor regarding her allegations of discrimination. Complaint at ¶ 18.

20.    The Agency elected not to renew Plaintiff's contract when it expired on September 30, 2003. Complaint at ¶16. Plaintiff was given a limited extension to October 31, 2003, to allow her a month with pay. Id.

5

Respectfully submitted,


  /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


  /s/ Rudolph Contreras
RUDOLPH  CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


  /s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. BAR # 420232
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530
(202) 307-2843


Agency Counsel:

ADAM CHANDLER
Office of the General Counsel
U.S. Department of Commerce

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AISHA HUSSAIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07cv1364 (HHK) |
| | ) | |
| CARLOS M, GUITIERREZ, SECRETARY | ) | |
| U.S. DEPARTMENT OF COMMERCE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

On July 26, 2007, Plaintiff Aisha Hussein, a former Personal Services Contract (PSC) employee of the U.S. Foreign and Commercial Service (USFCS), International Trade Administration (ITA), U.S. Department of Commerce, filed suit against the Defendant Carlos M. Gutierrez, alleging that the agency discriminated against her on the basis of her gender (female), national origin (Indian), and religion (Muslim), retaliated against her because of prior complaints of discriminatory actions, and subjected her to a hostile work environment.[1]  Report of

_____

[1]  Specifically, Complainant alleges that she was subjected to a hostile work environment when:

> Rundell treated her as his personal servant in that he required her to keep his wife's personal schedule, schedule his wife's personal travel, baby-sit his child, bring coffee/tea to him, his wife and guests, take snacks for his child, place work orders to get the freezer and microwave fixed and have the fence painted, etc.

> Rundell often spoke to her at a distance of inches, which she found sexually belittling and intimidating.

> Rundell continually tasked her demeaning duties such as cleaning offices, hallways, and ordering supplies, etc.

> Rundell assigned her to sit in the reception area and told her what could be placed on her

Investigation (ROI), Exhibit (Ex.) 7 at 1.

In short, this is the case of a PSC employee, dissatisfied with the administrative/clerical aspects of her position (as set forth in her position description), who resisted her supervisor's attempts to get her to do her job. The agency, as is its undisputed right, elected not to extend her contract. A review of the undisputed factual record establishes that Plaintiff cannot establish a *prima facie* case of harassment or retaliation. Nor can Plaintiff show that the Agency's articulated legitimate, nondiscriminatory reasons for its actions are pretextual, as there is not a scintilla of evidence of discrimination or retaliation. Accordingly, the Agency submits that it is entitled to judgment as a matter of law.

## I. **PROCEDURAL BACKGROUND**

On April 9, 2004, Plaintiff filed a formal complaint of discrimination with the Agency's

---

desk and what kind of chair she could sit in. In particular, Rundell took her chemical mask and injections off her desk during a high alert and put them away somewhere.

Rundell compared her to a maid during a meeting with Ms. Smoker-Ali on October 7, 2002.

She was the only employee required to pay for taxi rides out of pocket to attend official events.

Rundell gave her five official job descriptions, which changed and downgraded her job duties.

Rundell screamed and yelled at her, made belittling remarks about her Indian/Pakastani attire and made prejudicial remarks when she closed her door to pray.

Rundell required she accompany him and three men unrelated to her in public, which is against Saudi law and custom and could have been 'tragic' for her if they had been stopped or questioned by the religious or regular police.

ROI, Ex. 7 at 1-2.

Office of Civil Rights, alleging that the Agency harassed her on the basis of her sex (female), race (Asian/Indian), color (Brown), national origin (Indian) and religion (Muslim), culminating in a hostile work environment.  Following the investigation of the complaint by the Agency's Office of Civil Rights, Plaintiff requested a hearing before an Administrative Judge of the Equal Employment Opportunity Commission ("EEOC").  On October 18, 2006, Administrative Judge Richard Furcolo granted the Agency's Motion for Summary Judgment.  In his decision, the Administrative Judge found that the Agency had articulated legitimate, non-discriminatory reasons for its actions and that Plaintiff had not set forth any evidence that could demonstrate that those legitimate reasons were a pretext for illegal discrimination.  Subsequently, on November 20, 2006, the Agency's Office of Civil Rights issued a "Notice of Final Order" fully implementing the decision of Administrative Judge Furcolo.  On April 27, 2006, the EEOC's Office of Federal Operations denied Plaintiff's appeal of the Agency's Final Decision in a 2-page decision.

On July 26, 2007, Plaintiff filed suit against Defendant Carlos M. Gutierrez, Secretary of Commerce, U.S. Department of Commerce, in the United States District Court in the District of Columbia.  Defendant's answer is due on October 15, 2007.  Plaintiff is seeking the following relief: (1) Back pay "and all other benefits to which she would have been entitled for"; (2) Compensatory Damages and punitive damages in amounts to be proven at trial; (3) Reasonable attorney's fees and costs; and (4) such other relief as the Court deems just and equitable.

## II.    <u>MOTION TO DISMISS</u>

### A.    <u>Standard of Review.</u>

The standard to be applied in deciding a motion to dismiss is well-established.  For

purposes of deciding whether a plaintiff has failed to state a cause of action, the factual

allegations of the complaint must be taken as true, and all ambiguities or doubts in the factual

allegations must be resolved in favor of the pleader.  Caudle v. Thomason, 942 F. Supp. 635, 638

(D.D.C. 1996).  Despite this generous standard, the complaint still must set forth sufficient

factual information to suggest that there exists some recognized legal theory upon which relief

can be granted.  See Bell Atlantic Corp. v. Twombly,  __U.S. __, 127 S.Ct. 1955, 1969 (2007)

("once a claim has been stated adequately, it may be supported by showing any set of facts

consistent with the allegations in the complaint").  A court must dismiss a complaint where, even

assuming all the factual allegations are true, the plaintiff has failed to establish a right to relief

based upon those facts.

### 1.    Motion to Dismiss Under Federal Civil Rule 12(b)(6).

In making determinations on a motion to dismiss under Rule 12(b)(6), a court must view

facts alleged in the complaint in the light most favorable to the plaintiff.  Conley v. Gibson, 355

U.S. 41, 45-46 (1957) (*opinion limited by* Twombly, __ U.S. __,127 S.Ct. 1955); Nix v. Hoke,

139 F. Supp. 2d 125, 131 (D.D.C. 2001) (*citing* Weyrich v. The New Republic, Inc., 235 F.3d

617, 623 (D.C. Cir. 2001); see also Slaby v. Fairbridge, 3 F. Supp. 2d 22, 27 (D.D.C. 1998).

However, while it is necessary for the court to construe the complaint in the plaintiff's favor, the

court "need not accept inferences drawn by the plaintiff[ ] if such inferences are not supported by

the facts set out in the complaint." Kowal v. MCI Communications, 16 F.3d 1271, 1276 (D.C.

Cir. 1994).  Furthermore, the Court is not required to accept plaintiff's legal conclusions, even

when couched as factual assertions.  See Papasan v. Allain, 478 U.S. 265, 286 (1986) (in

determining a motion to dismiss, a court need not accept as true conclusory allegations couched

as a factual allegation).  See also Taylor v. FDIC, 132 F.3d 753, 762 (D.C. Cir. 1997) ("Courts

accept plaintiffs' allegations of fact, not their conclusions of law"); Major v. Plumbers Local

Union No. 5, 370 F. Supp.2d 118, 123 (D.D.C. 2005) ("Conclusory legal and factual allegations,

however, need not be considered by the court").  "Although the court must accept the plaintiff's

version of the facts as true, the court need not accept the 'plaintiff's *characterization* of the

facts." Fisher Bros. Sales Inc. v. United States, 46 F.3d 279, 286 (3rd Cir. 1995)) (emphasis in

original).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle [ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." Twombly, __ U.S. at __, 127 S.Ct. at 1964-65 (*quoting* Papasan, 478

U.S. at 286).  In this case, ignoring the Plaintiff's conclusory allegations, Plaintiff fails to

establish a right to relief on the substantive claims asserted.

### 2. Motion to Dismiss Under Federal Civil Rule 12(b)(1).

Requests for dismissal for lack of jurisdiction over the subject matter pursuant to Federal

Civil Rule 12(b)(1) require a similar standard of review as those for failure to state a claim.

However, a plaintiff bears the burden of establishing subject matter jurisdiction.  See Miller v.

United States, 710 F.2d 656, 662 (10th Cir.), cert. denied, 464 U.S. 939 (1983); Barid v. United

States, 653 F. 2d 437, 440 (10th Cir. 1981), cert. denied, 454 U.S. 1144 (1982).  A court may

resolve a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) in two

ways.  First, the court may determine the motion based solely on the Complaint.  Herbert v.

National Academy of Science, 974 F.2d 192, 197 (D.C. Cir. 1992).  Alternatively, to determine

the existence of jurisdiction, a court may look beyond the allegations of the Complaint, consider

affidavits and other extrinsic information, and ultimately weigh the conflicting evidence.  See id.[2]

Applying these standards, Plaintiff's Complaint should be dismissed in its entirety.

> **B.    Plaintiff Failed to Exhaust Her Administrative Remedies for Her Claim of Pregnancy Discrimination.**

Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*., forbids

employment discrimination and retaliation for engaging in protected EEO activity.  In Section

717 of Title VII, 42 U.S.C. § 2000e-16, Congress established the exclusive remedy for federal

employee complaints, see Brown v. General Services Admin., 425 U.S. 820, 835 (1976), and

waived the government's sovereign immunity to permit discrimination suits against federal

agencies.  See Irwin v. Department of Veterans Affairs, 498 U.S. 89, 94 (1990), *rehearing*

*denied*, 498 U.S. 1075 (1991).  This waiver of sovereign immunity, however, is subject to

"certain preconditions."  Brown, 425 U.S. at 832.  A plaintiff must first seek relief in the agency

that allegedly discriminated against her before filing suit under Title VII, see id. at 831-32; 29

C.F.R. § 1614.106(a), by following the procedures outlined in 29 C.F.R. Part 1614.  If the

complainant is not satisfied with the result on the agency or EEOC level, she must either file a

request for appeal or reconsideration with the EEOC within 30 days of receipt of that order, 29

C.F.R. §1614.405; or file a civil action "[w]ithin 90 days of receipt of notice of final action taken

by" the employing agency.  42 U.S.C.  §2000e-16(c); 29 C.F.R. §1614.407 (2000).

---

[2]        It is well-established that when a defendant challenges the substance of
jurisdictional allegations, it may use extraneous evidence to test those allegations without
converting the motion into one for summary judgment.  See Land v. Dollar, 330 U.S. 731, 735
n.4 (1947); Herbert v. National Academy of Sciences, 974 F. 2d 192, 197-98 (D.C. Cir. 1992);
Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987); Bonterra America, Inc. v. Bestmann, 907
F.Supp. 4, 5 n.1 (D.D.C. 1995); Kuffel v. United States Bureau of Prisons, 882 F. Supp. 1116,
1120 (D.D.C. 1995); see also 11 Moore's Federal Practice, § 56.30[6] (Matthew Bender 3d ed.).

These procedural requirements governing a plaintiff's right to bring a Title VII claim in court are not unimportant. "It is part and parcel of the Congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel 'primary responsibility' for maintaining nondiscrimination in employment." Kizas, 707 F.2d at 544. "Exhaustion is required in order to give federal agencies an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary." Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir. 1985). In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court required that all discrete discriminatory and retaliatory acts be fully exhausted as a prerequisite to suit. Id. at 113 ("discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges"). The consultation deadline allows an employer to investigate promptly before evidence becomes stale. See, e.g., Delaware State College v. Ricks, 449 U.S. 250, 256-57 (1980) (stating that the Title VII administrative filing requirement protects employers from the burden of defending claims that arise from decisions that were made long ago).

Here, Plaintiff has failed to exhaust her administrative remedies with respect to her claim of pregnancy discrimination. In this regard, Plaintiff raised in her complaint before this Court an allegation of pregnancy discrimination for the very first time. At no point during the administrative process did Plaintiff raise such an allegation. Because Plaintiff neglected to make such an allegation of pregnancy discrimination during the administrative processing of her complaint, Plaintiff cannot raise such a claim now and this allegation must be dismissed for this reason alone. See Park v. Howard University, 71 F.3d 904, 907 (D.C. Cir. 1995) (plaintiff's administrative claim alleging national origin discrimination in the selection of Dean "cannot be

7

read to encompass a hostile work environment claim"); Alfred v. Scribner, Hall & Thompson, 473 F.Supp.2d 6, 9 (D.D.C. 2007) (plaintiff did not exhaust her administrative remedies with respect to her sex discrimination allegation because she only raised claim of racial discrimination during administrative processing); Miller v. Smith, 584 F.Supp. 149, 155 (D.D.C. 1984) (plaintiff's claim of discrimination based on his friendship with black employees dismissed because he only alleged national origin discrimination during administrative proceedings).

## III.    MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In determining whether there exists a genuine issue of material fact, the trier of fact must view all facts, and reasonable inferences to be drawn from them, in a light most favorable to the non-moving party. Anderson, 477 U.S. at 255. If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50. Indeed, in order to withstand summary judgment, the non-moving party may not rest upon mere allegations or denials. Id. at 248.

Moreover, the mere existence of some factual dispute is insufficient to withstand summary judgment; there must be a genuine issue of material fact. Id. at 247-48. That is, the factual dispute must be capable of affecting the substantive outcome of the case and supported by

sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party.  Id.  See also Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  If the submitted evidence is of such a character that it would not permit a reasonable fact finder to find in favor of the non-moving party, summary judgment is appropriate.  Anderson, 477 U.S. at 251.

Federal Civil Rule 56 does not require the moving party to negate the non-movant's claim or to show the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Rather, when the movant files a properly supported summary judgment motion, the burden shifts to the nonmoving party to advance "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Further, the non-movant cannot manufacture genuine issues of material fact with "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., 475 U.S. at 586, or with "conclusory allegations," "unsubstantiated assertions," "or by only a 'scintilla' of evidence."  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).  Likewise, an affidavit that merely recites conclusory allegations will not defeat summary judgment.  See Lujan v. National Wildlife Federation, 497 U.S. 871, 888-89 (1990) ("The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

The undisputed material facts demonstrate that Plaintiff has failed to meet her burden of proof on the issues in this case.  Thus, the Defendant is entitled to summary judgment as a matter of law.

**B.**    **Plaintiff Fails To Establish A Prima Facie Case Of Hostile Work Environment**

To establish a *prima facie* case of a hostile work environment, Plaintiff must show that:

9

(1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her protected status; (4) the harassment materially affected a term, condition, or privilege of employment; and (5) there is a basis of imputing liability to the employer.  See, e.g., Brooks-Miller v. England, 495 F.Supp.2d 197, 201 (D.D.C. 2004).  To determine whether a working environment is hostile, a reviewing body may consider the frequency of the alleged discriminatory conduct, its severity, whether it is physically threatening or humiliating, and if it unreasonably interferes with an employee's work performance.  Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).  Generally, a single group of isolated incidents will not be sufficient to constitute a hostile work environment actionable under Title VII.  See Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2004).

Plaintiff could not possibly establish a *prima facie* case of a hostile work environment because she could not possibly prove that the alleged harassment complained of was sufficiently severe and pervasive to create a hostile work environment.  First, nearly all of the allegations set forth in the Report of Investigation and the Complaint to support a claim of hostile work environment amount to nothing more than disagreements with the job duties assigned to Plaintiff by Mr. Rundell.  Complaint at ¶¶ 5-11.  However, the mere assignment of undesirable job responsibilities does not possibly support a finding of a hostile work environment.  See DeNovellis v. Shalala, 124 F.3d 298, 311 (1st Cir. 1997) (assignment to undesirable position does not provide the basis for a hostile work environment claim).  While Plaintiff may not have liked her job duties, they are clearly part of the position she accepted with the Agency and are succinctly outlined in her position description.  As an Administrative Assistant, Plaintiff was responsible, among other things, for providing "clerical support" to Commercial Service

10

Officers, handling phone calls, receiving visitors, arranging schedules and official travel,

preparing work orders and coordinating their execution, monitoring and procuring office

supplies, and preparing schedules for office drivers.  Def. Exh. 2 at 1.  Plaintiff could not

possibly establish a *prima facie* case of a hostile work environment merely by complaining that

she is being required to discharge the job duties that she was hired to perform.

 Moreover, the alleged discriminatory comments cited by Plaintiff (Mr. Rundell often

spoke to her at a distance of inches, compared her to a maid on one occasion, screamed at her)

could not, even if true, support a finding of a hostile work environment as they are not

sufficiently severe or pervasive to materially affect or change a condition of employment.  In

Faragher v. Boca Raton, 524 U.S. 775 (1998), the Supreme Court instructed that, in determining

whether a work environment is sufficiently hostile to be actionable under Title VII, a court is to

consider:  (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3)

whether the conduct is physically threatening or merely offensive; and, (4) whether the conduct

reasonably interferes with the employee's performance.  Id. at 787-88.  The Faragher opinion also

stated that "[t]he standards for judging hostility are sufficiently demanding to ensure that Title

VII does not become a 'general civility code.'"  Properly applied, this will filter out complaints

attacking, "the ordinary tribulations of the workplace, such as the sporadic use of abusive

language ... and occasional teasing."  Faragher, 524 U.S. at 787 (also stating that conduct must be

"extreme").  Compare Stewart v. Evans, 275 F.3d 1126, 1133 (D.C. Cir. 2002) ("Title VII is not

a general civility code for the American workplace, nor does it serve as a remedy for all instances

of verbal or physical harassment, for it does not purge the workplace of vulgarity.") (internal

citations and quotations omitted).

Here, Plaintiff complains of isolated comments occurring over more than a year's time, which amount to nothing more than stray comments unrelated to unlawful discriminatory actions that are actually at issue here, nor are they sufficiently severe or persuasive to alter Plaintiff's conditions of employment. See Freedman v. MCI Telecommunications, 255 F.3d 840, 848 (D.C. Cir. 2001) (stray allegedly discriminatory comment did not establish hostile work environment).

For these reasons, Plaintiff has failed to establish that the Agency subjected her to a hostile work environment and this claim must be dismissed.

### C. Plaintiff Cannot Prove Discrimination Based On Her Gender, Religion, or National Origin With Respect To Any Of Her Allegations.

#### 1. Plaintiff Cannot Establish a Prima Facie Case of Discrimination Based on Her Gender, Religion or National Origin.

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the U.S. Supreme established the evidentiary framework governing discrimination claims under Title VII where there is no direct evidence of discrimination. Under McDonnell Douglas, the burden of proof remains with Plaintiff at all times to show she was the victim of intentional discrimination. Id. Under the McDonnell Douglas analysis, Plaintiff has the initial burden of establishing, by a preponderance of the evidence, a *prima facie* case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); see also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-54 (1981). If Plaintiff can establish a *prima facie* case of disparate treatment, the burden shifts to the Agency to articulate a legitimate, nondiscriminatory reason for the challenged action. McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 253. Once the Agency has articulated a legitimate, nondiscriminatory reason for its actions, the burden shifts back to Plaintiff to show that the Agency's proffered reason was not the true reason for its

12

actions and was only a pretext for unlawful discrimination.  McDonnell Douglas, 411 U.S. at

804; Burdine, 450 U.S. at 253.

    With regard to her claims of discrimination, Plaintiff cannot establish that she suffered an

adverse employment action which had a materially adverse impact on the terms and conditions of

her employment.  In this regard, the vast majority of Plaintiff's allegations relate solely to the

assignment of job duties to her.  However, Plaintiff could not possibly show that she suffered any

loss of pay or suffered any other loss or harm based on the Agency's assignment of the duties that

she was hired to perform.  See Freedman, 255 F.3d at 848 (assignment of "junk jobs" that does

not result in loss of pay does not create liability under Title VII).  The only allegations raised by

Plaintiff, unrelated to her job duties, the terms of her position description and the Agency's

decision not to extend her employment contract, relate to allegedly discriminatory comments

allegedly made by Mr. Rundell.  However, Plaintiff could not possibly show any harm or loss

with respect to her conditions of employment based merely on comments alone. Thus, Plaintiff

cannot possibly show that the Agency subjected her to any adverse employment actions.

Accordingly, she cannot establish a *prima facie* case of discrimination and summary judgment

should be granted for the Agency on this basis alone.

    **2.      The Agency Has Articulated Legitimate, Nondiscriminatory Reasons
            for its Actions, and Plaintiff Cannot Prove That the Agency's Reasons
            Are Pretext for Discrimination.**

    In the alternative, even if Plaintiff could establish a *prima facie* case of discrimination,

summary judgment is still appropriate because the Agency can set forth legitimate,

nondiscriminatory reasons for its actions.  To adduce sufficient evidence of discriminatory

animus and pretext to prevent summary judgment, Plaintiff must do more than merely cast doubt

on the Agency's proffered reasons.  Plaintiff must establish that the Agency's stated reasons were

not the actual motivation for the actions taken or show that the Agency's explanations are

unworthy of credence.  See McDonnell Douglas, 411 U.S. at 804-05; Burdine, 450 U.S. at 253;

St. Mary's Honor Center v. Hicks, 509 U.S. 502, 517 (1993).  Importantly, "a reason cannot be

proved to be 'a pretext for discrimination' unless it is shown that the reason was false, and that

discrimination was the real reason."  St. Mary's Honor Center, 509 U.S. at 515 (emphases in

original).  This she cannot do.

　　　　As an Administrative Assistant, Plaintiff was responsible, among other things, for

providing "clerical support" to Commercial Service Officers, handling phone calls, receiving

visitors, arranging schedules and official travel, preparing work orders and coordinating their

execution, monitoring and procuring office supplies, and preparing schedules for office drivers.

Def. Exh. 2 at 1.  As early as October 2002, Plaintiff resisted performing the basic requirements

of her position.  See Def. Exh. 5 at 7.  That resistance was noted contemporaneously by Mr.

Burton (Def. Exh. 6 at 10), Ms. Smoker-Ali (Def. Exh. 11 at 57), and Mr. McGee (Def. Exh. 8 at

24).  Likewise, Mr. Rundell noted Plaintiff's repeated failure to accept and/or complete

assignments:

- Over the period from March to April 2003, Mr. Rundell had to make seven requests to Plaintiff to get her to cull and organize office files.  Def. Exh. 12 at 35-42.

- On March 31, 2003, Mr. Rundell tasked Plaintiff with preparing a leave schedule for the office.  Def. Exh. 12 at 44.  On May 10, 2003, he sent Plaintiff an example to work from to complete the project.  Id. at 45.  On May 28, 2003, Mr. Rundell again had to ask Plaintiff to complete the project, which had been pending for more than two months.  Id. at 46.

- On or about May 26, 2003, Mr. Rundell asked Plaintiff to complete a travel

14

voucher for his recently completed official travel.  Def. Exh. 9 at 33.  According to his contemporaneous memorandum to the record, she refused and said it was not her job.  <u>Id.</u>

Plaintiff's repeated refusals and failures to perform the very tasks for which she was hired provide a legitimate basis both for the Agency's repeated requests that she actually perform her assigned job duties and the Agency's ultimate decision not to extend or renew or her contract.  Title VII does not require that the Agency tolerate such poor performance.

Moreover, with respect to Plaintiff's allegation that the Agency did not renew or extend her employment contract because of her national origin, gender and religion, Plaintiff could not possibly explain why the Agency, and Mr. Rundell in particular, would have previously extended her contract if the Agency and Mr. Rundell had truly wanted to discriminate against her.  Plaintiff apparently illogically argues that the Agency brought her back merely to discriminate against her.  <u>See</u> <u>Proud v. Stone</u>, 945 F.2d 796, 798 (4th Cir. 1991) ("in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer").  <u>See</u> <u>also</u> <u>Bradley v. Harcourt, Brace & Co.</u>, 104 F.3d 267, 270-71 (9th Cir.1996) (if the discriminating supervisor "had preferred to place a man in the position, we can see no reason she would have hired a woman . . . earlier").

Thus, the Agency has easily articulated legitimate, non-discriminatory reasons for its allegedly discriminatory actions.  Plaintiff must now show that the Agency's legitimate reasons are a pretext for illegal discrimination.  This Plaintiff cannot do.  All of the reasons set forth by the Agency during the investigation as to the reasons for its actions towards Plaintiff are amply supported by the extremely well-documented evidence of her blatant and persistent refusals to

carry out even the simplest tasks despite repeated, clear instructions from her supervisor.

**D.     Plaintiff Cannot Establish that the Agency Retaliated Against Her**

Plaintiff alleges that in retaliation for her filing an EEO complaint, Mr. Rundell removed her from her position.  Evaluation of Title VII retaliation follows the same burden-shifting template as discrimination claims.  Holcomb v. Powell, 433 F.3d 889, 901 (D.C. Cir. 2006); Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006).  As demonstrated above, even if Plaintiff establishes a *prima facie* case of retaliation, Plaintiff cannot prevail because she is unable to show that the Agency's legitimate, nondiscriminatory reasons for its actions are a pretext for unlawful retaliation.  Plaintiff's contract was not renewed because of documented concerns over her performance and her resistance to performing the basic functions of her job and Plaintiff can point to no evidence that would allow her to demonstrate that these reasons are a pretext for illegal retaliation.

**CONCLUSION**

For the reasons set forth above, Defendant Carlos Guitierrez, Secretary of Commerce, is entitled to dismissal of Plaintiff's pregnancy discrimination claim and summary judgment on all claims asserted by Plaintiff in this action.  There are no genuine issues of material fact.  This action should be dismissed in its entirety with prejudice.

Respectfully submitted,


  /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


  /s/ Rudolph Contreras
RUDOLPH  CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


  /s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. BAR # 420232
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530
(202) 307-2843


Agency Counsel:

ADAM CHANDLER
Office of the General Counsel
U.S. Department of Commerce

17

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of October, 2007, a copy of the foregoing Motion to Dismiss and for Summary Judgment was mailed, postage prepaid, to Plaintiff, Aisha Hussain, 2262 Sir Amant Drive, Lewisville, TX 75056.


 /s/ Darrell c. Valdez
DARRELL C. VALDEZ
Assistant United States Attorney

# U.S. DEPARTMENT OF STATE
## CONTRACT WITH A U.S. CITIZEN FOR PERSONAL SERVICES ABROAD

Contract No. S0SA700-01-P-0012

===========================================================

NEGOTIATED PURSUANT TO SECTION 2(C) OF THE
STATE DEPARTMENT BASIC
AUTHORITIES ACT OF 1956, AS AMENDED (22 U.S.C. 2669[C])

===========================================================

| | |
|---|---|
| CONTRACT FOR<br>Fiscal/Administrative Assistant | ESTIMATED CONTRACT AMOUNT<br>USD13,039.62 |
| PROGRAM OFFICE<br>Foreign Commercial Service | EFFECTIVE DATE<br>May 20, 2001 |
| PROJECT OFFICER<br>Charles Kestenbaum | ESTIMATED COMPLETION DATE<br>September 30, 2001 |
| ADMINISTRATIVE BY: *Sharon Nichols*<br>Sharon Nichols<br>Human Resources Office<br>American Embassy, Riyadh | ACCOUNTING AND APPROPRIATION<br>DATA 13-X12500000-02-1302111213-<br>J1011470-1252-1122-340000-0-347001. |
| PAYING OFFICE:<br>Financial Management Center<br>American Embassy, Riyadh | FMC Certifying Officer<br>Debra Smoker-Ali |

===========================================================

The United States of America (hereinafter called the "Government"), represented by the Contracting Officer executing this Contract, and the Contractor agree that the Contractor shall perform all services set forth in the attached Schedule for the consideration stated therein. The rights and obligations of the parties to the contract shall be subject to and governed by the Schedule and the General Provisions. To the extent of any inconsistency between the Schedule or the General Provisions and any specifications or other provisions which are made a part of this contract by reference or otherwise, the Schedule and General Provisions shall control. To the extent of any inconsistencies between the Schedule and the General Provisions, the Schedule shall control.

===========================================================

*Aisha Hussain*
PSC Employee's Signature                    Contracting Officer Signature
------------------------------------------------------------
**Aisha Hussain**                           Valeria Kayatin

Date: 5-28-01                               Date: *Kayatin 5/30/01*

===========================================================

EXHIBIT

_1_

Page 1

## **TABLE OF CONTENTS**

SECTION A: <u>SCHEDULE OF SERVICES</u>

The Services of this contract are as follows:

I.      STATEMENT OF DUTIES
II.     PERIOD OF SERVICE
III.    CONTRACTOR'S COMPENSATION
        AND REIMBURSEMENT IN U.S. DOLLARS

SECTION B: <u>GENERAL PROVISIONS</u>

The General Provisions (GPs) of this contract are as follows:

1.      LAWS AND REGULATIONS APPLICABLE
2.      COMPENSATION
3.      SOCIAL SECURITY AND FEDERAL INCOME TAX
4.      INSURANCE (RESERVED)
5.      PAYMENT
6.      SECURITY REQUIREMENTS
7.      CONTRACTOR-EMBASSY RELATIONSHIP
8.      RELEASE OF INFORMATION
9.      TERMINATION OF CONTRACT

SECTION C: <u>FAR CLAUSES</u>

This Section incorporates by reference, the Federal Acquisition Regulations (FAR) clauses contained in "Text of FAR Clauses."

SECTION D: <u>ATTACHEMENTS</u>

The following attachments are incorporated into this contract:

1. ATTACHMENT (1): POSITION DESCRIPTION FOR:
                    Fiscal/Administrative Assistant in the Foreign
                    Commercial service office of The American
                    Embassy Riyadh, Saudi Arabia.

2. ATTACHMENT (2): TEXT OF FAR CLAUSES (SECTION C)
                    The Contracting Officer will make the text of FAR
                    clauses available upon request.

## SECTION A.    SUPPLIES OR SERVICES

### I.    STATEMENT OF DUTIES

a.  <u>Purpose</u> - The purpose of this contract is to provide the services of a Fiscal/Administrative Assistant at the foreign commercial service of the U.S. Embassy, Riyadh, Saudi Arabia.

b.  <u>Statement of Duties</u> - The PSC employee shall perform in accordance with the position description contained in Attachment 1.

c.  <u>Contracting Officer's Representative</u> - The Contracting Officer may appoint an individual to act as the Contracting Officer's Representative (COR) for technical liaison, inspection, testing, and such other purposes as are deemed necessary for this contract.  The COR shall be appointed in writing by the Contracting Officer.

The COR will be designated the authority to act for the Contracting Officer in matters concerning technical clarification, inspection and, after concurrence by the Contracting Officer, acceptance of Contractor's performance under the contract, including authorization of payments.  The Contractor's performance at significant stages of its development.

In no instance, however, shall the COR be authorized to alter or waive any of the specifications or terms and conditions of this contract.  The Contracting Officer must authorize such changes, in writing.

### II.    PERIOD OF SERVICE

a. The contract period of performance shall be from <u>May 20, 2001 Through September 30, 2001.</u>

### III.    CONTRACTOR'S COMPENSATION AND REIMBURSEMENT IN U.S. DOLLARS

a.  The Embassy will pay the Contractor compensation after it has accrued, and reimburse the Contractor in U.S. Dollars for necessary and reasonable costs actually incurred in the performance of this contract within the categories listed under "ALLOWABLE COSTS (in U.S. Dollars)" in paragraph (c) below, and subject to the conditions and limitations set forth herein and under Section B, "General Provisions (GP)."

b. The amount budgeted and available as personal compensation to the Contractor is calculated to cover a calendar period of approximately 19 Weeks. The PSC employee will be paid at the rate of USD 12,278.37 for a 39HWW workweek.

c. Allowable Costs (in U.S. Dollars): USD13,039.62

Compensation - At the rate of $16.57/Hour

FICA - USG contribution 6.2% (not payable to the PSC).

Total Estimated Cost  USD13,039.62

d. Maximum U.S. Dollar Obligation - In no event shall the maximum U.S. dollar obligation under this contract exceed USD13,039.62 except as authorized in writing by the Contracting Officer.

## SECTION B.  GENERAL PROVISIONS

### 1. LAWS AND REGULATIONS APPLICABLE

a. Conformity to Laws and Regulations of the Host Country The Contractor agrees to abide, by all applicable laws and regulations of the host country and political subdivisions thereof while performing under this contract.

b. Code of Conduct - The PSC employee shall, during the term of this contract, be considered an "employee" for the purposes of and shall be subject to the provisions of 3 FAM 620 (Volume 3, Foreign Affairs Manual, subchapter 620), "Employee Responsibilities and Conduct."

### 2. BENEFITS:

The PSC employee shall earn annual leave at the rate of 4 hours per pay period, which will be pro-rated for regular duty of less than 80 hours per pay period.  A lump sum payment will be made for any unused annual leave upon the expiration of this contract. Should this contract be renewed for an additional period, any unused balance of annual leave up to a maximum of 30 days will be carried over to the new contract.

The PSC employee shall earn sick leave at the rate of 4 hours per pay period which will be pro-rated for regular duty of less than 80 hours per pay period.  The CONTRACTOR shall not be provided a lump sum payment for any unused sick leave upon the expiration of this contract.  Should this contract be renewed for an additional period, any unused balance of sick leave will be carried over to the new contract.

The PSC employee will only be granted leave without pay upon written approval from the Section Chief and the Counselor for Administrative Affairs.

The PSC employee shall be granted all official U.S. and local holidays observed by the American Embassy Riyadh, Saudi Arabia and no deduction in salary shall be made for those holidays.

The PSC employee will be granted premium compensation for any hours of work in excess of 8 hours per day, 40 hours per week or 80 hours per pay period.  Such premium compensation will be made in accordance with applicable USG regulations.  The CONTRACTOR will also be eligible for premium compensation for hours worked on observed US holidays.

The PSC employee shall not by virtue of this contract be considered a Civil Service or Foreign Service employee or an employee of the U.S. Government for purposes of any law administered by the Office of Personnel Management.  The CONTRACTOR shall not be eligible for Foreign Service or Civil Service Disability and Retirement Systems, Federal Employees Retirement System, Federal Group Life Insurance, Federal Employees Health Benefits Program.

After completion of 52 weeks, the contractor shall be eligible for within grade increase (WGI).  Upon expiration of the contract, the concerned Supervisor is required to complete an evaluation report on the Contractor, which specifies whether the terms of the contract were met. Subsequent renewal of the contract must be documented. Also the Contractor is entitled to receive any annual general increases given to all American Federal employees.

The Contractor (who is NOT a dependent of current or retired civil service, Foreign Service, or Military Service member and who is covered by an employee's Government health of life insurance policy) shall be provided with the following:

- A maximum contribution of up to 50% against the actual costs of contractor's annual health insurance costs, provided that such costs may not exceed the maximum U.S. Government contribution for direct-hire personnel as announced annually by the office of personnel Management.
- A contribution of up to 50% against the actual cost of annual life insurance premiums not to exceed $ 500.00 per year.


3. SOCIAL SECURITY AND FEDERAL INCOME TAX     **(NOT APPLICABLE)**

a.  The PSC employee is considered an employee of the U.S. Government for the purpose of a) making FICA contributions and, b) U.S. Federal Income Tax withholding.  FICA contribution and U.S. Federal Tax withholding shall be deducted in accordance with regulations and rulings of the Social Security Administration and the U.S. Internal Revenue Service, respectively.

b.  Because the PSC employee is treated as an employee of the U.S. Government, she is not eligible for the "foreign earned income" exclusion under the IRS regulations (see 26 CFR 1.911-3[c][3]).

## 4.  PAYMENT

a.  Notwithstanding any other payment clause in this contract, the Government will make payments under the terms and conditions specified in this clause.  Payment shall be considered, as being made on the day a check is dated.  Payments shall be made from the paying office identified on the cover page of the contract. Definitions of the pertinent terms are set forth in FAR 52.232.03. Payments under Personal Services Contract and FAR 52.232.25 - Prompt Payment.

b.  The PSC employee shall submit time sheets to the designated COR.

c.  Payment under this contract shall be made to the PSC employee on a bi-weekly basis.

## 5.  CONTRACTOR-EMBASSY RELATIONSHIPS

a.  The PSC employee acknowledges that this contract is an important part of the U.S. Mission in the host country and agrees to carry out assigned duties in such manner as to be fully commensurate with the responsibilities, which this entails.

b.  While performing under this contract, the PSC employee is expected to show respect for the conventions, customs, and institutions of the host country and not interfere in its political affairs.

c.  If the PSC employee's conduct is not in accordance with paragraph (b) of this clause, the contract may be terminated under FAR Clause 52.249-12, "Termination."  The Contractor recognizes the right of the Chief of Mission or his/her designee to direct her immediate removal from any country when, at the discretion of the Chief of Mission or his/her designee, the interests of the United States so require.

## 6.  RELEASE OF INFORMATION

All rights in data and reports shall become the property of the U.S. Government.  All information gathered under this contract by the Contractor and all reports and recommendations hereunder shall be treated as confidential by the Contractor and shall not, without the prior written approval of the COR, be made available to any person,

party, or government, other than the U.S. Employees in the Embassy, except as otherwise expressly provided in this contract.

## 7. TERMINATION OF CONTRACT

The Government may terminate this contract at any time upon at least 15 days' written notice by the Contracting Officer to the Contractor. The Contractor, with the written consent of the Contracting Officer may terminate this contract upon at least 30 days' notice to the Contracting Officer. Additionally, the Government may terminate this contract without prior notice upon a determination in writing by the Contracting Officer that the Contractor has committed a serious act of misconduct, or that the Contractor has materially failed or refused to perform the duties assigned to her in accordance with any terms or conditions of this contract or that the Contractor's continued employment presents a risk to the security of the mission.

Performance under this contract is subject to the Contractor being capable of obtaining and maintaining a security clearance as required by the position as processed by the Regional Security Officer. Failure to obtain this clearance will be cause for immediate termination of the contract. No compensation shall be rendered to the Contractor after such termination.

Attachment 1

<u>DUTIES AND RESPONSIBILITIES</u>:

**SEE JOB ANNOUNCEMENT.**

<u>HOURS OF DUTY</u>:

The CONTRACTOR shall be required to work Eight (8) hours a day, Saturday through Tuesday, 08:00 - 17:00 and seven (7) hours on Wednesday, 08:00 - 1600, i.e. (39 HWW).

ATTACHMENT 2

## FAR CLAUSES

The following Federal Acquisition Regulations (FAR) clauses are
hereby incorporated into this contract:

1.  52.203-01        Officials Not to Benefit, APR 1984
2.  52.203-05        Covenant Against Contingent Fees APR 1984
3.  52.203-06        Restriction on Contractor Sales to the
                     Government, MAR 1988
4.  52.203-07        Anti-Kickback, Procedures, FEB 1984
5.  52.212-13        Stop Work, MAR 1988
6.  52.215-01        Examination of Records by Controller
                     General, APR 1984
7.  52.215-02        Audit - Negotiation APR 1984
8.  52.215-33        Order of Precedence MAR 1988
9.  52.217-09        Option to Extend Term of Contract MAR 1988
10. 52.224-01        Privacy Act Notification, APR 1984
11. 52.224-02        Privacy Act, APR 1984
12. 52.232-03        Payments Under Personnel Services Contract
                     MAR 1988
13. 52.232-17        Interest, APR 1984
14. 52.232-19        Availability of Funds for the Next Fiscal
                     Year, MAR 1988
15. 52.232-20        Limitation of Cost, APR 1984
16. 52.232-22        Limitation of Funds, APR 1984
17. 52.232-23        Assignment of Claims, JAN 1986
18. 52.232-25        Prompt Payment, FEB 1988
19. 52.233-01        Disputes, (Alternate), APR 1984
20. 52.233-03        Protest After Award, MAR 1988
21. 52.237-02        Protection of Government Buildings,
                     Equipment, and Vegetation, APR 1984
22. 52.237-03        Continuity of Services,  MAR 1988
23. 52.242-01        Notice of Intent to Disallow Costs, APR 1984
24. 52.243-01        Changes - Alt. III, MAR 1988
25. 52.246-05        Inspection of Services - Cost - Reimbursement
                     APR 1984
26. 52.246-25        Limitation of Liability/Service, APR 1984
27. 52.247-63        Preference for U.S. -Flag Air Carriers APR 1984
28. 52.249-12        Termination Personal Service, APR 1984

# PERSONAL SERVICES CONTRACTING ACTION

| 1. Name *(Family/Surname, Given Name/s)*<br>Hussain, Aisha | 2. Employee Number | 3. Contract Number<br>S0SA70001P0011 | 4. Date of Birth<br>08/07/1969 |
|---|---|---|---|

| 5. Sex<br>F | 6. Service Comp. Dates *(1-Leave, 2-Severance Pay)*<br>5/20/2001 | 7. Effective Date<br>10/01/2001 | 8. Authority *(Authorization Cable)*<br>USDOC 05414 dated 09/20/2001 |
|---|---|---|---|

| 9. Leave Plan<br>2 | 1 - Local<br>2 - U.S. Style | 10. Retirement(s)<br>None | 11. Annuitant<br>3 | 1 - CS<br>2 - FS<br>3 - N/A | 12. Tenure Code |
|---|---|---|---|---|---|

| 13-A. NOAC<br>760 | 13-B. Nature of Action<br>Extension of appointment effective 10/01/2001, NTE: 09/30/2002 | 14. Citizenship<br>1 | 1 - U.S.<br>2 - FN |
|---|---|---|---|

| 15. FROM: Position Number, Series Code, and Position Title<br>Fiscal/Administrative Assistant | 23. TO: Position Number, Series Code, and Position Title<br>Same |
|---|---|
| 16. Name of Agency, Location of Employing Office<br>Foreign Commercial Services<br>American Embassy<br>Riyadh, Kingdom of Saudi Arabia | 24. Name of Agency, Location of Employing Office<br>Same |

| 17. Pay Plan<br>FP | 18. Grade<br>06 | 19. Step<br>05 | 20. Salary<br>34,575.00 | 21. Pay Basis<br>P.A. | 25. Pay Plan<br>FP | 26. Grade<br>06 | 27. Step<br>05 | 28. Salary<br>34,575.00 | 29. Pay Basis<br>P.A. |
|---|---|---|---|---|---|---|---|---|---|
| 22. Work Schedule<br>Same | | | | | 30. Work Schedule<br>39 HWW | | | | |

**31. Duty Station**

Riyadh, Kingdom of Saudi Arabia

**Accounting Classification Codes**

| a. Agency | b. Appropriation | c. Allotment | d. Organization/Location | e. Function | f. Sub-Object | g. Project Resource |
|---|---|---|---|---|---|---|
| 13-02 | 13-125000000 | J2011470 | 347001 | 1252 | 1141 | 340000 |

**33. Remarks**

1. Aisha Hussain
2. U. S. Citizen
3. Annual Salary: US$ 34,575
4. FICA and US Federal Income tax to be deducted from salary
5. Contract begins 10/01/01, and ends on 09/30/2002
6. M06: Reason for Temporary Appointment: Needs of the Service
8. M32: Tour of Duty: Saturday through Tuesday: from 8:00 to 17:00 (8 hrs/day) with lunch hour
-- Wednesday from 8:00 to 16:00 (7 hrs/day) with lunch hour.
Y25: Your appointment may be terminated at any time.

**Page 10**

| 33a. SSN | 33b. CPSS Number | 33c. Action Control Number | 33d. TCN Origin |
|---|---|---|---|
| 34. Signature of Personnel/Administrative Officer<br>Jon D. Nichols, HR Officer | 35. Date<br>10/01/2001 | 36. Signature of Contracting Officer<br>Valeria Kayatin, SGSO | 37. Date<br>10/01/2001 |

**38. Employing Department or Agency**

Foreign Commercial Services

| Form<br>2-88 | JF-62 | Distribution (Circle One) | | | For use by Foreign Affairs Agencies |
|---|---|---|---|---|---|
| | | 1 - Employee | 2 - Payroll | 3 - Personnel Folder | 4 - Utility |

# PERSONAL SERVICES CONTRACTING ACTION

| 1. Name *(Family/Surname, Given Name/s)* | | 2. Employee Number | 3. Contract Number | 4. Date of Birth |
|---|---|---|---|---|
| Hussain, Aisha | | — | S0SA70001P0011 | 08/07/1969 |

| 5. Sex | 6. Service Comp. Dates *(1-Leave, 2-Severance Pay)* | 7. Effective Date | 8. Authority *(Authorization Cable)* | |
|---|---|---|---|---|
| F | 5/20/2001 | 05/19/2002 | USDOC 05414 dated 09/20/2001 | |

| 9. Leave Plan | 10. Retirement(s) | 11. Annuitant | 12. Tenure Code |
|---|---|---|---|
| 2 | 1 - Local 2 - U.S. Style | None | 3 | 1 - CS 2 - FS 3 - N/A | - |

| 13-A. NOAC | 13-B. Nature of Action | 14. Citizenship |
|---|---|---|
| | Modification of contract effective 05/19/2002 | 1 | 1 - U.S. 2 - FN |

| 15. FROM: Position Number, Series Code, and Position Title | 23. TO: Position Number, Series Code, and Position Title |
|---|---|
| Fiscal/Administrative Assistant | Same |

| 16. Name of Agency, Location of Employing Office | 24. Name of Agency, Location of Employing Office |
|---|---|
| Foreign Commercial Services American Embassy Riyadh, Kingdom of Saudi Arabia | Same |

| 17. Pay Plan | 18. Grade | 19. Step | 20. Salary | 21. Pay Basis | 25. Pay Plan | 26. Grade | 27. Step | 28. Salary | 29. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|
| FP | 06 | 05 | 35,819.00 | P.A. | FP | 06 | 06 | 36,894.00 | P.A. |

| 22. Work Schedule | 30. Work Schedule |
|---|---|
| Same | 39 HWW |

**31. Duty Station**

Riyadh, Kingdom of Saudi Arabia

| Accounting Classification Codes | | | | | | |
|---|---|---|---|---|---|---|
| a. Agency | b. Appropriation | c. Allotment | d. Organization/Location | e. Function | f. Sub-Object | g. Project Resource |
| 13-02 | 13-X12500000-02 | J2011470 | 347001 | 1252 | 1411 | 340000 |

**33. Remarks**

1. Aisha Hussain
2. U.S. Citizen
3. Annual Salary $ 36,894.00 (FP-06/06).
4. M32: Tour of Duty: Saturday-Tuesday from 8:00 to 5:00, with 1 hour lunch,
-- Wednesday from 8:00 to 4:00 with 1 hour lunch
5. FICA and US federal income tax to be deducted from salary.
6. M06: Reason for temporary appointment: Needs of the service.
7. M39: N/A
8. Y25: Your appointment may be terminated at any time.

Page 11

| 33a. SSN | 33b. CPSS Number | 33c. Action Control Number | 33d. TCN Origin |
|---|---|---|---|
| | | | |

| 34. Signature of Personnel/Administrative Officer | 35. Date | 36. Signature of Contracting Officer | 37. Date |
|---|---|---|---|
| Shirley E. Kern, A/HR Officer *acting* | 06/24/2002 | Laura Eppers, SGSO | 06/24/2002 |

**38. Employing Department or Agency**

Foreign Commercial Services

Form 2-88    JF-62

Distribution (Circle One)

For use by Foreign Affairs Agencies

1 - Employee    2 - Payroll    3 - Personnel Folder    4 - Utility

# PERSONAL SERVICES CONTRACTING ACTION

| 1. Name *(Family/Surname, Given Name/s)*<br><br>Hussain, Aisha | | 2. Employee Number | 3. Contract Number<br>PSCA 3000HR | 4. Date of Birth<br>08/07/1969 |
|---|---|---|---|---|
| x  F | 6. Service Comp. Dates *(1-Leave, 2-Severance Pay)*<br>5/20/2001 | 7. Effective Date<br>10/01/2002 | 8. Authority *(Authorization Cable)*<br>USDOC 4888  dated 09/20/2002 | |

| 9. Leave  Plan<br><br>2 | 1 - Local<br>2 - U.S. Style | 10. Retirement(s)<br><br>None | 11. Annuitant<br><br>3 | 1 - CS<br>2 - FS<br>3 - N/A | 12. Tenure Code<br><br>- |
|---|---|---|---|---|---|

| 13-A. NOAC | 13-B. Nature of Action<br>Extension of contract  NTE: 09/30/2003 | 14. Citizenship<br>1 | 1 - U.S.<br>2 - FN |
|---|---|---|---|

| 15. FROM: Position Number, Series Code, and Position Title<br>Fiscal / Administrative Assistant | 23. TO: Position Number, Series Code, and Position Title<br>Same |
|---|---|
| 16. Name  of Agency, Location of Employing Office<br>Foreign Commercial Services<br>American Embassy<br>Riyadh, Kingdom of Saudi Arabia | 24. Name of Agency, Location of Employing Office<br>Same |

| 17. Pay Plan<br>FP | 18. Grade<br>06 | 19. Step<br>06 | 20. Salary<br>36,894.00 | 21. Pay Basis<br>P.A. | 25. Pay Plan | 26. Grade | 27. Step | 28. Salary | 29. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|
| 22. Work Schedule<br>Same | | | | | 30. Work Schedule | | | | |

31. Duty Station

## Riyadh, Kingdom of Saudi Arabia

| Accounting Classification Codes | | | | | | |
|---|---|---|---|---|---|---|
| a. Agency | b. Appropriation | c. Allotment | d. Organization/Location | e. Function | f. Sub-Object | g. Project Resource |
| 13-02 | 13-X12500000-02 | J3011470 | 347001 | 1252 | 1411 | 340000 |

33. Remarks

1. Aisha Hussain
2. U.S. Citizen
3. Annual Salary $ 36,894.00 (FP-06/06).
4. M32: Tour of Duty: Saturday-Tuesday from 8:00 to 5:00, with 1 hour lunch,
-- Wednesday from 8:00 to 4:00  with 1 hour lunch
5. FICA  and US federal income tax to be deducted from salary.
6. M06: Reason for temporary appointment: Needs of the service.
7. M39: N/A
8. Y25: Your appointment may be terminated at any time.

Page 12

| 33a. SSN | 33b. CPSS Number | 33c. Action Control Number | 33d. TCN Origin | |
|---|---|---|---|---|
| Signature of Personnel/Administrative Officer<br>Debra Smoker-Ali, HR Officer | 35. Date<br>09/28/2002 | 36. Signature of Contracting Officer<br>N/A | 37. Date | |

38. Employing Department or Agency

## Foreign Commercial Services

# PERSONAL SERVICES CONTRACTING ACTION

| 1. Name (Family/Surname, Given Name/s)  Hussain, Aisha | | 2. Employee Number | 3. Contract Number  PSCSAR03HR000  3 | 4. Date of Birth  08/07/1969 |
|---|---|---|---|---|
| 5. Sex  F | 6. Service Comp. Dates (1-Leave, 2-Severance Pay)  N/A | 7. Effective Date  10/01/2003 | 8. Authority (Authorization Cable)  USDOC CABLE DTD 9/24/03 | |

| 9. Leave Plan  2 | 1 - Local  2 - U.S. Style | 10. Retirement(s)  N/A | | 11. Annuitant  3 | 1 - CS  2 - FS  3 - N/A | 12. Tenure Code  0 |
|---|---|---|---|---|---|---|

| 13-A. NOAC  760 | 13-B. Nature of Action  Extension of appointment NTE: 09/30/2004 | | 14. Citizenship  1 | 1 - U.S.  2 - FN |
|---|---|---|---|---|

| 15. FROM: Position Number, Series Code, and Position Title  Fiscal/Administrative Assistant | 23. TO: Position Number, Series Code, and Position Title  Same |
|---|---|
| 16. Name of Agency, Location of Employing Office  Foreign Commercial Services  American Embassy  Riyadh, Kingdom of Saudi Arabia | 24. Name of Agency, Location of Employing Office  Same |

| 17. Pay Plan  FP | 18. Grade  06 | 19. Step  06 | 20. Salary  $38,037.00 | 21. Pay Basis  P.A. | 25. Pay Plan  FP | 26. Grade  06 | 27. Step  06 | 28. Salary  $38,037.00 | 29. Pay Basis  P.A |
|---|---|---|---|---|---|---|---|---|---|
| 22. Work Schedule  40 HWW | | | | | 30. Work Schedule  Same | | | | |

| 31. Duty Station |
|---|
| Riyadh, Kingdom of Saudi Arabia |

### 32. Accounting Classification Codes

| a. Agency | b. Appropriation | c. Allotment | d. Organization/Location | e. Function | f. Sub-Object | g. Project Resource |
|---|---|---|---|---|---|---|
| 13-02 | 13-X125000000 | J4011470 | 347001 | 1252 | 1411 | 340000 |

33. Remarks

1. Aisha Hussain
2. U. S. Citizen
3. Annual Salary USD 38,037 (FP-06/06)
4. M32: Tour of Duty: Saturday thru Wednesday from 8:00 thru 17:00 with 1 Hr. for lunch
5. FICA and U.S. Federal Income tax to be deducted from salary
6. Contract begins 10/01/2003, ends 09/30/2004
7. M06: Reason for Temporary Appointment : Needs of the Service.
8. M39: N/A
9. Y25: Your appointment may be terminated at any time.
10. 126: Employee is not eligible for a career candidate appointment untill all conditions for such appointment are met including prescribed U.S. Office of Personnel Management tests, or other qualifing tests required by the Department of State.

Page 13

| 33a. SSN | 33b. CPSS Number | 33c. Action Control Number | 33d. TCN Origin |
|---|---|---|---|
| | | | |

| 34. Signature of Personnel/Administrative Officer  Debra Smoker-Ali, HRMO | 35. Date  09/29/2003 | 36. Signature of Contracting Officer  N/A | 37. Date |
|---|---|---|---|

| 38. Employing Department or Agency | Department of Commerce | |
|---|---|---|

Distribution (Circle One)

Form  JF-62
2-88

1 - Employee    2 - Payroll    3 - Personnel Folder    4 - Utility

For use by Foreign Affairs Agencies

## PERSONAL SERVICES CONTRACTING ACTION

| 1. Name *(Family/Surname, Given Name/s)* | | 2. Employee Number | 3. Contract Number | 4. Date of Birth |
|---|---|---|---|---|
| Hussain, Aisha | | | PSCSAR03HR000 3 | 08/07/1969 |

| 5. Sex | 6. Service Comp. Dates *(1-Leave, 2-Severance Pay)* | 7. Effective Date | 8. Authority *(Authorization Cable)* |
|---|---|---|---|
| F | N/A | COB 10/31/03 | USDOC CABLE DTD 9/24/03 |

| ...ve Plan | | 10. Retirement(s) | 11. Annuitant | 12. Tenure Code |
|---|---|---|---|---|
| 2 | 1 - Local 2 - U.S. Style | N/A | 3  1 - CS  2 - FS  3 - N/A | 0 |

| 13-A. NOAC | 13-B. Nature of Action | | 14. Citizenship |
|---|---|---|---|
| 357 | Termination of appointment eff.: COB 10/31/03 | | 1  1 - U.S.  2 - FN |

| 15. FROM: Position Number, Series Code, and Position Title | 23. TO: Position Number, Series Code, and Position Title |
|---|---|
| Fiscal/ Administrative Assistant | Same |

| 16. Name of Agency, Location of Employing Office | 24. Name of Agency, Location of Employing Office |
|---|---|
| Foreign Commercial Services American Embassy Riyadh, Kingdom of Saudi Arabia | Same |

| 17. Pay Plan | 18. Grade | 19. Step | 20. Salary | 21. Pay Basis | 25. Pay Plan | 26. Grade | 27. Step | 28. Salary | 29. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|
| FP | 06 | 06 | $38,037.00 | P.A. | FP | 06 | 06 | $38,037.00 | P.A. |

| 22. Work Schedule | 30. Work Schedule |
|---|---|
| 40 HWW | Same |

31. Duty Station

### Riyadh, Kingdom of Saudi Arabia

| ...counting Classification Codes | | | | | | |
|---|---|---|---|---|---|---|
| ...cy | b. Appropriation | c. Allotment | d. Organization/Location | e. Function | f. Sub-Object | g. Project Resource |
| 13-02 | 13-X125000000 | J4011470 | 347001 | 1252 | 1411 | 340000 |

33. Remarks

1. Aisha Hussain
2. U. S. Citizen
3. Annual Salary USD 38,037 (FP-06/06)
4. OPF maintained by the Department of State PER/EX/RR/P, room 1609, Washington, D.C. 20520.
5. 416: Forward leave transfer record (SF-1150) to PER/EX/RR/RC.
6. S48: Reason for Termination: 805: Expiration of appointment
7. M67: Forwarding address: AmEmbassy Riyadh, P.O.Box 94309, Riyadh, S.A.
8. N27: Lump sum payment to be made for any unused annual leave.

**Page** 14

| 33a. SSN | 33b. CPSS Number | 33c. Action Control Number | 33d. TCN Origin |
|---|---|---|---|
| | | | |

| 3...nature of Personnel/Administrative Officer | 35. Date | 36. Signature of Contracting Officer | 37. Date |
|---|---|---|---|
| ...Smoker-Ali, HRMO | 12/07/2003 | N/A | |

38. Employing Department or Agency

### Department of Commerce

| Form 2-88 | JF-62 | Distribution (Circle One) 1 - Employee   2 - Payroll   3 - Personnel Folder   4 - Utility | For use by Foreign Affairs Agencies |
|---|---|---|---|

## Position Description

### Office Manager

### Basic Functions of Position:

This is a 40-hour per week American PSC position. The occupant of this position serves primarily as an administrative assistant, but also as the backup system administrator, time keeper and webmaster.

### Major Duties and Responsibilities

30 %  The incumbent provides clerical support to the Commercial Counselor and three Commercial Officers, prepares unclassified draft letters, memos and faxes, files these materials, maintains all common office files and monitors and distributes e-mail messages addressed to the Riyadh office box as well as on the State intranet.

30 %  The incumbent handles mainline phone calls, receives office visitors, handles administrative details for representational events, arranges schedules and official travel for the Commercial Counselor and arranges accommodations and schedules for official/VIP visitors.

20 %  The incumbent serves as the principal liaison between the Commercial Section and the GSO Section, prepares work orders and coordinates their execution, monitors and procures office supplies and coordinates routine personnel actions including leave schedules.

10 %  The incumbent prepares schedules for the office drivers, ensures that mileage logs are accurately maintained, schedules routine vehicle maintenance and ensures that maintenance logs are accurately maintained. The incumbent also provides backup in the absence of the timekeeper, systems administrator and webmaster.

10%  The incumbent is responsible for women's outreach programs and promoting FCS products and services to businesswomen.



EXHIBIT

2

Page (

**Required Qualifications:**

Education: Completion of secondary school.
Experience: Must have three years work experience in personnel administration or a closely related office environment.
Knowledge: Good knowledge of general office skills.
Language Proficiency: Level IV (fluent) English.
Skills and Abilities: The incumbent should be familiar with Windows NT, Lotus Notes, servers, working within a LAN environment and possess Level IV (45 WPM) typing skills in English. The incumbent must be tactful and have an ability to deal with the public.

**Desired Qualifications:**

Education: College degree.
Experience: Prior office work experience with a USG agency.
Language Proficiency: Level IV (fluent) Arabic.
Skills and Abilities: Knowledge of 3,4 and 6 FAM regulations concerning personnel, budget and general service administration.



**U.S.
COMMERCIAL
SERVICE**
*United States of America*
*Department of Commerce*

## THE COMMERCIAL SERVICE – RIYADH

**UNCLASSIFIED
MEMORANDUM**

**Date:**      October 23, 2002

**To:**        David Rundell

**From:**      Aisha Hussain

**Subject:**   Job Description

*Yes if you have time to take a sector or assist with one that is great. Just remember Mona has no website or BuyUSA problem to worry about*

As per your request I have update the job description. Please feel free to make what ever changes you would like. However, since you mentioned that Mona Hassoun in Jeddah handles sectors along with her current duties and that I could do the same if time permitted, please let me know if you would also like me to do this.

Since I have been working with the development, creation and maintenance of the BuyUSA main and local web site since February of 2001 through the time when these sites were being launched, I would like to continue to do this in coordination with Michael McGee as you had mentioned. I would appreciate it if you could consider this since I have proven that I am capable of handling this job function.

Thanks.

*Fine idea*

*PS Let me know which sector you are interested in*



**Job Title: Office Manager**

**Basic Function of Position:**

The occupant of this position serves as Administrative/Fiscal Assistant/Webmaster and backup system administrator.

**Major Duties and Responsibilities:**

1. The incumbent provides clerical and logistical support to the Commercial Counselor, and other Commercial Officers, as required. Provides guidance and support to administrative assistants at constituent posts. Handles incoming calls for the Commercial Counselor, receives office visitors and arranges accommodations for the Commercial Counselor and official/VIP visitors. Arranges details of representational trade events.

2. Prepares drafts, letters, memos, and faxes of unclassified subject matter for the Commercial Counselor and files these materials, as well as maintain a filing system for the Commercial Counselor. Assists Commercial Specialists as needed in organizing and promoting trade events. Supervises the office drivers to ensure that routine maintenance of the office's three vehicles is scheduled, and the vehicle use is coordinated effectively through management of vehicle logs.

3. The incumbent is responsible for the Riyadh Office e-mail box for action items, and routes them appropriately. In addition, the incumbent is responsible for checking the Commercial Counselor's state email. The incumbent will provide e-menu, fiscal, and time and attendance support when the primary fiscal person is on vacation.

4. Assists in the development and will be responsible for the maintenance of USFCS/Saudi Arabia's Internet presence. This includes the main BuyUSA web site and the local BuyUSA/Saudi Arabian web site.

*DHRandell*
Oct 23, 2002

Page 4



**THE COMMERCIAL SERVICE – RIYADH**

**UNCLASSIFIED
MEMORANDUM**

Date:        November 10, 2002

To:          David Rundell          *OK DHR*

From:        Aisha Hussain  *AH*

Subject:     Request for taking up a sector

One of the sectors I am interested in taking up is the IT and computer hardware and software sector to promote to women only. I am not interested in taking this sector away from Ahmed Khayyat or assisting him with his projects. I would only like to be involved in conferences and meeting that I could benefit from to be updated about the latest technology and etc. Per my conversation with Ahmed Khayyat there are meetings and conferences that women only are allowed to attend. Since I have a strong IT back ground both in computers and in the telecom industry, I would appreciate it if I could be considered for this.

In addition, I have already started a good relationship with the Saudi businesswomen in Riyadh and this would help in promoting US products and services to them. Some examples of promoting our products and services to women owned businesses and computer related businesses are:

1. Ms. Huda Jeraisy who is very interested in having her computer software certificates Microsoft certified.
2. Ms. Shamseia Tanveer is interested in purchasing child development materials and would like to come to the Embassy so that I could enroll her business (Cordoba Day Care Center) on the BuyUSA website, since she is not that familiar with the internet.
3. Ms. Amal Benis who owns Eve Beauty salon is interested in purchasing some hair care products.

Therefore, maybe I can take up the option of being responsible for women's outreach programs and promoting US products and services to women owned businesses. Please let me know what your thoughts are and feel free to make the changes you would like.

Thanks.



**Job Title: Office Manager**

**Basic Function of Position:**

The occupant of this position serves as Administrative/Fiscal Assistant/Webmaster and backup system administrator.

**Major Duties and Responsibilities:**
1. The incumbent provides clerical and logistical support to the Commercial Counselor, and other Commercial Officers, as required. Provides guidance and support to administrative assistants at constituent posts. Handles incoming calls for the Commercial Counselor, receives office visitors and arranges accommodations for the Commercial Counselor and official/VIP visitors. Arranges details of representational trade events.
2. Prepares drafts, letters, memos, and faxes of unclassified subject matter for the Commercial Counselor and files these materials, as well as maintain a filing system for the Commercial Counselor. Assists Commercial Specialists as needed in organizing and promoting trade events. Supervises the office drivers to ensure that routine maintenance of the office's three vehicles is scheduled, and the vehicle use is coordinated effectively through management of vehicle logs.
3. The incumbent is responsible for the Riyadh Office e-mail box for action items, and routes them appropriately. In addition, the incumbent is responsible for checking the Commercial Counselor's state email. The Incumbent will provide e-menu, fiscal, and time and attendance support when the primary fiscal person is on vacation.
4. Assists in the development and will be responsible for the maintenance of USFCS/Saudi Arabia's Internet presence. This includes the main BuyUSA web site and the local BuyUSA/Saudi Arabian web site.
5. Responsible for women's outreach programs and promoting US products and services to women owned businesses.

Recieved
Nov 10 02

# INTERAGENCY FOREIGN SERVICE NATIONAL EMPLOYEE POSITION DESCRIPTION

Prepare according to instructions given in Local Emplyee Position Classification Handbook, Appendix B and 1978 A-3606

| 1. POST | 2. AGENCY | 3. POSITION NO. |
|---|---|---|
| RIYADH | FOREIGN COMMERCIAL SERVICE | SOSA 70001 Po011 |

**4. REASON FOR SUBMISSION**

[X] a. Reclassification: This position replaces

Position(s) No. _____ , __ FCS Office Manager (Title) __6__ (Series) __6__ (Grade)

No. _____ _____ (Title) _____ (Series) _____ (Grade)

[ ] b. New Position

[X] c. Other (explain) Duties of position have changed.

| 5. CLASSIFICATION ACTION | Position Title and Series Code | Grade | Initials | Date (mm-dd-yyyy) |
|---|---|---|---|---|
| a. Post Classification Authority | | | | |
| b. Other | | | | |
| c. Recommended by Initiating Office | | | | |

| 6. POST TITLE POSITION (if any) | 7. NAME OF EMPLOYEE |
|---|---|
| FCS SYSTEMS MANAGER/ Office Manager | AISHA HUSSAIN |

| 8. MISSION OR OFFICE | c. Third Subdivision |
|---|---|
| AMEMB RIYADH | |
| a. First Subdivision | d. Fourth Subdivision |
| COMMERCIAL SECTION | |
| b. Second Subdivision | e. Fifth Subdivision |

**9.** This is a complete and accurate description of the duties and responsibilities of my position.

*Aisha Hussain*    8-25-03

Signature of Employee    Date (mm-dd-yyyy)

**10.** This is a complete and accurate description of the duties and responsibilities of this position.

Signature of Local Supervisor    Date (mm-dd-yyyy)

**11.** This is a complete and accurate description of the duties and responsibilities of this position. There is a valid management need for this position.

*Douglas Wallace*    8/25/03

Signature of American Supervisor    Date (mm-dd-yyyy)

**12.** I have satisfied myself that this is an accurate description of this position, and I certify that it has been classified in accordance with appropriate Local Employee Position Classification Handbook (LPEPCH) standards.

Signature of Administrative or Personnel Officer    Date (mm-dd-yyyy)

**13. BASIC FUNCTION OF POSITION**

Manager of all computer systems and equipment; administration work; Saudi Business women point of contact.

**14. MAJOR DUTIES AND RESPONSIBILITIES** (See attached for details.)    % OF TIME

| | |
|---|---|
| Systems Manager | 50 |
| Administration | 35 |
| Saudi Business Women Specialist | 10 |
| Back up Commercial Librarian | 5 |

Page 7

*(continue on blank sheet)*

NSN 7540-01-124-5050    50398-101    OPTIONAL FORM 286 (11-61)
DEPT. OF STATE

15. **DESIRED QUALIFICATIONS:**

a. Education:

Some college education preferably in computer science.

b. Prior Work Experience:

3 years in active office setting preferably dealing with systems management.

c. Post Entry Training:

Post entry training should focus on basic FCS structure, goals and operations and FCS IT infrastructure.

d. Language Proficiency:

Fluency in English required.

e. Knowledges:

Computers and English writing skills.

f. Skills and Abilities:

Ability to trouble shoot computer problems.
Good interpersonal skills.

16. **POSITION ELEMENTS:**

a. Supervision Received:

Job holder is supervised directly by American Commercial Officer.

b. Available Guidelines:

Departmental guidelines and post policies.

c. Exercise of Judgment:

Job holder must demonstrate sound judgement in performance of duties.

d. Authority to Make Commitments:

Authority to make commitments is subject to supervisory approval.

e. Nature, Level, and Purpose of Contacts:

A minority portion of the position requires the job holder to maintain solid working relationships with the Saudi Business Women's community. Must maintain important contacts with FCS/HQ, FCS/Jeddah, and FCS/Dhahran

f. Supervision Exercised:                                        IT officers.

Job holder supervises no other employees.

g. Time Required to Perform Full Range of Duties after entry into the Position:

Job holder must be able to perform at 100% within three months of entering on duty.

Page 8

**Aisha Hussain**

<u>Computer Supervision</u>     **50%**
- Acts as Systems Administrator for Local Area Network of the Foreign Commercial Service and assists System Administrators for CS/Dhahran and CS/Jeddah.
- Maintains computer system/equipment by trouble shooting/fixing software problems including arranging outside services with local vendors.
- Maintains successful functioning of CS/Saudi Arabia's electronic email system. Coordinates with ITC and RMO to ensure data lines are working properly.
- Performs timely complete system backups and maintains backup tapes to load in the system in case of system crashes to restore data.
- Loads new/modified software programs on the network.
- Requests computer supplies from OIS/Washington and maintains sufficient stock on hand.
- Updates the Commercial Management System records in the system.
- Assists all CS/Riyadh computer users as necessary.
- Reports annual computer equipment inventory to OIS/Washington.
- Maintains a stand-alone FCS Internet computer for users in obtaining commercial information from the Internet.

<u>Administration</u>     **35%**
- Prepares the Country Clearance cables for all CS Saudi Arabia official visitors.
- Checks Riyadh email box on a daily basis and forwards pertinent email messages to appropriate FCS employees.
- Prepares the draft monthly cover-letter for the mailing of 2,000 copies of the Commercial News USA magazine, highlighting U.S. products and CS Riyadh events.
- Acts as back-up time keeper.
- Prepares accommodations and schedules for official/VIP visitors.
- Prepares drafts, letters, memos, and faxes of unclassified subject matter as necessary.

<u>Commercial Librarian</u>     **5%**
- Acts as back-up Commercial Librarian when necessary.

<u>Saudi Women's Businesswomen</u>     **10%**
- As primary CS/Riyadh primary point of contact for Saudi Businesswomen, maintains and builds relations with Saudi businesswomen, attends functions and meetings, helps to build business contacts with U.S. firms, and arranges official Embassy businesswomen's functions as necessary.

# DECLARATION OF
## David H. Rundell

**Aisha Hussain**

    v.

**Agency Case No. 03-55-00217**

**U.S. Department of Commerce**

I, David H. Rundell , FSO 1, Counselor for Commercial Affairs until July 2004 and now Counselor for Economic Affairs at the United States Embassy in Riyadh Saudi Arabia, pursuant to 28 U.S.C. § 1746, hereby declare:

In addition to the statement provided on November 10, 2004, I would like to provide the following additional documents and comment.

I began working with Aisha in early September of 2002. I was always aware of her religious background because Aisha is a Muslim name; to be precise it is the name of the Prophet Mohammad's daughter. I was the Commercial Counselor. Aisha was the Officer Manager. She worked directly for me in an administrative support role.

When I arrived Aisha had begun working on a conference for Saudi businesswomen. She asked to be excused from her normal duties to complete this project. I agreed, however, once the conference was over I asked her to return to her regular administrative duties.

Aisha resisted my requests as her supervisor to return to her administrative duties. The first independent counseling session dealing with this problem was held on October 12, 2004, little over a month after my arrival.

Attached is the memo describing the meeting written by Human Resources Officer Debra Smoker Ali. Also attached is my reply to her memo that clarifies my view of several points. These are documents 1 and 2.

Affiant's initials: _DHR_

**EXHIBIT**

**3**

Page 1

A year latter when a new Deputy Senior Commercial Officer arrived at post, I asked him to take a fresh look at our administrative support function. Ed Burrton's memo clearly notes the shortcomings in Aisah's performance and her persistent efforts to remove administrative tasks from her work requirements. His memo is document number 3.

You now have three memos of counseling sessions held with Aisha. They are from the Human Resource Officer, the Acting Management Counselor and the Deputy Chief of Mission. Higher and higher rainking officers within the Embassy heard Aisha's complaints. They all sought to explain to Aisha her need to perform the administrative duties outlined in her work requirements.

You also have two memos documenting problems with Aisha's performance and behavior. They are from Principal Commercial Officer McGee and Deputy Senior Commercial Officer Burton.

Three of these memos are from women, two from African Americans and one from an officer married to a Muslim. All of these people were present for discussions in Riyadh or with Washington about the decision not to renew Aisha's contract. None disagreed with this decision or found evidence of racial, religious or gender prejudice in it.

For the record, I would also like to state that Aisha was moved from her role as Webmaster to backup Webmaster for three reasons. First, her performance as Webmaster had been poor. Mike McGee, who was in charge of our website, counseled her about this at least twice. Second, once we created an Arabic website, we needed an Arabic speaking Webmaster. Third, and most importantly, we wanted to assign the Webmaster duties to the most technically qualified member of our staff.

Mona Hassoun was given the Webmaster duties. Mona was a native Arabic speaker and had an undergraduate degree in Computer Science. Mona was a Microsoft Certified Professional, a Microsoft Certified System Administrator and a Microsoft Certified System Engineer. Each of these Microsoft qualifications required months of study and passing a rigorous exam. They are industry standard qualifications. Aisha on the other hand was a high school graduate with a few short computer-training courses to her credit. There really was no comparison in their qualifications. As managers, McGee and I sought to fill an important position with the best-qualified employee.

We were well within our authority to do this and we confirmed this fact with our Admin Officers both in Riyadh and in Washington. To be

Page 2 of 4- David H Rundell                     Affiant's initials: _DHR_



precise, we could change work requirements either for the needs of the service, ie office efficiency, or due to performance. Both reasons were relevant in this case, though either one would have been sufficient.

Aisha requested leave without pay in July of 2003. Taking such leave is by no means a right. As the Senior Commercial Officer, granting or refusing this request was my responsibly. Based on guidelines in the Foreign Affairs Manual and our pressing staff shortages, I could have very easily denied her request. I confirmed this option with our Human Resources Office.

Aisha was very concerned for her family's safety. I believe now and believed at the time that she would have left whether the leave was granted or not. I could have forced her to resign. Instead, her personal concerns were taken into account. Her request was granted even though it meant placing an extra burden on the remaining staff. I attach the memo that approved this leave as document 4.

Finally, in "Notes to the File" section D, I discussed Aisha's failure to obtain a Security Clearance despite repeated verbal and written requests to do so.  The essential first step in obtaining a clearance is for her to fill out the application.  I first asked her to apply for a clearance in September of 2002.  She had still not done so by September of 2003.

Attached as document 5 is a memo from my predecessor Charles Kestenbaum concerning Aisha's security clearance. This memo makes clear that the need for Aisha to have a clearance was well recognized long before I arrived and that Aisha did nothing about it for two years.

Attachments:

1. Smoker Ali memo concerning October 7, 2002 counseling session
2. Rundell memo concerning October 7, 2002 counseling session
3. Burton memo concerning administrative support in the office
4. Rundell memo approving Aisha's leave without pay
5. Kestenbuam memo concerning Aisha's security clearance



I have read the above statement consisting of ____3____ pages. I declare
under the penalties of perjury that my statement is true, correct and complete
to the best of my knowledge and belief. I understand that the information I
have given is not to be considered confidential and that it may be shown to the
interested parties.


David H. Rundell                    November 17, 2004

Affiant's initials:  _DHR_



Page 4



Memo to the File

Date of Meeting: October 7, 2002
Time: 1300 – 1400
Place: HRO office

Subject: Summary of meeting between FCS Counselor and LES member

In Attendance:
David Rundell, FCS Counselor
Aisha Hussain, FCS
Debra Smoker-Ali, HRO

The three of us met to discuss Aisha's job description and problems she had spoke about to HRO.

Mr. Rundell suggested that Aisha speak first. He wanted to know what is currently in her current job description and what she was responsible for when working under the previous management. She went over the points such as coordinating paperwork and projects within the office, handling all aspects of representational events, and coordinating the drivers' schedules especially when there was a conflict. She also was responsible for answering the phone and conveying messages to both the American officers and LES in the office. She made travel arrangements for the FCS consular but did not handle travel vouchers. She also assisted Mary Jane in the budget process and covered for her when she was on leave.

Mr. Rundell pulled out the job announcement for Aisah's position from his pocket and said that what was advertised for was an administrative asst./office manager. He clarified that what he wants is someone who can answer all his phone calls, keep track of paperwork and set up a filing system in the office. He believes that Aisha feels the clerical work is beneath her and she has an attitude about doing it. Every time he asks her to do something she has an excuse.

He praised her for the work she has been doing and which could be considered a commerce specialist and said that she has the talent for such work, but he needs a clerical person to screen phone calls and set up appointments according to his new system. Aisha then stated that she is afraid to come to him as he always gets very angry when she tries to explain things. She has no problem in answering his phone but does not know with whom he wants to speak with and whom he doesn't and does not want to be berated when she asks him about the phone calls.

I suggested that the two of them need to sit down and go over exactly what his expectations are from her and to update her position description. He needs to explain what kind of filing system he wants and explain how he wants her to screen his calls. Give her examples of the people he will accept calls from and who he won't.

I then said that from my previous conversation with Aisha it is evident to me that she is afraid to come to him as he tends to get angry and raise his voice to the point of yelling. I continued saying that he may not be aware that he is yelling but sometimes when you are angry you do not realize how your voice goes up. This behavior is unacceptable. He must understand that he cannot raise his voice to anyone in the embassy. at her not matter how frustrated or angry he gets. Please pay attention to your voice when you begin to get upset.

He did not feel that he raised his voice but would work on it. He did say many times in the meeting that he feels that Aisha is not interested in doing clerical work and this is what he needs. He also stated that if she did not want to do this work then it might be best for him to find someone else. The clerical work is especially important as there are only 2 officers doing 4 officers' jobs and he cannot take all of these calls and has limited appointments to ½ hour each.

CC:    Aisha Hussain
       David Rundell
       Margaret Scobey



**EXHIBIT**

4

11/19/04  FRI 13:25 FAX 4883278       ECON                                      ☒006



# Embassy of the United States of America

### U.S. and Foreign Commercial Service
### Riyadh, Saudi Arabia



②

November 9, 2002

To:     HRO - Debra Smoker-Ali

From:   FCS - David Rundell   _D✓✓R_

Subject: Meeting with Aisha Hussain on October 7, 2002

Thank you for your recent memo to the files.   We have prepared a new set of work requirements for Aisha that more accurately reflect the priorities of her original position description.  Things appear to be back on track.

For the record I attach a few thoughts on your memo.

Paragraph two: Aisha's description of her current job included statements about answering phones and dispatching drivers.  The point was that she was NOT performing these duties.  I pointed this out at the time.  This was the essence of the entire problem and should have been recorded in your memo.

Paragraph four: Aisha's claim that she found it difficult to come to speak to me is inaccurate and not borne out by the facts.  During my first week here, she asked to be completely excused of all her normal duties so that she might concentrate on her ladies e-business event. Despite our critical staff shortage, I agreed.  She subsequently asked for overtime to work late on her project.  I agreed.  She then asked for overtime for a driver who could take her home late.  Again, I agreed.  On yet another occasion during my first month here Aisha asked to move to a new and better office.  I agreed.   During the same period, I complimented her work on the ladies' event and told her I would recommend her for an award.  I also discussed with her my willingness to move her position from part time to full time and thus increase her salary package by approximately ten percent.  Aisha had no problem talking with me on any of these matters.  In fact her success in getting her way on so many occasions so quickly had led some in the office to believe she was getting special treatment.

What Aisha did not get her way on was my insistence that she begin to perform the clerical and administrative duties outlined in her job description.  Specifically she was not answering phones, dealing with the drivers' schedules or handling routine filing.  I spoke

---

International Mail:
P.O. Box 94309
Riyadh 11693
Saudi Arabia

Phone : 966-1-488-3800
Fax   : 966-1-488-3237

U.S. Mail Only:
American Embassy
Unit 61307
APO AE 09803-1307



EXHIBIT

_5_

Page 6



with her informally about this twice. Then on October 5, I had a formal meeting with her and the other administrative FSN Mohammed Masood. I outlined what each would now have to do in light of our staff shortages. A written record ~~of this meeting~~ was kept of this meeting. Aisha was asked to perform duties already in her job description. Masood was asked to shoulder additional duties not in his position description. Masood left the meeting and went to work. Aisha, after protesting yet again that she was too busy to answer the phones, went off to file a complaint.

Paragraph five: Your description of previous conversations with Aisha seems to imply that you accept her versions of events as fact. Unless you have independent corroboration of specific times and places where I "yelled" at her, this account should be qualified to make it very clear that these are the allegations of a disgruntled employee, not statements of fact. In particular, Aisha was never criticized for handling my calls incorrectly because she was not handling them at all.

The central issue of this event is a subordinate refusing to perform duties described in her job description. She felt these duties were beneath her. She had asked my predecessor, during his last month at post, to completely rearrange her job requirements to suit her interests not the office needs. You resolved this issue and I appreciate your help.



# Embassy of the United States of America

## U.S. Commercial Service
### Riyadh, Saudi Arabia

 

October 8, 2003

**UNCLASSIFIED**

To:      FCS - David Rundell

From:    FCS - Edward Burton

Subject:   Assessment of current clerical, administrative and officer support

Shortly upon arrival at post, 29 AUG 2003, I began one-on-one meetings with staff to get acquainted and learn how they perceived their individual contributions to office operations. From these meetings, I identified the need to assess the adequacy of current clerical, administrative and officer support as they are currently being performed. This required a thorough review of the office manager position, the incumbent's performance, as well as others who serve a supporting role in the office.

In my discussions with staff and officers, I became aware of the history of the adversarial relationship between you and the incumbent office manager, Aisha Hussain. As the record shows, this history involved disturbing allegations by both of you against the other. The nature of these allegations do not impact this assessment and I have not inquired into them. The record shows Aisha's numerous allegations were investigated and addressed by embassy management. However, it appears to me that the relationship between you and Ms. Hussain has so deteriorated to the point of being irreparably damaged and that any trust either of you may have had for the other has completely and irretrievably disappeared. Since one of the critical functions of the incumbent office manager is to support the Commercial Counselor/SCO and other officers, it was necessary to consider the negative remnants of this relationship within the narrow context of this assessment.

## Assessment

Ms. Hussain was hired after answering the original 04/10/2001 vacancy announcement for a "Fiscal/Administrative Assistant." The "Basic Function of Position" heading for this announcement read: "The occupant of this position serves as Fiscal/Administrative Assistant to the Commercial Counselor, Commercial Attache and the Assistant Commercial Attaché by performing administrative, personnel and budgetary duties." Additionally, the "Major Duties and Responsibilities" heading description stated: "The incumbent of this position serves as Fiscal/Administrative Assistant to the Commercial Counselor, Commercial Attaché and the Assistant Commercial Attaché by performing administrative, personnel and budgetary duties. These duties include overall office management, preparing estimated budgets and reconciling final budgets for trade promotion events. Responding to action cables regarding

International Mail:                    Phone : 966-1-488-3800                       U.S. Mail Only:
P.O. Box 94309                          Fax : 966-1-488-3237                          American Embassy
Riyadh 11693                    E-mail : riyadh.office.box@mail.doc.gov               Unit 61307
Saudi Arabia               www.uscommercialservice.com/saudiarabia/en                 03-1307



**EXHIBIT**

_6_

Page 8



final budgets for trade promotion events. Responding to action cables regarding administrative, budgetary or personnel matters, and designing appropriate action individuals for other action items."

After a through review of Ms. Hussain's personnel file and other file notes, it appears that Aisha's position description was officially changed three times to fit the circumstances and needs of the office and her own desires for career growth. There was a fourth attempt to change her position description (PD) which I address below. However, as you are aware past official PD changes have included assigning duties such as building the FCS website, maintaining FCS Riyadh's Client Management System (CMS), and developing Saudi women-owned businesses as a market for U.S. exports. Notwithstanding these changes, within each successive PD the duties and responsibilities pertaining to clerical and administrative support functions of the office manager have remained constant. Among others, the existing PD for Ms. Hussain (Attached hereto) contains the following support duties and responsibilities:

> "... provides clerical support to the Commercial Counselor and three Commercial Officers, prepares unclassified draft letters, memos and faxes, files these materials, Maintains all common office files ..., handles mainline phone calls, ... handles administrative details for representational events, arranges schedules and official travel for the Commercial Counselor ..., [T]he incumbent prepares schedules for the office drivers, ensures that mileage logs are accurately maintained, schedules routine vehicle maintenance and ensures maintenance logs are accurately maintained."

These include some of critical clerical and administrative support functions of the office manager. And, it is where I have identified weak and non-performance by the office manager and some confusion among staff as to ownership of duties and responsibilities.

As you know, prior to your departure for annual leave, CO Douglas Wallace approached you concerning the restructuring of the duties and responsibilities of Aisha, Mohammed Masood and Abdul Shakoor with an eye toward giving Aisha considerably more computer systems and support responsibilities. My understanding is that you agreed you were open to the idea and told CO Wallace you would discuss it in detail with him upon his return. There seems to have been some misunderstanding in that CO Wallace then proceeded to work out a revised PD for Ms. Hussain.

The revised PD divided Aisha's duties and responsibilities as follows: 50% Computer Supervision (including systems administration); 35% Administration; 10% Saudi Women's Businesswomen; and 5% Commercial Librarian. Despite the misunderstanding between you and CO Wallace, it is clear that this revised PD was never formalized or executed by you, the rating supervisor. I have reviewed this revised PD and have concluded it is unworkable for a few reasons. First, I have confirmed with USDOC HQ computer technical support that the proposed computer support duties in Ms. Hussain's revised PD not only fails to comprise 50% of Aisha's 40-hour work week, it would bearly constitute 10 per cent of that available time. Second, as written, the proposed PD dilutes many of the previously mentioned clerical and administrative responsibilities within her existing PD. And, these support functions serving the office's mission and in large measure you as the SCO are critical to an office that

2




is smooth-running, efficient and responsive to the needs of the corporate constituents we are here to assist.

Although some administrative and clerical duties pertaining to the motorpool and computer support were transferred to Abdul Shakoor Abdulqaum and Mohammed Masood, under the proposed PD for Aisha, I would not change the duties of the incumbent as proposed given the current needs and circumstances of FCS Riyadh.

Clearly, someone should be performing the duties as delineated in Ms. Hussain's existing PD. The record shows that Aisha has demonstrated her resistance, refusal and in some cases failure to adequately perform some of the clerical and administrative duties and responsibilities with her existing PD. In my conversations her, Ms. Hussain voiced reservations over performing several key duties that necessitate working closely with you on a daily basis such as keeping his schedule, retrieving classified communications and passing them along to him, and working with him to assure organized motor pool operations. Undoubtedly, her reluctance to work with you is a consequence of the contentious relationship she has had with you and the allegations made against you.

Weak performance by Ms. Hussain, particularly regarding responding to and completing some assigned administrative and clerical tasks, coupled with her reticence to work with you I believe has compromised her effectiveness as the office manager. In my opinion, the trustful and mutually supportive relationship that should exist between an FCS office manager and the post's SCO has been irreparably damaged.

## Recommendation

Currently, we have upgraded computer servers that will demand considerably less time in systems administration as before. The office manager's time should be devoted to those duties and responsibilities as outlined, and within those percentages stated, in the existing office manager's PD. However, since I believe circumstances will not permit her to effectively discharge certain critical clerical and administrative functions, serious consideration should be given to renewing her contract. Although Mohammed Masood has improved in his financial management abilities, I believe he can be used more efficiently in a number of other areas including computer support for which he has training and was originally hired. Although Abdul Shakoor was hired as a driver, he has expressed a keen interest in performing some limited clerical and administrative support work. In short, I believe there should be adjustments made in work responsibilities and duties to better serve the needs and mission of the office, its staff and officers. I have specific ideas I would like to discuss with you at your convenience.

 Page 10

11/19/04  FRI 13:27 FAX 4883278





## THE COMMERCIAL SERVICE – RIYADH

**UNCLASSIFIED
MEMORANDUM**

**Date:**        May 27, 2003

**To:**           ADM - Chris Riche

**Through:**   FCS – David Rundell    *DHRundell  OK*

**From:**       FCS – Aisha Hussain

**Subject:**    Request for unpaid leave

Due to the Embassy being on ordered departure and the overall unstable climate in Saudi Arabia, I would like to apply for unpaid leave. One of my main concerns is for my daughters. I would like to request from June 2, 2003 to August 2, 2003. I look forward to returning to work after this. I would greatly appreciate it, if you would consider this request.

11/19/04  FRI 13:27 FAX 4883278        ECON                                            ☑012





## THE COMMERCIAL SERVICE – RIYADH

**UNCLASSIFIED**
**MEMORANDUM**

**Date:**      November 26, 2001

**To:**        Sharon Nichols-HR

**From:**      Charley Kestenbaum-FCS

**Subject:**   Secret Security Clearance

Please initiate the necessary paperwork for Aisha Hussain to receive the blue secret security badge.  She has the need to go upstairs for various reasons.  Some of these reasons include checking cable traffic, getting signatures on various documents from protocol, and the Office Mangers of the DCM and AMB, and providing the AMB and DCM with various documents as necessary.

Her husband is a Senior Manager at Lucent, and is involved with various projects, and they are anticipating to stay in Saudi for a couple of years.  Therefore we are requesting clearance for Aisha Hussain to receive a blue secret security badge.

## Notes to the File A

## Aisha Hussain
## Position Description

Aisha was hired as and Administrative Assistant. Providing administrative support for this large office was the one constant factor in all of her work requirements statements. Providing this support efficiently was critical at a time when the office was missing two of its three officers.

A great deal of thought and effort went into writing and rewriting Aisha's position description. Serious consideration was given to finding a program that would allow Aisha professional growth, while also insuring coverage of the office's administrative needs.

On October 23 2002 Aisha asked to be given responsibility for an Industry Sector. She also asked to continue working with PCO Mike McGee on our website and BuyUSA program. Both requests were agreed to in writing.

On November 10, 2002 Aisha asked to be given responsibility for women's outreach and part of the IT sector. Again, both requests were granted.

In March 2003, PCO McGee asked that Aisha no longer serve as the principal FSN working on our website. At her request, Aisha's position description was again formally modified in April to reflect that she was now the backup webmaster. She subsequently asked to keep her outreach to women responsibilities and this was agreed to.

Attachments:

1. October 23, 2002 memo concerning work requirements

2. November 10, 2002 memo concerning work requirements

3. April 23, 2003 memo concerning work requirements

EXHIBIT
7

Page 13



## THE COMMERCIAL SERVICE – RIYADH

**UNCLASSIFIED**
**MEMORANDUM**

Date:        October 23, 2002

To:          David Rundell

From:        Aisha Hussain

Subject:     Job Description

*Yes if you have time to take a sector or assist with one that is great. Just remember Mona has no website on BuyUSA problem to worry about*

As per your request I have update the job description. Please feel free to make what ever changes you would like. However, since you mentioned that Mona Hassoun in Jeddah handles sectors along with her current duties and that I could do the same if time permitted, please let me know if you would also like me to do this.

Since I have been working with the development, creation and maintenance of the BuyUSA main and local web site since February of 2001 through the time when these sites were being launched, I would like to continue to do this in coordination with Michael McGee as you had mentioned. I would appreciate it if you could consider this since I have proven that I am capable of handling this job function.

Thanks.

*Fine idea*

*PS Let me know which sector you are interested in*

Page 14

Job Title: Office Manager

## Basic Function of Position:

The occupant of this position serves as Administrative/Fiscal Assistant/Webmaster and backup system administrator.

## Major Duties and Responsibilities:

1. The incumbent provides clerical and logistical support to the Commercial Counselor, and other Commercial Officers, as required. Provides guidance and support to administrative assistants at constituent posts. Handles incoming calls for the Commercial Counselor, receives office visitors and arranges accommodations for the Commercial Counselor and official/VIP visitors. Arranges details of representational trade events.

2. Prepares drafts, letters, memos, and faxes of unclassified subject matter for the Commercial Counselor and files these materials, as well as maintain a filing system for the Commercial Counselor. Assists Commercial Specialists as needed in organizing and promoting trade events. Supervises the office drivers to ensure that routine maintenance of the office's three vehicles is scheduled, and the vehicle use is coordinated effectively through management of vehicle logs.

3. The incumbent is responsible for the Riyadh Office e-mail box for action items, and routes them appropriately. In addition, the incumbent is responsible for checking the Commercial Counselor's state email. The Incumbent will provide e-menu, fiscal, and time and attendance support when the primary fiscal person is on vacation.

4. Assists in the development and will be responsible for the maintenance of USFCS/Saudi Arabia's Internet presence. This includes the main BuyUSA web site and the local BuyUSA/Saudi Arabian web site.

*[signature]*
Oct 23, 2002


11/14/04   THU 14:05 FAX 4883278



U.S.
COMMERCIAL
SERVICE
United States of America
Department of Commerce

## THE COMMERCIAL SERVICE – RIYADH

**UNCLASSIFIED
MEMORANDUM**

**Date:**      November 10, 2002

**To:**         David Rundell          *OK DHR*

**From:**      Aisha Hussain

**Subject:**    Request for taking up a sector

One of the sectors I am interested in taking up is the IT and computer hardware and software sector to promote to women only. I am not interested in taking this sector away from Ahmed Khayyat or assisting him with his projects. I would only like to be involved in conferences and meeting that I could benefit from to be updated about the latest technology and etc. Per my conversation with Ahmed Khayyat there are meetings and conferences that women only are allowed to attend. Since I have a strong IT back ground both in computers and in the telecom industry, I would appreciate it if I could be considered for this.

In addition, I have already started a good relationship with the Saudi businesswomen in Riyadh and this would help in promoting US products and services to them. Some examples of promoting our products and services to women owned businesses and computer related businesses are:
1. Ms. Huda Jeraisy who is very interested in having her computer software certificates Microsoft certified.
2. Ms. Shamseia Tanveer is interested in purchasing child development materials and would like to come to the Embassy so that I could enroll her business (Cordoba Day Care Center) on the BuyUSA website, since she is not that familiar with the internet.
3. Ms. Amal Benis who owns Eve Beauty salon is interested in purchasing some hair care products.

Therefore, maybe I can take up the option of being responsible for women's outreach programs and promoting US products and services to women owned businesses. Please let me know what your thoughts are and feel free to make the changes you would like.

Thanks.



11/04/04   THU 14:05 FAX 4883278

**Job Title: Office Manager**

**Basic Function of Position:**

The occupant of this position serves as Administrative/Fiscal Assistant/Webmaster and backup system administrator.

**Major Duties and Responsibilities:**

1. The incumbent provides clerical and logistical support to the Commercial Counselor, and other Commercial Officers, as required. Provides guidance and support to administrative assistants at constituent posts. Handles incoming calls for the Commercial Counselor, receives office visitors and arranges accommodations for the Commercial Counselor and official/VIP visitors. Arranges details of representational trade events.

2. Prepares drafts, letters, memos, and faxes of unclassified subject matter for the Commercial Counselor and files these materials, as well as maintain a filing system for the Commercial Counselor. Assists Commercial Specialists as needed in organizing and promoting trade events. Supervises the office drivers to ensure that routine maintenance of the office's three vehicles is scheduled, and the vehicle use is coordinated effectively through management of vehicle logs.

3. The incumbent is responsible for the Riyadh Office e-mail box for action items, and routes them appropriately. In addition, the incumbent is responsible for checking the Commercial Counselor's state email. The incumbent will provide e-menu, fiscal, and time and attendance support when the primary fiscal person is on vacation.

4. Assists in the development and will be responsible for the maintenance of USFCS/Saudi Arabia's Internet presence. This includes the main BuyUSA web site and the local BuyUSA/Saudi Arabian web site.

5. Responsible for women's outreach programs and promoting US products and services to women owned businesses.

Recieved
Nov 10, 02
DF Rundt

**Notes to the Files B**

## Aisha Hussain
## Website Duties

Under the direct supervision of Principal Commercial Officer Mike McGee, Aisha was responsible for maintaining the FCS website from before September 2002 until March 2003.

McGee is one of the Commercial Service's most experienced e-business officers. According to our Post Strategic Plan, he formally supervised all IT and e-business activities at all three posts in Saudi Arabia.

McGee found Aisha's work to be of poor quality due to her lack of skill and lack of effort. After discussing these problems with her on at least two occasions, he recommended that her duties be shifted to another FSN.

Attached are two detailed memos describing McGee's assessment of the website and Aisha's performance.

Attachments:

    1.  McGee memo concerning Aisha's performance.

    2.  McGee memo concerning Aisha position description.

EXHIBIT

tabbies

8



**Michael McGee**          To: david.rundell@mail.doc.gov
04/16/03 03:09 PM          cc: Mona Hassoun/SAUDIARABIA/USFCS/USDOC
                           Subject: our web presence and ebusiness tools

When I agreed to get involved in the ebusiness activities here in Saudi Arabia, I had no idea that it would involve so much wasted effort to "justify" to Aisha that the FSOs are the supervisors and managers here and she is a subordinate. Sadly, you, and I have been drawn into endless emails, and phone calls that have taken many hours of our time because one person refuses to cooperate with us. Had her work been exemplary, perhaps it would have been worthwhile, but Aisha, neither a background in trade promotion or significant experience in designing websites, other than some html coding, which is like glorified typing. Whatever skill, training, or experience she has was lost in her negligent or vain behavior.

I appreciate your confidence in Mona and me and our efforts to bring CS Saudi Arabia up to par with the expectations CS HQ, but frankly speaking, we are beyond frustration with Aisha's arrogant and intransigent attitude. On several occasions you have spoken with Mona or I about the website and the status of our ebusiness program in Saudi Arabia. We gave you a thorough verbal briefing, but we have been hesitant to document the sad state of our website and the poor use of our ebusiness tools, because I did not want to humiliate Aisha or get into some long drawn out debate. We preferred to focus our energy on positive features of improving our performance and ability to support US companies, but Aisha has continually eaten up so much time with her tiring unprofessional behavior. Now it is time to try to put this matter to rest with a complete analysis of the work.

As you know, my last assignment was Director of the BuyUSA office in Miami. In that capacity, I spent 2 years working on the Commercial Service's eMarketplace, which was a partnership between IBM and CS. Before that, I pioneered the development of the CMS and developed ground breaking electronic strategies in Argentina, both of which were the reason why I was chosen for the Miami assignment. I supervised or participated in the user analysis, conception, design, training, of all aspects of our Commercial Service ebusiness tools. I also reported directly to the Deputy Director General and it was my responsibility to brief, consult and advise him and all of senior management in the Commercial Service on these and other technology issues and programs. It should be noted that I was the highest-ranking Foreign Service Officer associated with the development of BuyUSA. My other responsibilities included designing the CS Web-based Market Research database, which is used worldwide by all of our more than 200+ offices, and I collaborated on the design of the TMS, which is the country specific CS websites (the same website that Aisha claims to be the top expert). I participated in training the domestic and foreign field in the use of these websites. I also participated in the design of the Emenu and intranet training modules, and carrying out the training, for the foreign and domestic offices.

You also have ample evidence of Mona's training and background, which is unique within the Commercial Service in ANESA and among the most qualified in the Commercial Service worldwide. I think we are very well qualified to evaluate the ebusiness tools and their use here in Saudi Arabia.

From the beginning, Aisha has been very uncooperative. I had to ask her for the password to the website several times, even before I decided to move the management to Jeddah. She boasts of her qualifications, but there is little or no correlation with her work.

A few points about the CS Saudi Arabia website worth mentioning are:

- The contact information was very outdated. For instance, David Kelly, the officer killed in an auto accident last August, was still listed in the contact list in January when I assumed responsibility for the site. Aisha's response on why she had not removed his name was that she was not sure if she was going to stay with CS. Sincerely speaking, I do not know which is worse, the act of negligence or admitting it.
- All of the events had already past and that section had not been updated in many months. In this case, Aisha's response was that you had not been given her time to work on the site. I find that strange, since the outdated events had been left from the time of the previous SCO, during the period between his departure and your arrival, and after your arrival.

- Were they companies previously unknown to CS?
- Were they already in the CMS and simply pushed to BuyUSA (which has not proved to get clients to visit and use the site and is often unappreciated by the clients)?
- Were the Commercial Specialists involved in contacting and recruiting the clients, or did Aisha do all this alone?
- How many credible leads and/or export successes have been generated from the 500 registrations through BuyUSA? (I think there has been 1 export success)

Sorry to slam this so hard, but enough is enough. I am a veteran of commercial work for many years and experienced in using electronic tools and organizing productive trade events. I can learn from anyone, but it bothers me to be consistently criticized and questioned by someone that has less credentials and poor performance. Perhaps this will help you and anyone that has to become involved in the ebusiness parts of this ongoing dilemma with Aisha.

Michael L. McGee
Commercial Attache
US Commercial Service
Jeddah, Saudi Arabia
Tel: 966 2 606 2479 x 210
Fax: 966 2 606 2567
michael.mcgee@mail.doc.gov
http:www.buyusa.com

11/01/04  THU 14:11 FAX 4883278



**Michael McGee**          To: David Rundell/SAUDIARABIA/USFCS/USDOC@USDOC
03/29/03 05:18 PM          cc:
                           Subject: Re: PD for Aisha

I will do my best to answer your questions as objectively and honestly as I can. I base my answers on what I view as our program needs and how to best fill those needs. I will address the additional staff needs of our ebusiness activities. These are above and beyond what has been clearly defined in Mona's PID and numerous emails.

First of all, our ebusiness activities require close team work and should include individuals from each post that can share with and support each other. Beyond Mona's position and the support from the System Administrators in each post, we need the collaboration of key FSNs that are deeply involved with the planning and execution of our trade promotion and financial/administrative activities.

The ebusiness activities should not be isolated from the rest of our activities. They are simply a distinct medium through which we execute our programs. Mona is the best qualified to deliver the technical coordination and management of our ebusiness activities with minimum help, but she will need experienced Commercial Specialists to provide her with content, insight into how business is done, and help with recommending priorities.

**CS Saudi Arabia WEBSITE:**

We need someone at each post to coordinate the gathering and organization of content. When I say content, I mean: editorials, event/product/service information, contact information, business service provider information, major project information, market research, general commercial related information, etc.) relevant to that post and territory. That information should be forwarded to one person to upload (Mona). This will ensure consistency, quality, and freshness of the content we display. It will also center this under one head, that responds to SCO/FSO(s). Mona is working on a style guide and orientation about how to present the information for speedy upload.

The researching, gathering, drafting, editing, planning, and execution of promotional activities and recruiting of business service providers, should be contributed by all of the professional staff at each post, under the coordination of a seasoned Commercial Specialists with the guidance/support of an FSO.

I think someone like Maher is the most appropriate/qualified to coordinate Riyadh content. (Hussam for Jeddah, and Robert should identify someone for Dhahran)

**Emenu**

Each post should have one (or two) staff members collaborating on Emenu at that post. Ideally that person would be involved with the financial/administrative responsibilities and product/event planning delivery at that post. This local activity involves entering and monitoring obligations and liquidations (O&A), entering collections, entering and updating information on products and events (Trust Fund), keeping the contact information up to date, and generating surveys and reports on post activity.

I think Masoud, and to a lesser extent someone like Maher, are more directly involved in Emenu activities in Riyadh. (Mona/Hussam for Jeddah, and perhaps Shella/? for Dhahran - Robert's call)

**CMS**

Generally speaking CMS activity is specific to each staff member and other than occasional training it does not need to be coordinated at each post. Mona can handle coordinating changes, updates, and troubleshooting with WDC.

**Intranet**

Same as CMS

BuyUSA

Same as CMS, except for promotional activities.

Mather or someone with deep understanding of event management and single company promotions is best suited for that activity. (As I understand it, you spent $3,000 (from O&A) on the BuyUSA event, while we generated $4,000 through sponsors to pay for 2 events (180 in the men's and 50 in the women's), plus the Hijaz Award certificates, plus some additional that will be used for travel.)

My point is; promotional activities should always recover the costs. Consequently, an experienced Commercial Specialist(s) is more qualified to promote/manage BuyUSA.com.

System Administrator and Microsoft Suite

That seems to be working as it has been assigned now, but Mona is well qualified to handle the coordination with WDC and troubleshoot for all three posts.

To answer your questions directly,

1.  I see no role for Aisha. As I understand it, in addition to her office manager activities, she has interests/responsibilities in businesswomen's activities. According to her, she had little or no time to work on ebusiness activities up January, when we assumed responsibility for them. Does she have time to do them now? If so, perhaps she could increase her support for your administrative activities. She might also have time to take responsibility for a sector or do market research. That would give her a deeper understanding of commercial work and the CS, which would help to grow professionally.

2.  Answered in 1.

This was more than a sentence or two, but hopefully it will be useful.

Michael L. McGee
Commercial Attache
US Commercial Service
Jeddah, Saudi Arabia
Tel: 966 2 606 2479 x210
Fax: 966 2 606 2567
michael.mcgee@mail.doc.gov
http:www.buyusa.com

# Notes to the File C

## Aisha Hussain
## Lack of Flexibility

The Job Announcement that Aisha answered and the Positions Descriptions that she signed clearly stated certain clerical duties such as answering phones, filing, escorting visitors and supervising the FCS drivers.

While Aisha was willing to expand her work into areas she found interesting, she persistently refused to perform some of the functions for which she was hired.  This led to numerous meetings that specifically dealt with her reluctance to perform tasks outlined in her work requirements.  Some of these meetings are documented here.

Attachments:

    1.  Meeting with Senior Commercial Officer

    2.  Counseling Session with Acting Management Counselor

    3.  Meeting with Senior Commercial Officer

EXHIBIT

tabbies®

9

Page 29

April 6, 2003

To: The File

From: - SCO Rundell *DAN*

Subject: Motorpool Supervision

Today I met with Aisha, Shakoor and Masood to make certain they were all clear on the motorpool supervision policy. Omar was not available. I reviewed our new policy of giving drivers 24 hours notice if a driver was expected to come late and work late. I noted that tonight would be the first example of this policy and that since Shakoor had not received 24 hours, notice he would be paid overtime.

I then noted that there was a potential problem because Aisha supervises the motorpool and Masood keeps my schedule. I asked that they coordinate.

Aisha very clearly resisted this and attempted to shift the responsibility for checking my schedule to the drivers. She said she did not schedule the drivers, but only stepped in when there was a problem. I reminded her that it was in her position description to schedule and monitor the drivers. She said she had too much else to do and was too busy to get involved in this on a daily basis. I pointed out that office mangers in Jeddah and Dhahran both closely coordinate the driver's activities and that it was not the driver's job to schedule themselves. She countered again saying this was not how things worked here in Charlie's time. I pointed out that Charley was no longer here.

I concluded by saying that I was not trying to create work or additional layers of bureaucracy. If drivers could anticipate which days they needed to come late, that was fine, but the officer manger needed to be aware of what hours each driver worked on a daily basis so that this can be accurately reported to the time keeper. We were not going to have a situation in which drivers come late or early on their own accord without supervision.



"Mayberry, Alberta J"
<MayberryAJ@state.go
v>

04/19/03 03:24 PM

To: "David.Rundell@mail.doc.gov" <David.Rundell@mail.doc.gov>
cc:
Subject: FW: Regarding meeting today

Sorry, I thought that your name was on this exchange.

-----Original Message-----
From: Mayberry, Alberta J
Sent: Saturday, April 19, 2003 2:36 PM
To: 'Aisha.Hussain@mail.doc.gov'; SmokerAli, Debra L
Cc: 'Bobette.Orr@mail.doc.gov'; 'Michael.Staunton@mail.doc.gov'; Riche,
Christopher R (Riyadh)'; 'JeNelle.Matheson@mail.doc.gov'; Scobey,
Margaret M; Riche, Chris X(Jeddah)
Subject: RE: Regarding meeting today

Aisha, I am personally and professionally incensed at the statements in this
email and the obvious one-sided views that you have provided to Commerce on
our Meeting on last Wednesday.

To begin with there was never an intent of "Ganging up" on you. I must note
that you made no mention of the composition of the meeting at the outset or
during the meeting.

Ganging up on you would have been us talking and dictating and not allowing
you to express your views, opinions or concerns. This was certainly not the
case. You were repeatedly asked for input and if you had questions or
concerns. The meeting was predicated on fair exchange on the PD and was
proposed by HRO Smoker-Ali and Mr. Rundell, and as stated at the outset of
the meeting by me. In only two instances did stop you from speaking; once
on your performance as that was not a point of discussion at this time and
another time on your other allegations against Mr. Rundell (those matters
were handled properly by the ADMIN/C and the DCM.) Otherwise, you were
allowed to speak at will and I will say that you spoke at great length.

Ganging up on you would have been pulling in a group of adversaries "out to
get you." You have come to me and spoken to me of these problem on numerous
occasions, as you have with MANY other members of the Embassy community. I
am not a stranger to you or your concerns. You sought me out. I aided in
the continued deliberations of this matter by advancing it to the ADMIN/C.
It is a personal affront to be called a part of a 'ganging up effort' for
doing my job.

Ms. Smoker-Ali was anything but adversarial with you, nor was Mr. Rundell.
Case in point, when I explained that your change in responsibilities could
not effect your position grade or salary while under the current contract,
Mr. Rundell explained that a part of the delay in the rewrite in your PD was
because he did not want you to suffer any salary loss. HE WAS LOOKING OUT
FOR YOUR RIGHTS! He also readily agreed at Ms. Smoker Ali's suggestion that
the Women's Group be added back to your PD. They were both looking after
your rights. We all agreed that the Final Word on your PD was approval from
Commerce and that our meeting was for clarification of expectations. We all
agreed that if Commerce came back with a declaration that the supervisor
could not make the changes as requested, that it would be on Mr. Rundell to
rectify matters with the American Officer in Jeddah. We were acknowledging
that your rights would be honored and upheld.

While you have documented many things, you seem to negate the use of other
documentation that I attempted to point out to you. We compared the current
PD (the Version that Mr. Rundell has sent in to the DOC for review/approval)

with the Position announcement and the two previous announcements. You have
signed in October and November 2002, versions that are very similar to the
current position description in the arrangement of duties. On one hand, you
claimed not to know that the order of the tasks were the priorities of the
office; on the other hand you admit that you signed the two PD revisions as
the priorities of the supervisor. I asked you to review the POST Job
announcement under which you were hired, and you wanted to refer to the
commerce PD only. Your contract refers only to the Job announcement.
Again, that announcement, the October and November 2002, PDs and the current
PD under discussion are very similar. As I stated in the meeting, Mr.
Rundell had done what you initially told me that you wanted. You stated on
several occasions to me that he had switched the responsibilities of the
WebPage and Internet to Jeddah. You even told me that the staff member who
took on the responsibilities did not have the technical background to do the
work. While Mr. Rundell paints a different side of that story, I felt that
you deserved what you asked for, the rewrite of your PD so that he(David
Rundell could not evaluate you on responsibilities he had transferred to
someone else. I was stunned that you denied or didn't remember that you had
told me that.

Finally, I resent that you imply that this post, the officers at this post,
or Commerce for that matter, have not taken proper deliberation or
corrective actions on behalf of your complaints/concerns. Yes, we have. I
have advised Ms. Smoker-Ali to compile a chron log of her and post's
actions. That you are not party to all deliberations concerning the
American Officer does not mean that this Embassy has not been diligent in
its approach to this problem. That you may not get the answers that you
seek does not mean that we have not sought the correct information in this
matter. The meeting last Wednesday afternoon was one more occasion to
resolve this matter in a professional manner.

Alberta Mayberry
Administrative Officer

May 26, 2003

To:        The Files

Subject    Aisha Hussain

I returned from the official travel to the WorldWide SCO Conference last week. Today I asked Aisha to complete my travel voucher.

She informed me that this was not her job. She said that as this dealt with budget it was Masood's responsibility. She raises this objection during a staff meeting and I chose not to argue with her in public. I subsequently spoke with her again alone and advised her that handling travel issues for the SCO was a routine part of Office Manager responsibilities including those in Jeddah and Dhahran.

@008

11/04/04   THU 14:06  FAX 4883278



**Embassy of the United States of America**

U.S. Commercial Service

Riyadh, Saudi Arabia



April 7, 2003

TO:        HR - Debra Smoker Ali

FROM:      FCS - David Rundell

SUBJECT:   Position Description for Aisha Hussain

Thank you for your memo of March 9, requesting a revised position description for Aisha Hussain. I am attaching a new position description that more accurately reflects the work she was hired to do, has been doing since my arrival and will be expected to do in the future.

**Background**

As you may know, FCS Saudi Arabia made a strategic decision this year to transfer the management of all IT- related issues to the Principal Commercial Officer in Jeddah. We also transferred supervision of all three partnership posts to our Principal Commercial Officer in Dhahran. These moves were part of our FY 03 Strategic Plan that was approved by Washington management. A copy of the plan is attachment 1.

There were several reasons for these changes. First, we are short two officers in Riyadh and some activities simply had to be delegated. Second, we are trying to create a less vertical management structure without everything being run from Riyadh. For example, some of our budget process has now been decentralized. Giving Kingdom-wide responsibility for some programs to the constituent posts was part of this initiative. Finally, our PCO in Jeddah, Mike McGeee, has had previous tours devoted completely to website development and is one of the Commercial Service's acknowledged experts in e-commerce.

Aisha had been responsible for the website. Mike took charge on January 1, 2003. He was not pleased with what he found. On January 14 he informed me that the site was "very stale and poorly designed." He further noted that "our website has been neglected since well before you and I arrived and there is no excuse for its incorrect and embarrassing information." His January 14 e-mail is attachment 2.

International Mail:           Phone : 966-1-488-3800        U.S. Mail Only:
P.O. Box 94309               Fax : 966-1-488-3237           American Embassy
Riyadh 11693                 E-mail : riyadh.office.box@mail.doc.gov      Unit 61307
Saudi Arabia                 www.uscommercialservice.com/saudiarabia/en   APO AE 09803-1307



EXHIBIT

10

18

Mike prefers to maintain the website with the assistance of his office manger Mona Hasson. Mona's IT expertise is well recognized within the Commercial Service. She has a B.Sc. in Computer Science. She is a Microsoft Certified System Administrator, and a Microsoft Certified System Engineer. These qualifications require passing a series of rigorous examinations. . Her qualifications significantly exceed those of any other Commercial Service FSN in Saudi Arabia. She is fully familiar with HTML website code.

Perhaps most importantly, Mike and Mona have now built an Arabic language FCS website that mirrors our English site. Maintaining the Arabic site requires and Arabic speaker. Mona is an Arabic speaker. Aisha is not. Mike has prepared a new PD for Mona which includes increased IT and e commerce functions. This new PD has been sent it to Washington for approval.

## Aisha's Position Description

While there were initial interoffice tensions, Mike held several discussions with Aisha and believed he had worked out a modus vevendi with her. I expected that Aisha could continue to work under her existing position description and told you so in a phone conversation following your March 9 memo. Please see attachment 3 concerning Aisha's understanding of her role.

However, in light of subsequent requests from Aisha for further clarification, I have now prepared a new Position Description for her. Most of the PD remains unchanged. It reflects the original job announcement and the work done by office managers at other posts. It clearly notes that Aisha's principal duties are clerical and administrative. Primary focus on these duties is absolutely essential at a time when we are missing two of three tenured officers and one out of three support staff. Her Position Description includes:

1. Provide clerical support for the Commercial Counselor and three Commercial Officers
2. Draft English language letters, memos, faxes and diplomatic notes.
3. Handle mainline phone calls. Maintain and distribute current phone lists.
4. Meet and escorts visitors.
5. Make official travel and accommodation arrangement for the Commercial Counselor and official visitors.
6. Arrange details of representational events.
7. Maintain common office files.
8. Schedule office drivers to ensure effective coordination.
9. Ensure preparation of accurate, up to date vehicle mileage and maintenance logs.
10. Monitor and distribute Riyadh office box e-mail and our State e-mail connection.
11. Monitor and procure office supplies.
12. Coordinate routine personnel actions including the preparation of leave schedules.
13. Serve as the principal liaison between FCS and GSO.
14. Serve as floor warden.

11/04/04   THU 14:07 FAX 4883278                                                              ☒010

## Website Duties

Before preparing Aisha's new PD, I conferred with PCO McGee about what role he now saw for her in website management. In a detailed two-page memo, PCO McGee described why several other FSNs are better qualified to help maintain the website. He saw no further role for Aisha. Please see attachment 4 concerning the role of various FSNs in maintaining the website.

PCO McGee has been given responsibility for our e-commerce initiatives. He will be judged by their success. I am not going to second-guess his personnel selections. Nor do I anticipate responsibility for e-commerce coming back to Riyadh when McGee departs post.

I attach Aisha's new PD. It no longer includes building the FCS website, since this work is already done. It no longer includes maintaining our Customer Management System, since this work is now done by the individual Commercial Specialists. It no longer includes website maintenance since this work is now done in Jeddah. However, Aisha has not been excluded from IT work. She remains the backup for website maintenance, just as she has been the backup system administrator and backup timekeeper. Please see attachment 5 Aisha's new position description.

Attachments:

1. FY 2003 Post Strategic Plan for Saudi Arabia
2. McGee E-mail concerning the state of our website
3. McGee E-mail concerning Aisha's understanding of her duties
4. McGee E-mail concerning e-commerce staffing
5. New Position Description for Aisha Hussain

cc. Admin Chris Riche

## Position Description

### Office Manager

**Basic Functions of Position:**

This is a 40-hour per week American PSC position. The occupant of this position serves primarily as an administrative assistant, but also as the backup system administrator, time keeper and webmaster.

**Major Duties and Responsibilities**

30 % The incumbent provides clerical support to the Commercial Counselor and three Commercial Officers, prepares unclassified draft letters, memos and faxes, files these materials, maintains all common office files and monitors and distributes e-mail messages addressed to the Riyadh office box as well as on the State intranet.

30 % The incumbent handles mainline phone calls, receives office visitors, handles administrative details for representational events, arranges schedules and official travel for the Commercial Counselor and arranges accommodations and schedules for official/VIP visitors.

20 % The incumbent serves as the principal liaison between the Commercial Section and the GSO Section, prepares work orders and coordinates their execution, monitors and procures office supplies and coordinates routine personnel actions including leave schedules.

10 % The incumbent prepares schedules for the office drivers, ensures that mileage logs are accurately maintained, schedules routine vehicle maintenance and ensures that maintenance logs are accurately maintained. The incumbent also provides backup in the absence of the timekeeper, systems administrator and webmaster.

10% The incumbent is responsible for women's outreach programs and promoting FCS products and services to businesswomen.

**Required Qualifications:**

Education:  Completion of secondary school.
Experience: Must have three years work experience in personnel administration or a closely related office environment.
Knowledge: Good knowledge of general office skills.
Language Proficiency: Level IV (fluent) English.
Skills and Abilities: The incumbent should be familiar with Windows NT, Lotus Notes, servers, working within a LAN environment and possess Level IV (45 WPM) typing skills in English.  The incumbent must be tactful and have an ability to deal with the public.

**Desired Qualifications:**

Education:  College degree.
Experience: Prior office work experience with a USG agency.
Language Proficiency: Level IV (fluent) Arabic.
Skills and Abilities: Knowledge of 3,4 and 6 FAM regulations concerning personnel, budget and general service administration.

### Notes to the Files F

## Aisha Hussain
## Loss of Confidence

Aisha has made dozens of false accusations against her supervisor. She made these charges in writing both to Washington and post management. At no point did she first discuss these issues with her supervisor or even inform him that there was, in her view, a problem.

A pattern of behavior developed in which when one charge was dismissed, another was added. Many of these charges were serious. They included malfeasance, visa fraud, sexual harassment and religious persecution. It became clear that Aisha's intent was not to resolve problems. She sought to deliberately undermine her supervisor's authority and damage his reputation. In doing this, she was quite successful.

Two examples during a meeting with the DCM illustrate a clear pattern of behavior characterized by inaccuracy and fabrication. First, Aisha accused her supervisor of persecuting her because she was a Muslim. While she initially claimed to have been interrupted while praying, she subsequently admitted that this never happened. She then claimed to have been denied overtime only to again subsequently admit that this had not happened.

In a third instance, Aisha complained to post management that her supervisor had arbitrarily canceled leave. The attached memo clarifies this event. Briefly, leave had been granted to two drivers at the same time only to avoid a loss of leave for a driver who had decided at the last moment to retire. When he changed his mind again, decided not to retire and no longer risked losing leave, there was no need for two drivers to be off at the same time.

Aisha's repeated and widespread false accusations ultimately led to a complete breakdown in trust between her and her supervisor. This in turn significantly damaged office operations. As the DCM noted in her meeting with Aisha, reestablishing her supervisor's trust is essential to the effective performance of her duties as Office Manger.

Attachments:

1. Memo concerning false accusations of religious persecution and denial of overtime.

2. Memo concerning false accusations of arbitrary cancellation of annual leave.

**EXHIBIT**

11

# Memo to the file on meeting with Ms. Aisha Hussain

**Time:** 1500 hours
**Date:** April 19, 2003
**Place:** DCM Office

**In Attendance:**
Aisha Hussain, FCS employee
Margaret Scobey, DCM
Debra Smoker-Ali, HRO

The three persons listed above met in the DCM's office to discuss Ms. Hussain's grievances concerning her job description and supervisor, Mr. David Rundell.

Ms. Scobey began the meeting by stating that she had been briefed about Aisha's concerns on a continuous basis since October. She stated that the meeting was held in an effort to promote communications and at the same time to bring these issues to closure. Ms. Scobey's basic question was, "What do you want?" "We know you are unhappy, what will make you happy."

Aisha responded by thanking Ms. Scobey for taking the time to meet with her. What she wants is help from Ms. Scobey and requested that she speak to Mr. Rundell about the list of grievances she had brought with her. Aisha feels that she is being discriminated against because she is a conservative Moslem woman of Indian origin.

Ms. Scobey responded that she was aware of these points as they had been brought up in the many lengthy emails of which she had received copies. DCM Scobey mentioned that we take every EEO accusation very seriously, as should the person making them. She went on to ask what grounds Aisha had for these accusations, such as ethnic remarks. Aisha responded that Mr. Rundell has pulled her out of prayer on occasion. She went on to explain that she closes her door when she does her prayers for about 5 minutes twice a day during working hours. Ms Scobey responded, "What do you mean? Does he physically open the door and grab your arm or how does this happen." Aisha explained that when she closes her door she can hear David coming down the halls saying her name. If she has not begun praying then she opens the door and steps out to talk to him. Ms. Scobey asked, "How many times has this happened in the last eight months?" and Aisha responded, "two." (In subsequent discussion with Mr. Rundell and DCM, Mr. Rundell said he did not even know that Aisha was praying in her office and never intentionally interrupted her prayers. He noted that the rest of the Muslim FCS staff also prays in the office.)

The DCM explained that we know after speaking to the HR officer in Commerce, that David as the manager has the right to decide who is assigned what tasks among his staff. An employee may want to do a specific task and may ask but that does not mean that the supervisor must agree. For example: If the DCM goes to the Ambassador and requests a specific task, the Ambassador has the right to refuse the DCM's request and give the task

April 5, 2003

To: The Files

From: SCO David H. Rundell

Subject: Mubarak's leave in Nov/Dec 2002

Ramadan Hours:

FCS only has 2 drivers who between them cover 12-13 hours each day Sat – Wednesday. This schedule does not change during Ramadan although the drivers work reduced hours. Regular extra cover can sometimes be arranged with the State motorpool, but not during Ramadan because their drivers are also working reduced hours.

 Another option would be to have the FCS drivers work overtime on a regular basis during Ramadan. This would not be prudent since fasting adversely impacts performance, effects that are exacerbated if someone is made to work long shifts as well. For these reasons, it is my philosophy that both drivers should be present during the month of Ramadan.

Mubarak's Leave

Mubarak had announced that he would retire in December of 2002. In early November, I received a leave request from Mubarak for the entire month of Ramadan. I was advised by my officer manager that this was terminal leave and that if Mubarak did not take it before December 31, he would lose his acquired comptime.  This leave request came late and conflicted with my Ramadan leave policy. I approved it only because not to do so would have caused it to be lost.

Several days later, during social conversation with the drivers, I was surprised to discover that Mubarak was retiring on Jan 19 2003 and not early December as I had originally been told. Therefore, he had 5 additional weeks during which he could take his leave. After determining that Mubarak had no specific plans to spend his leave out of Kingdom and explaining our difficulties to him, we compromised and he delayed his leave by 2 weeks so that we had full coverage for the first half of Ramadan. dHe did not express dissatisfaction about this arrangement to me.

I trust you now understand the background to this incident.

**Notes to the Files D**

# Aisha Hussain
## Lack of Timeliness

Aisha not only ignored clear and appropriate instructions from her supervisor, she also failed to perform routine duties in a timely fashion. This often created additional work for other employees and inefficiency in the office.

Filing provides a clear example of Aisha's inability to complete tasks in a timely manner. Once the FCS remodeling program was complete, she was advised that many old files, some dating back over a decade, needed to be culled. She was asked to create a central filing system based on the model provided in the Foreign Affairs Manual.

She received written instruction concerning the filing system on March 29. Over the next two month she received four additional e-mails stressing the importance of this project. Finally, on May 26 she was asked for a progress report. Aisha's e-mail reply stated "I have been making modest progress on the filling system....in the days ahead I will focus more effort on it." Other FSNs subsequently culled the files.

In another example, Aisha was asked in writing on March 31 for a leave schedule "time line". After several more verbal requests, she was again asked in writing on May 10. On May 28, she was sent a third written request. The day before, Aisha had submitted her own request for leave. This time she produced a very well done leave schedule in an hour and a half.

Finally, all of Aisha's predecessors had security clearances. This permitted them to retrieve and collect FCS cable traffic. Aisha was asked to obtain a clearance in September 2002. When it was discovered in April 2003 that she had still not even applied for a clearance, the request was put in writing and its importance stressed several times. By September 2003, Aisha had still not applied for her clearance and officers were still required to undertake the time consuming process of retrieving FCS cable traffic.

Attachments:

1. Seven written requests to cull and organize FCS files

2. Three written requests for a leave time line

3. Two written requests to apply for a security clearance



EXHIBIT
12

Exhibit 12 Page 34

11/04/04  THU 14:17 FAX 4883278          ECON                                    Ø003



**David Rundell**
03/29/03 11:55 AM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
cc:
Subject: week of Mach 29

Aisha,

This week could you attend to the following:

1. We will need to have our carpet cleaned when Kinarp is done. Please get some quotes for this.
2. Please place the orders for some new prints to hang on our wall. I will give you the websites to order them from.
3. Please consult with the commercial specialists and finalize the plan for a central filing system. Then create the needed files and clean out all the files we do not need. I do not believe we need any files more than three yeas old.

Thanks,
David

Exhibit 12   Page 25

**David Rundell**
04/03/03 12:11 PM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
cc:
Subject: Re: Housekeeping

did you get the file list from shila. If not take a look in the op manual or call robert thanks
—— Forwarded by David Rundell/SAUDIARABIA/USFCS/USDOC on 04/03/03 12:09 PM ——

**Robert Peaslee**
04/03/03 11:17 AM

To: David Rundell/SAUDIARABIA/USFCS/USDOC@USDOC
cc:
Subject: Re: Housekeeping

Hi David,

I thought Sheila already sent the list. If not, the filing categories are those as mandated in the Ops Manual. Let me know if Aisha needs help finding them if Sheila did not send them. I have requested confirmation from the RDs office on the ticket for Fred. They verbally said it is fine, but I hope to receive something in writing.

Thanks,
-RP

Robert Peaslee
Commercial Attache
American Consulate General Dhahran
Tel: 966-3-330-3200 #3014
Fax: 966-3-330-2190
Please visit: www.buyusa.gov/saudiarabia/en
David Rundell



**David Rundell**
04/01/03 05:23 PM

To: Robert Peaslee/SAUDIARABIA/USFCS/USDOC@USDOC
cc:
Subject: Housekeeping

Robert,

1. Could you get Sheila to send us your filing list before she goes on leave.

2. We should probably make certain HQ agrees to using IBP funds to buy a ticket for your CG. I think it is a good idea, but Bill Blaine raised a yellow flag today at our mid year budget review. He said it is unusual enough that we should have documentation for this expenditure. Let me know how you want to proceed on this.

Best,
David

Exhibit 12 Page 86



**David Rundell**
04/05/03 02:59 PM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
cc:
Subject: week of April 5

Aisha
Please attend to the following this week:

1. Our office phone list needs to be updated to include correct mobile numbers. Also I need a current Embassy wide phone list

2. Collect input from Specialists and other post and then draft the quarterly report. I will prepare the executive summary.

3. Lets finish with Kinarp this week. They were going to give us a final quote for a reception desk after deducting the cost of the dry sink we did not buy. Also if possible please get a qote from two other vendors for similar recepiton desk. Once the carpet is clean we need GSO to bring a sofa, end tables and lamps for the reception area. They also need to move furniture into the new conference room and into the new store room.

4. Thanks for starting on the fileing plan. Did Shila give you any thing? This is something we are going to have to bang away at until it is done. Then the specialists can clean their offices!!!.

Exhibit 12 Page 87

11/04/04   THU 14:18 FAX 4883278

David Rundell
04/13/03 09:37 AM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
cc:
Subject: Re: Assigned tasks for week of April 12

Aisha,

1. I did not know that you were allergic to dust.  In any event the furniture for Wallace is neatly placed in the aisles of the warehouse.  You need not push or carry anything.

In any event, look at the furniture either in the warehouse or once it has gone to J-6 to determine if you agree with the GSO view.  They believe that we should replace just about everything which may be true but we can not afford it.  So you will need to prioritize what must be repaired, cleaned or replaced.  Mrs McDavid has a list of things to be repaired.  Likewise you need to coordinate with Jeddah and Dahran to see what may be available in their warehouses.

2. Cleaning out the filing cabinets in the driver's room this week will be a very good start to our spring cleaning campaign.

3. Maher left on March 31 the last day of the second quarter so it would have been difficult to have written his report before the quarter finished.  As you know the report is not due until April 15.  This should give plenty of time for the two Consulates to get their parts finished.  I will speak to the specialists here about their submission.

4. This is not really a budget issue, just a matter of finding the cost of a ticket to Washington, but if you have forwarded it to Masood we can let him reply.

Thanks
David

Exhibit 12  Page 38



**David Rundell**
04/19/03 03:20 PM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
cc:
Subject: week of April 17



**David Rundell**
04/15/03 05:00 PM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC.
cc:
bcc:
Subject: week of April 17

Aisha,

Well it looks like we will finish with Kinarp this week. al hamdi allah. Thank you for your help on this.

Now we can turn to the files. I think you began cleaning them last week. Now we should be able to send the tallest one to the warehouse. The new filing system will follow the operations manual just like in Dhahran. Please begin creating this system and ask Sheila if you have any questions.

Please begin the process to hire a new driver when Mubarak leaves. Check with Peaslee to see if his driver still wants to come to Riyadh. If not, ask HR to put out an advertizement.

Exhibit 12 Page 39

11 /04/04   THU 14:18 FAX 4883278         ECON



**David Rundell**
04/22/03 09:00 AM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC, Mohammed
    Masood/SAUDIARABIA/USFCS/USDOC@USDOC
cc: Omar Mahmood/SAUDIARABIA/USFCS/USDOC@USDOC
Subject: Cleaning Files

Aisha and Mohammed,

We have now begun cleaning our files.  In general you can get rid of everything that is from 1999 or earlier.  The only exceptions should be financial and personnel records.  If you have any questions ask Omar or myself.  This process should be done in a few days.

Thanks,
David

Exhibit 12   Page 42

11/04/04   THU 14:19 FAX 4883278     ECON

David Rundell
04/10/03 02:28 PM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
cc:
Subject: week of April 12

1. We need to check the furniture for Wallaces house. Please work with GSO and give me an idea of what we may need to purchase, clean or repair. Use your judgment here. You may have to visit the warehouse and speak with Mohammed Tahir who has catalogues for new furniture. Bottom line: work with GSO to get his house ready. You may need to get some couches back from Dhahran.

*Sheila*

2. We can wait till next week to ask Mary Jane about her filing system in Dhahran. This week you can start cleaning out our files. Just about anything from the last century should be thrown out ie before 2000. If you have a question about an item ask me or Omar.

3. Of course you need to finish the quarterly report.

4. Finally we have a request from HQ about travel we have taken this year. Please check with Masood and the other posts to complete this spreadsheet. It is on an e mail I sent you.

Thanks
David

Exhibit 12 Page 41

11/04/04  THU 14:19 FAX 4883278          ECON                                                    @010



**Aisha Hussain**                    To: David Rundell/SAUDIARABIA/USFCS/USDOC@USDOC
05/26/03 02:51 PM                    cc: Douglas Wallace/SAUDIARABIA/USFCS/USDOC@USDOC
                                     Subject: Re: filing systgem

David,

I have been making modest progress on the filing system, the cable cabinet now occupies one drawer instead of 4 drawers. I went through the whole cabinet and threw away all unnecessary old cables. That only leaves 3 drawers for the Specialist to put their material in the filing room. Unfortunately, I haven't been able to devote as much time as I have wanted to due to other assignments, Embassy being closed, and Masood being in the process of moving into the office. However in the days ahead I will focus more effort on it. Doug is holding a meeting today with all of us to reorganize the filing system.

Please see below the completed alphabetical list for your reference for the time being:



FCS FILE LIST.xls

Thanks,
Aisha Hussain
Commercial Service
Tel.: 966-1-488-3800 X. 1516
Fax: 966-1-488-3237
http://www.uscommercialservice.com/saudiarabia/en/
David Rundell



**David Rundell**                    To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
05/26/03 12:52 PM                    cc:
                                     Subject: filing systgem

Aisha,
Could you give me an update on your efforts to create a new central filing system. How much more needs to be done before the Commerical Specialists can start using it.

Thanks
David

Exhibit 12  Page 42

11/04/04  THU 14:20 FAX 4863278       ECON                                    ☐011



## Embassy of the United States of America

### U.S. Commercial Service
### Riyadh, Saudi Arabia



March 24, 2003

**To:**        All Commercial Service Staff

**From:**     SCO – David Rundell   *DHR*

**Subject:**  Scheduling Leave

We are approaching the summer season. In order to avoid disappointment and confusion, please submit your leave plans to Office Manager Hussain. Next week, she will compile your requests into a leave schedule for my review.

 In addition to annual leave, please include any other planned absences such as retirement, training, TDYs or trade missions.

Thanks.

International Mail:            Phone : 966-1-488-3800              U.S. Mail Only:
P.O. Box 94309                   Fax : 966-1-488-3237               American Embassy
Riyadh 11693            E-mail : riyadh.office.box@mail.doc.gov     Unit 61307
Saudi Arabia            www.uscommercialservice.com/saudiarabia/en  APO AE 09803-1307

Exhibit 12 Page 43



**David Rundell**
03/31/03 06:50 AM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
cc: Omar Mahmood/SAUDIARABIA/USFCS/USDOC@USDOC
Subject: leave schedule

Aisha

Please fill in a "leave time line" with pay periods on the horizontal axis and staff names on the vertical axis.

Omar will review this and bring to my attention any disputes that can not be worked out among the employees.

thanks dhr

Exhibit 12 Page 44

11/04/04  THU 14:21 FAX 4883278                                              013



**David Rundell**
05/10/03 11:51 AM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
cc:
Subject: Annual Leave Schedule

This is the kind of chart we need for Riyadh.
----- Forwarded by David Rundell/SAUDIARABIA/USFCS/USDOC on 05/10/03 11:50 AM -----



**Mona Hassoun**
05/10/03 09:59 AM

To: CS OIO Country - Saudi Arabia
cc:
Subject: Annual Leave Schedule

Greetings everyone,

Attached is Jeddah's staff annual leave schedule for summer '03.



Annual leave schedule.do

Have a nice day

Mona Hassoun
US Commercial Service
Jeddah, Saudi Arabia
Tel: 966 2 606 2479 x 207
Fax: 966 2 606 2567
Please visit: www.buyusa.gov/saudiarabia/en

Exhibit 12 Page 45



**Aisha Hussain**
05/28/03 11:27 AM

To: David Rundell/SAUDIARABIA/USFCS/USDOC@USDOC
cc: Omar Mahmood/SAUDIARABIA/USFCS/USDOC@USDOC, Douglas Wallace/SAUDIARABIA/USFCS/USDOC@USDOC
Subject: Re: Leave Time Line

David,

Please see attached requested info.



chart of annual leave.do

Thanks,
Aisha Hussain
Office Manager
Commercial Service
Tel.: 966-1-488-3800 X. 1516
Fax: 966-1-488-3237
http://www.uscommercialservice.com/saudiarabia/en/
David Rundell



**David Rundell**
05/28/03 09:48 AM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
cc:
Subject: Leave Time Line

Aisha,

I need a leave time line with pay periods on the horizontal axis and employees on the the vertical axis. I send you a copy of how this was done in Jeddah some time ago. Could you please preare a similar chart for Riyadh ASAP.

Thanks,
David

Exhibit 12 Page 46

11/04/04  THU 14:22 FAX 4663276    ECON    @015



**David Rundell**
04/09/03 11:38 AM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
cc: Mohammed Masood/SAUDIARABIA/USFCS/USDOC@USDOC
Subject: Security Clearance

Aisha,

Omar raised a very good point at our staff meeting today concerning your security clearance. You have been here for nearly two year and really should have had a clearance long before this.    I know I spoke to you about this when Mary Jane left and on at least one other occasion.

So please tell me today.

1.  What forms have you already submitted?
2   To whom did you submit these forms?
3.  What is the status of your request?

This is a serious issue and requires your prompt attention.

Thanks,
David

Exhibit 12 Page 47

11/04/04  THU 14:22 FAX 4883278                                                    ☒016





**David Rundell**                    To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
04/13/03 08:59 AM                    cc:
                                     Subject: Re: Security Clearance

Aisha,

What is it that you believe I need to provide the Department?  Let me know what it is an I will do it at once. Omar and I both thougth you had applied for your clearance long ago.  Your not having a clearance places an extra burden on Omar and myself especially as we are short two officers and one American PSA.

If Michele Staunton does not get back to you quickly, please contact Dewitt Dugger.  He is the Office of Security liaison with OIO.  He will certainly know where you should send your papers.

Getting a clearance is important and it is your responsibility.   Please let me know when you submit your clearance application forms.

Thanks
David

Exhibit 12  Page 48

 **David Rundell**
04/13/03 10:37 AM

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
cc:
Subject: security clearance

Aisha,

The RSO say you will need a SECRET clearance.  Let me know if I should do anymore on this.

David

Exhibit 12  Page 49



**David Rundell**
**04/13/03 09:44 AM**

To: Aisha Hussain/SAUDIARABIA/USFCS/USDOC@USDOC
cc:
Subject: Re: Security Clearance📄

Aisha,

Very good.  Now we are moving forward.  Again if I need to fill something out let me know.

Best,
Daivd

Exhibit 12 Page 50

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
AISHA HUSSAIN                                                    )
                                                                )
            Plaintiff,                                          )
                                                                )
            v.                                                  )            Civil Action No. 07cv1364 (HHK)
                                                                )
CARLOS M, GUITIERREZ, SECRETARY                                 )
U.S. DEPARTMENT OF COMMERCE,                                    )
                                                                )
            Defendant.                                          )
_____)

**<u>ORDER</u>**

Upon consideration of Defendant's Motion to Dismiss and for Summary Judgment, the

Opposition thereto, and the entire record in this case; and the Court having found that there is no

issue of material fact in dispute, it is this _____ day of _____, 2007, hereby

ORDERED, that the Defendant's Motion for Dismiss and Summary Judgment is hereby

GRANTED, and it is further

ORDERED, that Judgment be entered in favor of the Defendant.


_____
HENRY H. KENNEDY
UNITED STATES DISTRICT JUDGE