## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AISHA HUSSAIN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )        Civil Action No. 07cv1364 (HHK) |
| | ) |
| CARLOS M, GUITIERREZ, SECRETARY | ) |
| U.S. DEPARTMENT OF COMMERCE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

### DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Defendant, Carlos Gutierrez, Secretary of the United States Department of Commerce, by and through undersigned counsel, hereby submits the following Reply to Plaintiff's "Motion to Deny Defendant's Request for Dismissal and Summary Judgment" ("Plaintiff's Opposition"). Specifically, Plaintiff has failed to demonstrate that she actually raised a claim of "pregnancy discrimination," and accordingly, failed to exhaust her administrative remedies with respect to that claim. In addition, Plaintiff failed to demonstrate that the material "facts" set forth by Defendant in the Motion for Summary Judgment are in "genuine" dispute, and therefor, Plaintiff cannot establish a claim as a matter of law.

**I.      PLAINTIFF'S PREGNANCY DISCRIMINATION CLAIM MUST BE DISMISSED.**

"[T]he requirement of some specificity in a charge is not a 'mere technicality.'" Park v. Howard University, 71 F.3d 904, 908 (D.C. Cir. 1995), cert. denied, 117 S. Ct. 57 (1996) (quoting Rush v. McDonald's Corp., 966 F.2d 1104, 1111 (7th Cir. 1992)). The enforcement procedures of Title VII represent "a careful blend of administrative and judicial enforcement

powers" in which the federal agency plays "a crucial administrative role . . . in the eradication of employment discrimination." Brown v. General Servs. Admin., 425 U.S. 820, 833 (1976). Exhaustion of administrative remedies is required "in order to give federal agencies an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary." Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir. 1985). Accordingly, the administrative complaint must be sufficiently specific to allow the agency to perform its statutory duty. Park, 71 F.3d at 908. "The administrative charge requirement serves the important purposes of giving the charged party notice of the claim and 'narrow[ing] the issues for prompt adjudication and decision.'" Id. at 907 (quoting Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 472 n. 325 (D.C. Cir. 1976)).

Taking into account the facts as set forth in Plaintiff's Opposition, it is still clear that Plaintiff has failed to exhaust her administrative remedies with respect to her claim of pregnancy discrimination. In her Opposition, Plaintiff asserts that because she described herself as being "seven months pregnant" at the time the agency allowed her contract employment to lapse, she properly raised a claim of "pregnancy discrimination" at the administrative level. However, more than a mere mention of her pregnancy is required to satisfy her administrative requirements. See Park, 71 F.3d at 908 ("[T]he goals behind the requirement of prior resort to administrative relief would be frustrated if the filing of a general charge with the EEOC would open up the possibility of judicial challenges to any related conduct that took place in connection with the employment relationship") (quoting Rush., 966 F.2d at 1110).

The complainant in Park argued that the mere mention of a hostile work environment in her pre-complaint paperwork sufficiently raised the claim for exhaustion purposes. Id. The

2

Court of Appeals, however, noted that not only is the pre-complaint not the same as a formal EEO charge, but the goals behind the requirement of administrative exhaustion would be frustrated if such a loose interpretation was allowed.  Id. at 908-909.   And, "[a]lthough it is true that the administrative charge requirement should not be construed to place a heavy technical burden on 'individuals untrained in negotiating procedural labyrinths' . . . it is also true that 'the requirement of some specificity in a charge is not a 'mere technicality.'" Id. At 907 (quoting Rush, 966 F.2d at 1111) (internal citation omitted).   Thus, a litigant, even one proceeding pro se cannot bypass the EEO administrative process and rely upon liberal interpretation of their administrative complaint to rescue claims not properly raised at the agency level.  Id.

    In the present case, Plaintiff was represented by legal counsel at the administrative level, and still failed to raise a pregnancy discrimination claim in the formal EEO complaint.  Indeed, such an issue was never accepted for investigation or ever actually investigated by the EEO Officer.  On April 9, 2004, counsel for Plaintiff submitted Plaintiff's formal complaint to the EEO Officer for the Department of Commerce.  Def. Exh. 13.  In addition to the formal administrative complaint, Plaintiff submitted a 16-page letter to the EEO Officer describing the facts and allegations.  Id.  In that letter, Plaintiff only mentions her pregnancy in the "Background" section, but fails to make any further mention of her pregnancy within the portions setting forth the facts supporting each allegation of misconduct or discrimination.  Id.  Notably, in the section entitled "Mr. Rundell's Further Conduct Toward Me that Evidence Discrimination Because of My Gender, Faith, and Ethnic Background," Plaintiff fails to make any mention of her pregnancy, or any allegation that her pregnancy formed the basis of any discriminatory conduct.  Id. at p. 12.

In response to Plaintiff's formal administrative complaint, the agency's EEO Office sent Plaintiff's attorney a list of conduct that the Officer found to form the basis of Plaintiff's discrimination claims. Def. Exh. 4. The list of conduct did not include any allegation of discrimination resulting from Plaintiff's pregnancy. Id. The letter further notified Plaintiff's counsel that if he believed the list to be inaccurate, then he must notify the EEO Officer within 15 calendar days after receiving the letter, and must further state why the issues had not been correctly identified. Id. In response, Plaintiff's attorney notified the EEO Officer that Plaintiff's employment had since been "terminated following complaints that Mr. Rundell, her supervisor, engaged in abuse of office (as well as complaints of discrimination)." Def. Exh. 15. At no time did Plaintiff attempt to amend the issues before the EEO Officer to include any allegation that she was terminated because of her pregnancy. Id.

Moreover, if Plaintiff believed that the Defendant wrongfully failed to investigate such a claim, she could have challenged the failure in front of the Administrative Judge of the Equal Employment Opportunity Commission ("EEOC") who initially heard the matter. Nevertheless, Plaintiff failed to do so. Because she never raised a pregnancy discrimination claim during the administrative processing of the complaint, never objected to its omission from the accepted claims before the EEO Office, and never challenged the omission before the Administrative Judge or the EEOC, Plaintiff cannot raise such a claim now and this allegation must be dismissed for this reason alone. See Park, 71 F.3d at 907 (plaintiff's administrative claim alleging national origin discrimination in the selection of Dean "cannot be read to encompass a hostile work environment claim"); Alfred v. Scribner, Hall & Thompson, 473 F.Supp.2d 6, 9 (D.D.C. 2007) (plaintiff did not exhaust her administrative remedies with respect to her sex discrimination

allegation because she only raised claim of racial discrimination during administrative processing); <u>Miller v. Smith</u>, 584 F.Supp. 149, 155 (D.D.C. 1984) (plaintiff's claim of discrimination based on his friendship with black employees dismissed because he only alleged national origin discrimination during administrative proceedings).

Nothing in any of the documents produced by Plaintiff would allow her to establish that she ever complained that she was being discriminated against **because of** her pregnancy.[1] Plaintiff cannot establish exhaustion merely by producing correspondence showing that she referenced her pregnancy. She must have actually complained of pregnancy discrimination and sought relief for the alleged discriminatory actions. Having failed to do so, Plaintiff's pregnancy discrimination claim must be dismissed.

## II. PLAINTIFF FAILED TO SET FORTH ANY FACTUAL EVIDENCE DEMONSTRATING AN UNLAWFULLY DISCRIMINATORY INTENT.

To survive summary judgment on a claim of discrimination, a plaintiff must demonstrate that she suffered an adverse employment action under "circumstances that give rise to an inference of discrimination." <u>Taylor v. Small</u>, 350 F.3d 1286, 1292 (D.C. Cir. 2003). In her Opposition, Plaintiff re-iterates her claims regarding the conditions of her employment and the treatment by her supervisor Mr. Rundell. However, absent from her Opposition is any evidence demonstrating that the reason for her treatment was unlawful discrimination. Instead, Plaintiff merely asks the Court to infer discrimination and pretext without any proof. Such conclusory and unsupported argument fails to create any genuine issue of **material** fact in dispute.

---

[1] For example, in her October 9, 2003, e-mail communication, she specifically alleges that her manager discriminates against minority women but does not allege that he discriminated against her because she is pregnant. (ROI, Ex. 2 at 8). Instead, she merely references her pregnancy in discussing how upset she is over the alleged discrimination. <u>Id</u>.

Applying the summary judgment standards, the undisputed material facts demonstrate that

Plaintiff has failed to meet her burden of proof on the issues in this case.  Thus, the Defendant is

entitled to summary judgment as a matter of law for the reasons set forth below.

A.    **Plaintiff Failed to Demonstrate a Claim of Hostile Work Environment**

To establish a *prima facie* case of a hostile work environment, Plaintiff must show that:

(1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the

harassment complained of was based on her protected status; (4) the harassment materially

affected a term, condition, or privilege of employment; and (5) there is a basis of imputing

liability to the employer.  See, e.g., Brooks-Miller v. England, 495 F.Supp.2d 197, 201 (D.D.C.

2004).  To determine whether a working environment is hostile, a reviewing body may consider

the frequency of the alleged discriminatory conduct, its severity, whether it is physically

threatening or humiliating, and if it unreasonably interferes with an employee's work

performance.  Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).  Generally, a single group of

isolated incidents will not be sufficient to constitute a hostile work environment actionable under

Title VII.  See Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2004).

Plaintiff has failed to point to any evidence in the record that would possibly allow her to

establish a *prima facie* case of a hostile work environment because she could not possibly prove

that the alleged harassment complained of was because of her "protected class," or that it was

sufficiently severe and pervasive to create a hostile work environment.  First, the only facts set

forth by Plaintiff demonstrate that she did not want to perform the basic job duties of her

position, and that she did not like her workload or office location.  See Plaintiff's Memorandum

of Points and Authorities in Support of Plaintiff's Motion to Deny Defendant's Motion to

6

Dismiss and for Summary Judgment (Dkt. No. 9) at 22-35. However, complaints over the mere assignment of undesirable job responsibilities and other such day-to-day concerns could not possibly support a finding of a hostile work environment. See Veitch v. England, 471 F.3d 124 (D.C. Cir. 2006) (complaints over non-selection, undesirable work assignments and office arrangements could not provide basis for finding of a hostile work environment); DeNovellis v. Shalala, 124 F.3d 298, 311 (1st Cir. 1997) (assignment to undesirable position does not provide the basis for a hostile work environment claim). While Plaintiff may not have liked her job duties and other aspects of her position, they are clearly part of the administrative position she accepted with the Agency. See Def. Exh. 2. It is interesting to note that, even in her own e-mails, Plaintiff describes the clerical portion of her job position as "unnecessary clerical work." Plaintiff's Opposition at 2. For this reason alone, Plaintiff cannot establish a *prima facie* case of a hostile work environment merely by complaining that she is being required to discharge the job duties that she was hired to perform.

In addition, because "Title VII is not a general civility code for the American workplace, nor does it serve as a remedy for all instances of verbal or physical harassment, for it does not purge the workplace of vulgarity," Stewart v. Evans, 275 F.3d 1126, 1133 (D.C. Cir. 2002) (internal citations and quotations omitted), Plaintiff has further failed to establish that the perceived harsh or degrading treatment by Mr. Rundell rises to the level of an unlawful hostile work environment. Nevertheless, Plaintiff continues to point to a few alleged comments made over the course of a two and a half year time period that she claims created a hostile work environment. However, in the absence of any evidence that these comments were continuous and/or in any way actually physically threatening to her, or even related in any way to her

7

protected status, such stray, isolated comments over such a lengthy period of time are not

sufficiently severe or pervasive to alter Plaintiff's conditions of employment.  Therefore, she

cannot possibly establish a *prima facie* case of a hostile work environment.  See Freedman v.

MCI Telecommunications, 255 F.3d 840, 848 (D.C. Cir. 2001) (stray allegedly discriminatory

comment did not establish hostile work environment).

### B.    Plaintiff Failed to Demonstrate Pretext With Respect To Any Of Her Allegations.

To rebut the Defendant's Motion, Plaintiff argues that she performed the duties of her

position, and that Mr. Rundell never criticized her performance prior to April 2003.  Plaintiff's

Opposition at 6.  However, the documentary evidence clearly contradicts this assertion.  Indeed,

Plaintiff even refers to a conference between herself, Mr. Rundell, and Ms. Smoker-Ali which

was specially set to discuss Mr. Rundell's concerns regarding Plaintiff's non-performance.  See

Plaintiff Disputes and Denies the Defendant's 'Statement of Material Facts Not in Genuine

Dispute' ("Plaintiff's Dispute of Facts") at ¶ 2e.  In addition to Mr. Rundell's own experience,

others who supervised Plaintiff's work criticized her performance.  Michael McGee, the

Commercial Attache who oversaw the maintenance of the office website, informed Mr. Rundell

that Plaintiff's performance on the website was poor, and that she was not able to take direction

or follow orders from her superior officials.  Def. Exh. 8 at 27.  Mr. McGee described Plaintiff as

"uncooperative", "unprofessional," with an "arrogant and intransigent attitude," and as

"negligent."  Id.  Indeed, Mr. McGee specifically described Plaintiff as exhibiting "less

credentials and poor performance."  Id.  Mr. McGee was not identified as a "discriminating

official."

Plaintiff also attaches her own self-serving "daily log" to argue that she did, in fact, perform the duties assigned to her. Plaintiff's Opposition at 7. The "daily log," however provides no insight into whether or not Plaintiff was actually performing the tasks assigned to her position. Indeed, an independent authority, Edward Burton, reviewed Plaintiff's work and determined that she was not performing the basic clerical functions of her position. Def. Exh. 6. Mr. Burton has not been identified by Plaintiff as a "discriminating official."

Finally, Plaintiff claims that she was unable to adequately perform her duties because Mr. Rundell changed her position description on multiple occasions. This argument, however, grossly mischaracterizes the evidence in order to create the mis-impression that Mr. Rundell was attempting to create a "moving target" out of her duties in order to discriminate against her. The documentary evidence establishes that the core duties that Plaintiff refused to perform remained the same at all times. Def. Exh. 10. More importantly, the evidence further establishes that Plaintiff's position descriptions were initially modified at Plaintiff's own request. Def. Exhs. 7 and 8. See also Def. Exh. 6 ("Aisha's position description was officially changed three times to fit the circumstances and needs of the office and her own desires for career growth"). Only after it became apparent that Plaintiff was still failing to perform the basic clerical duties that had always been a part of her position description, and after persons in other areas complained of her attitude and poor performance, was it returned to the original form. Def Exhs. 6 and 7. Indeed, an accurate description of Plaintiff's mis-use of the facts as a ruse to argue improper treatment is set forth in the Administrative Officer's e-mail to Plaintiff describing how she used Mr. Rundell's accommodations to her requests for additional duties as an excuse for her non-performance. Def. Exh. 9. The Administrative Officer directly witnessed Plaintiff ask Mr.

Rundell to amend her position description to add more duties, and then later deny that her request

ever occurred.  Id.  Accordingly, Plaintiff failed to rebut the factual evidence set forth by

Defendant, failed to address the testimony and other statements made by third parties that are not

named as discriminating officials, and failed to demonstrate that the Agency's reasons for not

renewing her contract employment were pretext.  See Scott v. Harris, __ U.S. __, 127 S.Ct. 1769,

1776 (2007) (when a party's "version of events is so utterly discredited by the record that no

reasonable jury could have believed him," a court "should not have relied on such visible fiction;

it should have viewed the facts in the light depicted by the [record]"); Bell Atlantic Corp. v.

Twombly, __U.S. __, 127 S.Ct. 1955, 1969 (2007) (in response to a motion to Dismiss, a plaintiff

must present "facts consistent with the allegations in the complaint").

Respectfully submitted,

/s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


/s/ Rudolph Contreras
RUDOLPH  CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


/s/ Darrell C. Valdez
DARRELL C. VALDEZ, D.C. BAR # 420232
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C.  20530
(202) 307-2843

10

Agency Counsel:

ADAM CHANDLER
Office of the General Counsel
U.S. Department of Commerce

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of December, 2007, a copy of the foregoing Reply

memorandum was mailed, postage prepaid, to Plaintiff, Aisha Hussain, 2262 Sir Amant Drive,

Lewisville, TX 75056.


_____
DARRELL C. VALDEZ
Assistant United States Attorney

**Dan Guttman**
1920 L Street, N.W. Suite 400
Washington, D.C. 20036
Tel 202-638-6050; Fax 202-478-2088: Email dan@dguttman.com

April 9, 2004                                       BY HAND DELIVERY

Ms. Bernadette Worthy
EEO Officer
U.S. Department of Commerce
Room 6010 HCHB
Washington, D.C. 20230

Re: Complaint of Ms. Aisha Hussain

Dear Ms. Worthy:

Pursuant to EEO law and rules and the March 23 Notice of Ms. Jane Mintz to Ms. Aisha Hussain and the undersigned (referencing case no. 03-55-00217) I enclose a copy of Ms. Hussain's complaint. Please note that the enclosure includes: (1) a filled out copy of the form provided in the March 23, 2004 Notice; (2) a narrative letter, which is referenced in the filled out form; (3) documents attached to, and supporting, the narrative.

I also note that Ms. Mintz' letter did not include national orgin as basis for Ms. Hussain's complaints. In fact national origin, as well as sex, race, religion, and retaliation, has been a basis of Ms. Hussain's complaint.

Please let the undersigned know should you have any questions regardingt his transmittal, or the complaint.

Very truly yours,

Dan Guttman

Enc.

EXHIBIT
13

## INFORMATION ABOUT YOU

| | |
|---|---|
| Name Aisha Hussain | Social Security Number ~~~~~~ |
| Address 4253 Hung Dr  Apt # 705 | Home Phone (972) 394 1343 |
| City/State Carrolton Texas Zip Code 75013 | Work Phone ( ) Carrollton, TX 75010 |

## INFORMATION ABOUT YOUR REPRESENTATIVE

Representative's Name Dan Gutman

NOTE: You do not have to have a representative.

| | |
|---|---|
| Address 1920 L St. NW Suite 400 | Phone (202) 638 6050 |
| Washington, DC | Fax (202) 478 - 2098 |
| City/State D.C | Zip Code 20036 | Is your representative an attorney? ☒ Yes ☐ No |

## INFORMATION ABOUT THE COMPLAINT

In which bureau did the alleged discrimination take place?
U.S. Department of Commerce  FCS  Riyadh, Saudia Arabia

Did you work for the Department of Commerce at the time? ☒ Yes ☐ No If yes, what was your position (title/series/grade), office, and
b      Fiscal Admin Assr   Grade 6 Step 6

Describe the action(s) or policy(ies) you believe was (were) discriminatory. Be specific and include dates. If you need more space, attach
an extra page(s).

Please See Attached Narrative
and Exhibit

What do you believe was (were) the reason(s) for the alleged discrimination? Check the appropriate box(es) and write in specific details.
For example: If it was because of your race, what is your race? If it was because of your age, what is your date of birth?

| | | | |
|---|---|---|---|
| ☒ Race | Indian  See attached for | ☒ National Origin | Indian  See attached |
| ☒ Color | Indian  specific date and | ☐ Age | for specific date |
| ☒ Religion | Muslim  details | ☐ Disability | and details |
| ☒ Sex | Female | ☒ Retaliation | Complaints for wrongdoing + discrimination - See attached |

What remedy(ies) do you seek for the alleged discrimination? If you need more space, attach an extra page(s)
Please See Attached Narrative
Section on " seeking settlement "

Did you discuss this(ese) issue(s) with an EEO Counselor? ☒ Yes ☐ No Counselor's name? Ms. Jane Mirr

file a grievance under a negotiated grievance procedure? ☐ Yes ☒ No Filing date(s)?

you file a Merit Systems Protection Board (MSPB) appeal? ☐ Yes ☒ No Filing date(s)?

Date David L. (for Ms. Hussain)

4/5/04

EXHIBIT 4 PAGE 2

evidenced discrimination against me based on my gender, faith, and ethnic background; (VI.) summarize the repeated occasions on which I brought my concerns about Mr. Rundell's abusive conduct (as identified in "1-5") to the attention of relevant officials, including EEO officials – all prior to Mr. Rundell's October 8, 2003 termination of me; (VII.) summarize my knowledge of Mr. Rundell's similar misconduct in prior positions; (VIII.) identify individuals who can verify the information provided here, and may have further relevant information.

## I. Background

I was employed at the U.S. Embassy under personal services contracts from May 20, 2001 through October 8, 2003.

During this period my initial supervisor was Mr. Charles Kestenbaum from – May 20, 2001 until September 7, 2002. Prior to this I worked for the same on a temporary basis from September 2000 to May 20, 2001.

Thereafter my supervisor was Mr. David Rundell, whose position was Senior Commercial Counselor. During this period my job title was Administrative Assistant/ Office Manager.

I understood that individuals employed under personal service contracts were to be employed on year to year contracts, which would be routinely renewed (unless, of course, there was no longer work to be done, or the performance was substantially unsatisfactory)

My initial contract ran from May 20, 2001 until September 30, 2001. I was then given a contract that ran from October 1, 2001 through September 30, 2002. Then the next contract was from October 1, 2002 through September 30, 2003. After September 31, 2003 I continued to report to work, and to work, at the Embassy. I naturally assumed that my contract would be renewed for one year, as was the routine.

On October 8, 2003 Mr. Rundell gave me my new contract. As printed, the contract was for the October 1, 2003 through September 30, 2004 year. However, Mr. Rundell drew a line across the end date of September 31, 2004 and placed an end date of October 31, 2003. But on October 8, 2003 David Rundell told me he no longer needed my services and he has decided he will not be renewing my contract and that I do not need to return to work. Present when David Rundell told me this was Chris Riche, Senior Administrative Officer and Debra Smoker-Ali, Human Resources Officer.

In short, Mr. Rundell summarily, and without notice, told me that I was terminated. When I was told this I was **seven months pregnant**, doing the job of 3 administrative staff and putting in 10+ hours a day and weekends, as needed.

EXHIBIT 4    PAGE 4

Prior to my work at the Embassy in Riyadh I worked for JECOR (United States – Saudi Arabian Joint Commission on Economic Cooperation). Prior to working for JECOR, I worked as a Junior Product Manager in Richardson, Texas for Samsung Telecommunications.

I performed as a Network Administrator from August 28, 1999 until May 31, 2000, when JECOR closed its doors.

During the period of my employment at the U.S. embassy I received many highly positive performance evaluations.

On June 11, 2002, I received an outstanding evaluation from Mr. Kastenbaum,

On March 16, 2002 and on October 12, 2002 I received meritorious honor awards. In addition, I have received numerous positive recommendation/appreciation letters. These include: (1)Recommendation letter from Peter Flynn (JECOR) dated April 25, 2000 stating an outstanding employee; (2), Recommendation letter from Charley Kestenbaum dated June 22, 2002 stating I was an outstanding employee; (3) Letter from Dr. Ann Jordan (Ambassador's wife) dated November 19, 2002 stating that I did an outstanding job on the September 29, 2002 Saudi Businesswomen's' E-Commerce event; (4) Appreciation letter from Maria Cino, Assistant Secretary and Director General of Commerce, for the job well done when she came to visit Riyadh.

Mr. Rundell's evaluation of me was due in May, 2003. No evaluation was provided. I received my evaluation only on October 8, 2003, after I was made to sign the contract terminating my services.

## II. Mr. Rundell's Misuse and Abuse of Government Property and Authority

During the period in which I worked for Mr. Rundell I continually observed that he engaged in and/or permitted behavior which included misuse of government property and abuse of his official position. This behavior – which I reported to others and which in many cases, was also observed by others-- included:

1.   Mr. Rundell permitted his wife Yin to use government office workspace and office supplies for periods of hours at a time to conduct her own business. This conduct was routinely observed by myself and other embassy staff. For example, I stated in a January 27, 2003 email in which identified many concerns to Mr. Mike Staunton of the Department of Commerce: (the document is attached)

"Yin Rundell spends anywhere from 1 to 4 hours a day at the office using the internet, fax, copier and printer for her personal business (Medical claims adjusting)... All of us in the office are well aware of this and can't believe it..."

EXHIBIT 4 PAGE 5

I note that I had understood that Ms. Rundell stopped using the office in about April, 2003, following admonishment to Mr. Rundell from a higher official that this conduct was unacceptable. However, when I returned to work on Aug. 2, 2003, a CS Officer told me that during my unpaid leave from June 2 to Aug 2, 2003, Yin had come on two occasions and used the Commerce (" CS") facilities for personal use that he had physically witnessed. He also showed me where he was documenting all misuse and abuse of government property in his planner. Also, a week or two before my termination Yin Rundell was visiting the office again and would use the copier etc.

2.    Mr. Rundell used government property – including cars/drivers and office equipment – for personal business (including that of his wife and daughter). For example:

-- On February 17, 2003, a CS driver told me that the Crown Victoria Car, an official CS (Commerce Department) car, was parked at David Rundells' house during both Eid holidays and even during the time he was on vacation from February 13 to 16.

-- When the car was parked at Mr. Rundell's house on December 2, 2002 when he was on vacation, Mr. Peaslee called Mr. Shakoor to bring it back to the embassy.

-- On March 30, 2003 and April 6, 2003. a CS driver showed me the car logs that Yin Rundell was taking home and returning the next day. On March 19, 2003 I witnessed myself that Mrs. Rundell had removed Car log sheets and was making copies and etc.

-- Priority of the CS cars and drivers was first given to just picking up the school bag from Caroline Rundell from school even though she would be going directly from school to play with friends, but the CS car and driver was sent to only pick up the school bags on many occasions. My records show that this occurred on 2/5/03 and 2/19/03. This was a total waste of the CS car and driver for at least 2 + hours for this task.

-- Priority of the CS cars and drivers was first given to taking Caroline Rundell to Girl Scouts meetings, ballot classes, friend's homes, and children's parties.

-- Priority of the CS cars and drivers was first given to taking Yin Rundell daily from home to Embassy and back so that she could work out at the Embassy's health club.

EXHIBIT 4  PAGE 6

Ms. Bernadette Worthy
EEO Officer, Room 6010 HCHB
U.S. Department of Commerce
Washington, DC 20230
Ph. No. 202-482-8121
Fax. No. 202-501-2937

Dear Ms. Worthy:

As provided by the letter dated March 23, 2004 sent by Ms. Mintz, EEO Counselor, this letter and the attached documents describe the discrimination that I was subjected to during my employment at the U.S. Embassy in Riyadh, discrimination which culminated in my arbitrary and unlawful termination on October 8, 2003.

My name is Aisha Hussain. I am a U.S. citizen of Indian background and Islamic faith. I worked at the U.S. Embassy in Saudia Arabia for the U.S. Department of Commerce from May 20, 2001 until October 8, 2003.

I am currently in Carrollton, TX. My address is 4253 Hunt Dr. Apt. 709, Carrollton, TX, 75010. My phone number is 972-394-1343.

## Summary

I am filing this complaint regarding:

(1) Discrimination conducted against me on the basis of my religious beliefs, gender, and ethnic and national background;

(2) Retaliation and reprisal conducted against me because of:

(a) My complaints to officials about the discrimination against me and

(b) My complaints to officials about the misuse of government property and abuses of office engaged in by Mr. David Rundell (and his wife Mrs. Yin Rundell), including the abuse of government authority by Mr. David Rundell.

This discrimination and reprisal culminated in the arbitrary termination of my work with the Commerce Department on October 8, 2003 by Mr. Rundell.

In the material that follows I: (I.) provide the background for the situation; (II.) summarize the ways in which Mr. Rundell abused government property and authority; (III.) summarize the ways in which Mr. Rundell called on me to perform work that was highly questionable; (IV.) summarize Mr. Rundell's abusive and discriminatory conduct towards me; (V.) summarize Mr. Rundell's further abusive conduct towards me that

1

EXHIBIT ___4___ PAGE ___3___

-- Priority of the CS cars and drivers was first given to taking Yin Rundell almost daily to the British Embassy for hair cuts, see friends, and etc.

-- On 9/9/02, there was a friend of David Rundell's who was visiting from Dubai, and he did not hesitate to have a driver and car available to him in the evening to drive him back and forth from the Hyatt hotel. The CS driver was instructed by Mr. Rundell to drop this person off at the hotel without any CS employee in the car.

3. On 3/3/03 Mr. Rundell told one of the Specialist to perform research for some contact names and numbers and forward it to Mr. Phillip Burham, the SCO of the British Embassy. Mr. Rundell used the CS Specialists on occasions to help the British Embassy. This can be verified by both at least two CS Specialist.

4. Mr. Rundell used public money for official receptions to conduct gatherings at his house that were primarily for personal friends. This can be verified by the Specialists and an Officer who is aware of this abuse. In addition, this can be verified by checking the guest list that Mr. Rundell submitted to the FMC department for payment of receptions held at his house. In addition, one of the Specialists had mentioned to me on one occasion, that Mr. Rundell when hosting a trade event reception at his house would tell the Specialist to limit the Saudi business contacts, so that Mr. Rundell could invite/entertain his personal friends.

5. I was repeatedly asked to perform personal service tasks for Mr.Rundell's family; for example:

-- I was asked to get a sponsorship letter for Ms. Rundell.

-- providing snacks for the Rundell's daughter.

-- babysitting the Rundell's daughter while Mrs. Rundell was using an embassy office computer for personal business.

I learned from others that this was not the first occasion on which Mr. and Mrs. Rundell used embassy staff for this purpose. In a phone conversation Saud Abdul Malik on 1/31/03 mentioned that Mr. Rundell knowingly allowed Mona Hassoun, Admin Asst of Jeddah and Mr. Rundell's previous place of posting, to help his daughter Caroline with school homework during work hours. In a phone conversation on 2/3/03 Saud Abdul Malik she mentioned that this used to occur at least once a week if not more, which she witnessed herself. After speaking to Saud Abdul Malik I understood why Mr. Rundell's daughter Caroline would be in my office whenever she came to work and what Mr. Rundell meant

EXHIBIT __4__ PAGE __7__

when he would say talk to Mona Hassoun she knows what and how it should be done.

6.     David and Yin Rundell wanted drivers not to turn in overtime and comp time sheets. Instead they would force the drivers to take comp time at Mr. and Mrs. Rundell's leisure. In the 3/11/03 meeting Chris Riche told me that comp time can not be forced according to the leisure of the employer

7.     David and Yin Rundell wanted to force vacation time on the drivers to suit their personal needs. For example, on November 5, 2002 Mrs. Rundell came to my office and told me to tell the drivers to take vacation in December. This meant that on some occasions there would not be drivers when needed. Of course, Mrs. Rundell was not an official and was not supposed to be directing staff.

8.     From October 2002 to April 2003 Mr. Rundell spent over $17,000 remodeling the office. There was no need to remodel and the activity required that staff be present when the workers were engaged in remodeling, wasting further embassy resources.

9.     The Dept. of Commerce pays roughly over $30,000 a year to occupy library space, but the library is only open one and half hour a day, sometimes not even that for days.


**III. Mr. Rundell called on me to perform work that was highly questionable.**

For example:

1.     I was treated as a personal servant, as discussed in more detail below.

2.     Mr. Rundell asked me to process a visa referral for an individual I understood to be on a terrorist watch list.

3.     On May 5, 2003 when Mr. Rundell should have known that Saudi law and custom is not accepting of an Islamic woman running around a souk with men unrelated to her, David Rundell took me, Habeeb Saeed, and Mohammed Masood, and the driver, Mubarak Saleh to go shopping for a chair and maybe buying an Arabic computer. First as mentioned going around the souk, which is highly visible, with 4 men unrelated to a female is against the Saudi law. If we had been stopped or questioned by a Matawa (religious police) or the regular police this would have been tragic for me. Second, the Embassy was under high alert, David put "five" lives including his own in danger. Third, the items where unnecessary items and wasted the time of five employees and the money of five employees that Commerce pays.

EXHIBIT 4 PAGE 8

4. On May 19, 2003, following the Riyadh bombing Mr. Rundell asked me to return a chair to a store, when the embassy was in lock down and the embassy staff were not supposed to be circulating in this way.

5. On March 4, 2003 and on another occasion Mr. Rundell had me write up OIO weekly reports showing the success stories being in the present week.

6. On October 5, 2003 Mr. Rundell instructed me to give different directions to the CS drivers then what the Regional Security Office had instructed, if anything happened to the CS cars or passengers, I would be questioned.

7. Mr. Shakoor told me on March 17 and March 18, 2003 the CS car was left unattended while he was instructed by Mrs. Rundell to go inside the school to pick-up there daughter. If anything had happen to the car or passengers I would be questioned by the Regional Security Office since I was the driver's supervisor.

8. On March 19, 2003 there was a threat to Embassy personnel and an Adm notice was immediately sent out by the RSO saying that all the diplomatic quarter (DQ) embassy personal should be in the DQ by 3:00 P.M. that day. As soon as I received this notice, I sent Mr. Shakoor to pick up Caroline Rundell who was outside the DQ at a friend's house. But Mrs. Rundell sent the driver back saying that Caroline did not get enough time to play with her friend and not to pick her up until 5:00 P.M. If anything had happened to the CS car or any passengers I would be questioned, since I was the driver's supervisor.

At the encouragement of Commerce officials I brought Mr. Rundell's (and his wife's) abuse of property and authority to the attention of Commerce and Post officials on repeated occasions prior to my October 8, 2003 termination.

### IV. Mr. Rundell's Abusive and Discriminatory Conduct towards Me

In addition to bringing Mr. Rundell's (and Mrs. Rundell's) abuse of government property and authority to official attention, I brought to official attention Mr. Rundell's (and Mrs. Rundell's) abuse and mistreatment of me as a woman of Indian ethnicity and Islamic belief.

I told relevant officials that Mr. Rundell treated me in the most unprofessional manner, as if I were a personal servant. For example:

1. Mr. Rundell had me keep track of his wife's schedule; on one occasion, he stopped my call to the Olayan Industries Office to have me get his wife out of her workout at the gym.

EXHIBIT 4 PAGE 9

7

2.     Mrs. Rundell believed that I was responsible to take snacks for the
       Rundell's daughter. (My records show for example that I was asked to do
       so on November 13, 16, and 17, 2002, and January 14, 2003).

3.     I had to baby-sit the Rundell's daughter when Mrs. Rundell worked at the
       Embassy conducting personal work. For example, on October 16, 2002 I
       was to reply to an important email sent by the Director General, when
       their daughter's continued presence in my office hampered my conduct of
       duties.

.4.    I had to schedule and dispatch drivers for the Rundell's personal needs
       constantly; including grocery shopping, doctor appointments, brownie
       (Girl Scouts), ballet, haircuts, etc.

5.     I had to schedule Mrs. Rundell's personal travel. For example, from
       October 27 to 29, 2002 I had to work on Yin Rendell's personal travel to
       Jeddah.

6.     I had to get tea/coffee for Mr. Rundell and his guests; on at least one
       occasion I was never reimbursed

7.     I had to put in work orders for Mr. Rundell's house fixing. This can be
       verified by the General Service Office ("GSO") work orders and further
       documentation. I made this known to Debra Smoker-Ali and Frances
       Alexander, Adm. Asst to Debra Smoker-Ali. Both told me this is personal
       work and that Mr. Rundell or his wife had to do the orders themselves. My
       records show, for example, that on 9/15/02 Mrs. Rundell kept calling
       about getting the fence at their house painted, 10/10/02 regarding pulling
       plants from the Rundell's garden, 3/17/03 Mr. Rundell asked me to take
       care of the freezer and microwave that was not working at his house and
       regarding changing light bulbs at his house; 4/29/03 Mr. Rundell told me
       to put in a work order to remove an extra coffee table from his house.

8.     I was effectively subject to direction by Mrs. Rundell (who, of course, was
       not a U.S. government employee) as well as Mr. Rundell, as Mrs. Rundell
       was around the office constantly. My records show many occasions of
       Mrs. Rundell's interference in official work some occasions include:
       10/28/02 Mrs. Rundell told me to tell Mr. Saleh to take that Wednesday
       off as comp time, while Mr. Rundell had instructed me earlier to tell Mr.
       Saleh to put in over time, 11/6/02 Mrs. Rundell was dictating to me how
       Mr. Saleh's and Mr. Shakoor driving schedule should be scheduled, on
       11/9/02, 11/19/02, and 11/24/02 Mrs. Rundell signed off on official
       driving schedule documents for both CS and State drivers which was
       being sent to the General Services Office, on 11/16/02 Mrs. Rundell was
       telling me to schedule a car and driver for Mr. Rundell's meeting, on

EXHIBIT 4   PAGE 10

11/23/02 Mrs. Rundell was picking up the office phones and answering official calls, on 1/14/03 when we had to remove all PCs for remodeling Mrs. Rundell was busy using the CS computer for personal work and wouldn't move, 1/20/03 Mrs. Rundell dictated to me on Sundays I should not be at work a minute later then 5:00 P.M., earlier on 1/20/03 Mrs. Rundell was on Mr. Rundell's PC and Mr. Rundell decided to come and take calls in my office which hampered my productivity that day, on 2/28/03 Mrs. Rundell was questioning me and Mrs. Wathen, per the vehicle schedule why Mrs. Wathen was going to Eskan was it for business or shopping, on 2/25/03 Mrs. Rundell called me to remind Mr. Rundell to bring home some emails that he had received from their personal friend, 3/23/03 due to Mrs. Rundell's hair-cut appointment I was late to work.

9.     Mr. Rundell continually tried to use me as a dispatcher of drivers, instead of as a supervisor. This practice also exemplifies the Rundell's use of me as a personal servant in an effort to further their own abuse at the expense of government resources.

In the role of driver's supervisor, that which I understood had been assigned to me, I was to assure that the drivers where continuously picking up and dropping-off all individuals, and that this had to do with official work. I would assure that the drivers were logging in all the trips that they were making on all different types of logs sheets. Individuals in the office would contact the drivers themselves and schedule the rides. Also as a Supervisor I would ensure that the official cars were being maintained properly.

In the role of dispatcher, all the individuals in the department, official or not, would be constantly calling me and telling me when they want to be picked up, and dropped off, and where they where going. I would have to track down the drivers, and coordinate with them and log it on the vehicle schedule sheet myself. Then I would have to call or track down the requester and explain to them when they would be picked up or dropped off if the timing was different. This would take up hours off my time and I was scheduling both official and personal trips.

· David Rundell was deliberately holding me back and occupying my time (or Commerce's time) for his personal needs. By having me function as a dispatcher David and Yin Rundell conducted the CS motor pool is such a way that first priority was given to all their personal needs; official work had to be worked around the personal scheduling of David and Yin Rundell. Many times official work got cancelled or rescheduled due to the driver and car not being available.

In fact, scheduling could easily have been done by everyone in the office directly with the drivers; both drivers had cell phones and were

EXHIBIT 4 PAGE 11

easily reachable. In the past this is how it was done with no conflicts. This was an efficient use of Commerce's time. But, in order to suit David and Yin's constant personal needs, as everyone understood to be a priority, I was made to function as a dispatcher.

### V. Mr. Rundell's Further Conduct Towards Me that Evidenced Discrimination Because of My Gender, Faith, and Ethnic Background

Mr. Rundell's unprofessional treatment, as just discussed, was clearly related to his view of me as a woman, and a woman of Islamic faith and Indian heritage. In addition to that just discussed, the kinds of conduct Mr. Rundell engaged in towards me that he did not engage in towards women of other faiths or towards men included:

1.   Mr. Rundell would often speak to me at a distance of inches, where we were hardly separated at all; he must have known that this would have the effect of sexually belittling and/or intimidating me. He would also stare at me long and hard in a very uncomfortable and intimidating way.

2.   I was the only person that Mr. Rundell has called a dispatcher and clerk in front of others to humiliate me. As stated above, Mr. Rundell's use of me as a dispatcher was a waste of Commerce's money and an abuse of government authority and property. In addition, Mr. Rundell was deliberately making me function as a dispatcher because he believes a minority women should be doing work like this, otherwise what was so wrong with directly scheduling with the drivers as it was in the past.

3.   I was the only one that was continually tasked with cleaning offices, files, hallways, etc. (There was a male Administrative staff member but he was never asked to do such cleaning).

4.   I was the only one pushed into the reception area and told by Mr. Rundell what could be placed on my desk and what kind of chair I could sit in (other staff members' offices were, to put it politely, often a mess; but Mr. Rundell never dictated similar office arrangements to others). One day Mr. Rundell did not like the chemical mask and injections being easily visible in my office and put them away somewhere. This was highly inappropriate since the embassy was on high alert and the mask and injections needed to be easily available in case of a chemical attack.

5.   I was the only one that Mr. Rundell compared to a maid (in the October 7, 2002 meeting with Ms. Smoker-Ali).

6.   I was the only one that had to pay for taxi rides out of pocket to attend official events on multiple occasions (Mrs. Wathen, by contrast, was always provided rides for official events).

EXHIBIT 4   PAGE 12

7.  I was the only one given "five" official job descriptions by Mr. Rundell. Mr. Rundell undertook to change my job description and to downgrade my job duties both in writing and verbally constantly. Only two women's job description were downgraded or terminated since Mr. Rundell arrived at the post—and both are of Islamic belief (myself and Suad Abdul Malik).

    The yearly evaluation is based upon a worker's job description. When one has performed accordingly to your job description, there is an automatic step increase in salary. A fair evaluation can only be done if one has performed per a job description for a year. But, if the job description is constantly changing every few days, it is impossible for a Manager to say if an employee has performed according to the job description or not.

8.  When I closed my door to pray, Mr. Rundell made prejudicial remarks.

9.  Mrs. Rundell made belittling remarks about my Indiana/Pakistani attire.

10. I was the only one that Mr. Rundell was reluctant to give unpaid leave when the Embassy was on authorized departure following the May 12, 2003 Riyadh bombings.

11. I was the only one not given the yearly performance evaluation due in May 2003 on time; when I finally got the evaluation, it was at the time I was terminated, I was the only one given a poor evaluation without any prior written notification or warning.

12. I was the subject of periodic outbursts – screaming and yelling – from Mr. Rundell.

13. Mr. Rundell remodeled the CS area with full knowledge that it would put me, as an Islamic woman, in an uncomfortable position. The area is open to heavy open traffic and, while suitable for a receptionist, is not suitable for the performance of the administrative assistant work I was to perform.

14. On April 6, 2003 Mr. Rundell forced me to work in dirt, dust and pull and push things around the office; I was sick for two days thereafter.

15. Mr. Rundell deliberately gave me jobs that were for individuals who had little or no education and job experience. (Dispatching drivers, ordering supplies, organize the supply cabinets, moving furniture, making leave charts, pulling furniture from warehouse, watch remodeling workers, get supplies for the remodelers and etc.).

EXHIBIT 4    13

16.    Mr. Rundell would have me work on tasks that were written in other staff member's job description. (Trade show charts, Vacation charts, ordering of supplies, organizing supplies, and etc.)

17.    Mr. Rundell did not allow me to work on the FCS budget even though I was best qualified and had good prior experience.

### VI. Prior to My October, 2003 Termination I Repeatedly Brought My Complaints and Concerns About Mr. Rundell's (and his wife's) Abuse of Property and Authority and Abuse of Me to Relevant Officials

I brought my concerns and related facts regarding Mr. Rundell's abuse of office and abuse of me to official attention on repeated occasions. For example: (copies of each of the documents identified below are attached)

1.    By email of October 6, 2002 to Ms. Debra Smoker–Ali, an HR official at the Post, with an eleven page attachment, I provided an extensive itemization of some of Mr.Rundell's abusive and questionable conduct.

2.    By email of October 15, 2002 to Ms. Smoker Ali and five page attachment I further elaborated on my concerns.

3.    By email of January 27, 2003 and eight page attachment I elaborated on my concerns to Mr.Michael Staunton.

4.    On January 29, 2003 I sent an email to Ms. Debra Croft, the EEO officer at the Post.

5.    I mentioned my concerns personally to Administrative Office Chris Riche in the March 11, 2003 meeting.

6.    On April 15, 2003 I sent an email to Michael Staunton, Bobette Orr, Alberta Mayberry, Chris Riche, Debra Smoker-Ali, JeNelle Matheson, and David Rundell.

7.    On April 19, 2003 a meeting was held between the DCM Ms. Scobey, Smoker-Ali and myself. In this meeting I expressed to the DCM how Mr. Rundell was being discriminative and prejudice towards me and the misuse/abuse of government resources.

8.    I sent an email to Mr. Staunton on April 21, 2003 and May 7, 2003. In the April 21 email, among other things, I asked why no action had been taken on my complaints about prejudice and harassment and misuse/abuse of government resources after I had repeatedly brought these matters to official attention.

9.    I sent an email to the EEO Office Ms. Worthy on September 29, 2003.

10.    My performance evaluation from Mr. Rundell was due in May, 2003. Each time Human Resources asked for my performance evaluation Mr. Rundell provided one excuse or another. I also checked on the evaluation many times, but no evaluation was provided.

## VII. Mr. Rundell's Further Pattern of Misconduct

I understand that Mr. Rundell's conduct is part of a pattern of behavior that he engaged in prior positions. For example:

I understand that when he was posted in Jeddah, Mr. Rundell systematically harassed/abused Mawada Al-Wazir and Suad AbdulMalik.

I understand that individuals saw Mawada Alwazir and Mona Hassoun sign Mr. Rundell's and Mr. McGee's signatures on official documents without indication that the signature was not Mr. Rundell's or Mr. McGee's.

I understand that whenever Mr. Rundell favored an employee he would allow them to use government facilities for personal benefit, as Mr. Rundell allowed Mona Hossoun to use the CS server room to receive training from an unauthorized instructor so that she could work towards obtain Microsoft certificates during work hours. – This was not a Commerce approved training and the CS IT department does not allow any unauthorized personnel to be in the CS's server room. This was witnessed by others on many occasions.

### Newly obtained information Demonstrates That My Job Responsibilities Were Removed on the Basis of Sexual Favoritism

I have just been provided with emails and related documents which appear to show that: (1) the decision of Mr. D Rundell to remove me from work I was doing in favor of Ms. Hasson was entered into by Mr. Rundell in consultation with, and with the supporting recommendation of, Mr. Michael McGee for the E-Commerce programs; (2) at the time Mr. McGee and Mr. Rundell coordinated their effort to replace my handling of the E-Commerce programs with Ms. Hasson, Mr. McGee was having an affair with Ms. Hasson; (3) the affair between Ms. Hasson and Mr. McGee was facilitated by use of government personnel and equipment—i.e., the communication between the two was conducted through a further U.S./Riyadh embassy employee (Ms. Mawada Alwazir).(4) A similar type of relationship used to exist between Mr. Rundell and Ms. Hassoun, and Mr. Rundell used to insist that I speak to Ms. Hassoun to, "find out how it's done".

EXHIBIT 4   PAGE 15

As I have previously communicated to the IG and the EEOC, there was no basis in merit for my replacement by Ms. Hasson for the E-Commerce programs and for my termination. The attached documents appear to confirm that Mr. Rundell's decision to replace me was rooted in entirely impermissible personal practices and fundamental abuse of public service position.

I enclose these documents, which I would be pleased to review with you.

### Responsible Commerce Officials Did Not Engage in Good Faith Settlement Talks and Acted With No Evident Regard for the Facts

After filing my complaint with Ms. Toy, I was contacted by Ms. Jane Mintz of the Department of Commerce. Ms. Mintz explained that, as provided for by EEO complaint rules, she would try to facilitate settlement discussions between myself and commerce officials regarding my complaint. I have no complaints with Ms. Mintz. However, based on my understanding of what Ms. Mintz told me,

(1) Department officials she communicated with in the mediation process quickly dismissed even a discussion of settlement of my complaint without any basic investigation of the facts. For example, Ms. Mintz initially told me that the officials told her that I had received a poor performance evaluation from Mr. Rundell. I explained that no timely performance evaluation was received, and I was only handed a performance evaluation (which I did not sign) in accompaniment with my termination.

(2) In quickly dismissing any settlement talks, Department officials' concededly did not do anything to look into whether my complaints regarding the abuse of government office by Mr. Rundell and his wife were merited. Ms. Mintz explained that the IG investigation regarding these complaints was not available to these officials, and they therefore dismissed my complaint without investigating the obvious possibility that Mr. Rundell's conduct towards me was both prejudice and an effort to retaliate because of the good merit of my complaints.

(3) Department officials refused to respond to Ms. Mintz's request that they undertake further inquiry, and provide further information - requests Ms. Mintz said she conveyed to these officials following her talks with me.

(4) Department officials even refused the offer of my attorney and I to meet to discuss the case.

### VIII. Further Individuals with Relevant Information

Individuals who can attest to my character and performance during this period, and who should be able to independently attest to abuses by Mr. Rundell described above, include:

EXHIBIT 4 PAGE 16

14

Douglas Wallace (presently at Post-Commerce)
Robert Peaslee (presently as post, Dhahran-Commerce)
Charles Kestenbaum (previously-SCO of Saudi Arabia)
Omar Mahmood (previously - Junior CS officer)
Ambassador Robert Jordan (returned to the private sector in 10/03)
Dr. Ann Jordan (wife of Ambassor Jordan)
DeNeece Tuller (presently at post, Riyadh)
Matt Tuller (presently at post, Riyadh)
Debra (Robin) Croft (presently at post, Riyadh-State)
Nancy Charles Parker (presently at post Abu Dhabi)
Robert Murphy (presently at post, Riyadh-State)
Anne Marie Moore (presently at post Tunisia-State)
Thomas Moore (presently at post Tunisia-State)
Charles Glatz (presently at post Riyadh-State)
Edward Burton (presently at Post Riyadh-Commerce)
Rebecca Gonzales (presently at post Riyadh- State)
Bill Blaine (Presently at post Riyadh- State)
Francis Alexander (Presently at post Riyadh – State)
Dona Scott (Post Riyadh – State)
Margaret Gray (Post Riyadh – State)
Quintin Gray (Post Riyadh – State)
Janet Bryant (Post Riyadh – State)
Seema Matin (Post Riyadh- State)
Tanya Spencer (Post Riydh- State)
Anne Flannagan (Post Riyadh – State)
Michael Macy (Post Riyadh – State)

In addition, others who may have relevant information include the Commerce specialists I worked with at the Riyadh post— including Habeeb Saeed, Ahmed Khayyat, Maher Siblini, Jacquie Wathern, Sheila Cassidy (Post Dhahran), Jalal Quadri (Post Jeddah), Suad Abdul Malik (Post Jeddah- now with State).

Also all the many Foreign Service nationals I interacted with on a daily basis would have relevant information include:

Riaz Mohammed Yousuf (ATO)
Asif Khan (FMC)
Fathen Ahmed (HR)
Dalia Elsoudani(ECON)
Dina El-Sourani (PAO)
Rasha Abourayya (Protocol Office)
Naiemeh Al-Hadidi (Public Affairs office)
Nasreen Fahmi (Financial Management Office)
Xavier Arulandoo (Financial Management Office)
Syed M. Rahman (FMC)
Ali Jama Haid (GSO)
Nasiruddin Ahmed (GSO)

EXHIBIT 4 PAGE 17

Hagos M. Berhe (GSO)
Mohamoud A. Igge (FMC)
Abdikarim Issa (HR)
Rumana Riaz (IT)
Louis Rodriques (IT)
Muddassir Syed (Travel)
Mohammed Naseeruddin (Travel)

## Seeking Settlement

1. Full compensation under the EEO, for the physical and mental anguish, the tarnish done to my name by Mr. Rundell and Commerce, and for loss of work/wages.

2. In addition all lawyer fees will need to be paid by Commerce to Mr. Dan Guttman.

3. I want it put in Mr. Rundell's permanent record that he has used and abused government resources, authority, and property and that he was prejudice against me.

4. Having individuals who were aware of everything but neglected to help and investigate be penalized and questioned i.e. Mr. Michael Staunton, Ms. Bobette Orr, and Ms. Nancy Kripner. In addition I want this put on their permanent record.

5. Having individuals who had a hand in having Mr. Rundell further his discrimination towards me, be penalized and questioned, i.e. Mr. Michael McGee and Ms. Mona Hassoun. In addition I want this put on their permanent record.

Please let me know what further information I can provide you regarding this matter, or whether and how the above is in need of clarification or amplification.

Very Truly Yours,

*Aisha Hussain*

Aisha Hussain

Enclosures:
1. Email of October 6, 2002 to Ms. Debra Smoker–Ali
2. Email of October 15, 2002 to Ms. Smoker Ali
3. Email of January 27, 2003 to Mr. Michael Staunton
4. January 29, 2003 I sent an email to Ms. Debra Croft

5. Copy of what I discussed with Mr. Chris Riche in the March 11, 2003 meeting. I handed the same document to him.

6. Email of April 15, 2003 I sent to Michael Staunton and etc.

7. Copy of what I discussed with the DCM Ms. Scobey in the April 19, 2003 meeting. I handed the same document to her.

8. Email of April 21, 2003 to Mr. Staunton

9. Email of May 7, 2003 to Mr. Staunton

10. Email to the EEO Officer Ms. Worthy on September 29, 2003.

11. Email of the repeated request for evaluation sent to Faten Ahmed with the HR (I will forward the emails and the handed documents as enclosure 1, 2, 3, and so on; as attachments or separate emails.)

12. Emails pertaining to the affair between Mr. McGee and Ms. Hassoun

13. Emails pertaining to E-Commerce and Budget sent by Mr. Rundell

EXHIBIT 4 PAGE 19

17



**UNITED STATES DEPARTMENT OF COMMERCE**
**Chief Financial Officer and**
**Assistant Secretary for Administration**
Washington, D.C. 20230

JUL  9 2004

July 9, 2004

Dan Guttman, Esquire
1920 L. Street, N.W., Suite 400
Washington, DC  20036

Dear Mr. Guttman:

This is in reference to complaint number 03-55-00217 filed by your client, Aisha Hussain, on April 9, 2004, and your telephone conversations with Susan Thomas, a member of my staff, on July 6 and 9, 2004, concerning the framing of the issues in your client's complaint, including the dismissal of reprisal.  After careful consideration, we have decided to accept the following bases and claims for investigation.

Complainant, a former Personal Services Contract (PSC) employee with the U.S. & Foreign Commercial Service, International Trade Administration, alleges that because of her sex (female), race (Asian/Indian), color (Brown),[1] national origin (Indian), and religion (Muslim), David Rundell, Senior Commercial Counselor, subjected her to an ongoing pattern of harassment constituting a hostile work environment during the period September 8, 2002 through October 8, 2003.  Complainant sets forth the following examples of harassment:

1. Rundell treated her as his personal servant in that he required her to keep his wife's personal schedule, schedule his wife's personal travel, baby-sit his child, bring coffee/tea to him, his wife and guests, take snacks for his child, place works orders to get the freezer and microwave fixed and have the fence painted, etc.  (See Part IV of Complainant's statement submitted with her formal complaint).

2. Rundell often spoke to her at a distance of inches, which she found sexually belittling and intimidating

3. Rundell continually tasked her demeaning duties such as cleaning offices, hallways, ordering supplies, etc.

4. Rundell pushed her into the reception area and told her what could be placed on her desk and what kind of chair she could sit in.  In particular, Rundell took her chemical mask and injections off her desk during a high alert and put them away somewhere.

5. Rundell compared her to a maid during a meeting with Ms. Smoker-Ali on October 7, 2002.

6. She was the only employee required to pay for taxi rides out of pocket to attend official events.

---

[1] The bases of race and color were clarified per telephone conversation between Susan Thomas, OCR, and Dan Guttman, Esquire, on July 9, 2004.

Exhibit  7

**EXHIBIT**
*tabbies*
**14**

7. Rundell gave her five (5) official job descriptions, which changed and downgraded her job duties.

8. Rundell screamed and yelled at her, made belittling remarks about her Indian/Pakistani attire and made prejudicial remarks when she closed her door to pray.

9. Rundell required she accompany him and three men unrelated to her in public, which is against Saudi law and custom and could have been "tragic" for her if they had been stopped or questioned by a Matawa (religious police) or the regular police.

Complainant further alleges that in retaliation for reporting Rundell's discriminatory and harassing conduct, she was given a poor performance evaluation and terminated on October 8, 2003.

That portion of your client's claim that she was subjected to reprisal for whistle blowing when she reported her supervisor's misuse of government property and abuse of his office remains dismissed for failure to state a claim for the reasons previously provided on June 22, 2004. At this time, you do not have the right to appeal the dismissed portion. However, the dismissed portion is reviewable by an Equal Employment Opportunity Commission (EEOC) administrative judge if a hearing is requested or by this office if no hearing is requested. You and your client will be fully advised of her appeal rights after adjudication of the entire complaint.

Regarding whether the complaint is a mixed case complaint or an unmixed complaint, your client's complainant is an unmixed complaint, which entitles her to appeal rights to the EEOC. Generally, termination claims that are coupled with allegations of discrimination are considered by the Merit Systems Protection Board (MSPB) as a mixed case complaint, i.e., one of which involves both an appealable action and also involves allegations of discrimination. In this case, however, since your client was a contract employee, she does not have standing before the MSPB. She does have standing in the Federal EEO complaint processing because she meets the EEOC's "common law agency test."

As an unmixed complaint, your client has the right request a hearing before the EEOC at any time after 180 days have passed from the date she filed the original complaint. You must file your request with the following EEOC office:

Equal Employment Opportunity Commission
Washington Field Office
1400 L Street N. W., Suite 200
Washington DC, 20005

The materials your client submitted will be included in the Report of Investigation. The accepted issue set forth above is a statement of the legal claim made against the Agency. If you believe the issues have not been correctly identified, please notify me, in writing, within **15 calendar**

Exhibit 7  Page 2

**days** after you receive this letter, and specify why you believe the issues have not been correctly identified. If you fail to contact me, I will conclude that you agree that the issue has been properly identified above.

Amendments to formal complaints, copies of hearing requests, and requests for corrections to the statement of claims may be sent to me at:

> Nancy McNamara
> Chief, Compliance Division
> Office of Civil Rights, Room 6012
> U.S. Department of Commerce
> Washington, D. C. 20230

Sincerely,

Nancy McNamara
Chief, Compliance Division
Office of Civil Rights

3

Exhibit 7 Page 3

**Certificate of Service**

I attest that a copy of this Letter of Acceptance has been sent to the parties listed below:

<u>By Certified Mail</u>:

Dan Guttman, Esquire
1920 L. Street, N.W., Suite 400
Washington, DC  200036

<u>Other</u>:

Aisha Hussain
4253 Hunt Drive, Apt. 709
Carrollton, TX  75010

Bernadette Worthy, EEO Officer

Investigative Team

Complaint File (Tab F)

OCR Office File

_____
Signature

JUL   9 2004
Date



.n Guttman, Esquire
,920 L. Street, N. W., Suite 400
Washington, DC 20036

4

Exhibit 7  Page 4

Dan Guttman
1920 L Street, N.W.
Suite 400
Washington, D.C. 20036
Tel.No. 202-838-6050; Fax No.202-478-2088; Email: dan@guttman.com

BY FAX

July 26, 2004

Nancy McNamara
Chief, Compliance Division
Office of Civil Rights, Room 6012
U.S. Department of Commerce
Washington, D.C. 20230

Re: Aisha Hussain: Complaint
No. 03-55-00217

Dear Ms. McNamara:

We are in receipt of your letter of July 9, 2004, which states the basis for acceptance of Ms. Hussain's complaint in the above-captioned case.

The letter asks me to notify you if Ms.Hussain believes the issues have not been correctly identified. Out of an abundance of caution, we note the following:

1.    The July 9, 2004 letter states that "Complainant sets forth the following examples of harassment" with nine items following thereafter. We note that Ms.Hussain's complaint, which the letter states is in the record, identifies examples of harassment in addition to those enumerated. In addition, in the interim since the complaint was filed, Ms. Hussain has obtained further evidence regarding harassment. We assume that the investigation will encompass all evidence (or examples) of harassment, and not just those enumerated. Please let me know if this is incorrect.

2.    As Ms. Hussain's complaint spells out (and as further evidence that will be provided demonstrates) Ms. Hussain was terminated following complaints that Mr. Rundell, her supervisor, engaged in abuse of office (as well as complaints of discrimination). The July 9,2004 letter states that Ms. Hussain's claim that she was subject to reprisal for whistleblowing when she reported her supervisor's misuse of government property is dismissed for reasons previously stated, and is not presently appealable. With great respect, and reserving Ms.Hussain's rights

1

EXHIBIT

15

Exhibit 8 Page 2

for later appeal of that dismissal, we note that the facts relating to: (1) Ms.
Hussain's whistleblowing; (2) Mr. Randell's conduct, and (3) the ensuing
investigation of Ms.Hussain's complaint (or lack thereof) are relevant to, e.g., the
credibility and/or motives of Mr.Randell (and other officials) in regard to the
issues here.  Under governing rules of evidence, we presume that such facts will
necessarily be matter for consideration by the investigator as appropriate (and at
hearing, as may be needed).  Once again, we believe this proposition is axiomatic,
but please let us know if there are any questions.

Very truly yours,

Dan Guttman

cc: Aisha Hussain

2

Exhibit 8  Page 3

**UNITED STATES DEPARTMENT OF COMMERCE**
**Chief Financial Officer and**
**Assistant Secretary for Administration**
Washington, D.C. 20230

Dan Gutman, Esquire
1920 L Street, NW, Suite 400
Washington, DC 20036

AUG 2 4 2004

RE: Aisha Hussain
Complaint Number: 03-55-00217

Dear Mr. Gutnam:

This is in response to your letter dated July 26, 2004, wherein you request clarification of the incidents of harassment that will be investigated. The incidents of harassment cited in our July 9, 2004, letter of acceptance are recited almost verbatim from your client's formal complaint of discrimination. Your client's claim of reprisal for reporting her supervisor's misuse of government property and abuse of office are more properly defined as whistle-blowing activities. Whistle-blowing activity, *per se*, is not covered under Title VII. Those incidents of reported abuse of office that can also be construed as discriminatory harassment have been included for investigation. At this stage of the process, it is only necessary to summarize the incidents relevant to those claims. The specific details of the incidents are matters more appropriate for submission to the investigator. The investigator is responsible for identifying, locating, obtaining, and putting into evidence the testimony and the documents of the involved parties. Your letter has been placed with your client's formal complainant of discrimination and will be made available to the investigator assigned to your client's complaint.

I trust this clarification is sufficient. If you have any questions, please feel free to contact me at (202) 482-4993.

Sincerely,

*Susan E. Thomas*
Susan E. Thomas
Acting Chief, Program Implementation Division
Office of Civil Rights
Department of Commerce

Exhibit 8   Page 4

## Certificate of Service

I attest that a copy of this letter has been sent to the parties list below:

**By Certified Mail:**

Dan Guttman, Esquire
1920 L. Street, N.W., Suite 400
Washington, DC 200036

**Other:**

Aisha Hussain
4253 Hunt Drive, Apt. 709
Carrollton, TX 75010

Bernadette Worthy, EEO Officer

Investigative Team

Complaint File (Tab F)

OCR Office File

_____
Signature

AUG 2 4 2004
_____
Date

Exhibit 8    Page 5